Appeal No. 16-1208

_____

# United States Court of Appeals
# for the Federal Circuit

_____

AFFINITY LABS OF TEXAS, LLC,

Appellant,

v.

SAMSUNG ELECTRONICS CO., LTD., SAMSUNG
ELECTRONICS AMERICA, INC., HTC CORP.,
HTC AMERICA, INC.,

Appellees.

_____

Appeal from the United States Patent and Trademark Office, Patent Trial and
Trademark Appeal Board,
Case Nos. IPR2014-00407 and IPR2014-00408

_____

**BRIEF OF APPELLEES SAMSUNG ELECTRONICS CO., LTD.,
SAMSUNG ELECTRONICS AMERICA, INC., HTC CORP., AND HTC
AMERICA, INC.**

Jerry R. Selinger
PATTERSON & SHERIDAN LLP
1700 Pacific Avenue, Suite 2650
Dallas, TX 75201
Phone: (214) 272-0957

B. Todd Patterson
PATTERSON & SHERIDAN LLP
24 Greenway Plaza, Suite 1600
Houston, TX, 77046
Phone (713) 577-4801

*Counsel for Appellees HTC Corp. and*

Douglas H. Hallward-Driemeier
J. Steven Baughman
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Phone: (202) 508-4600

Gabrielle E. Higgins
ROPES & GRAY LLP
1900 University Ave., 6 FL
East Palo Alto, CA 94303
Phone: (650) 617-4000

*HTC America, Inc.*

February 29, 2016

Brian P. Biddinger
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Phone: (212) 596-9000

*Counsel for Appellees Samsung
Electronics Co., Ltd. and Samsung
Electronics America, Inc.*

FORM 9.  Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Affinity Labs of Texas, LLC    **v.**    Samsung Electronics Co., Ltd., et al.

Case No.    2016-1208

### CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (<u>appellee</u>) (amicus) (name of party)
Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.

2.      The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3. below) represented by me is:

Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.

3.      All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below. (Please list each party or amicus curiae represented with the parent or publicly held company that owns 10 percent or more so they are distinguished separately.)

None.

4.  ☒    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

See attached list.

| November 30, 2015 | /s/ Douglas H. Hallward-Driemeier |
| Date | Signature of counsel |

Please Note: All questions must be answered

cc:    Counsel of record

Douglas H. Hallward-Driemeier
Printed name of counsel

Reset Fields

The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the agency or are expected to appear in this court are:

Ropes & Gray LLP: Douglas H. Hallward-Driemeier, J. Steven Baughman, Gabrielle E. Higgins, Brian P. Biddinger, Kathryn N. Hong, Carolyn L. Redding, Christopher M. Bonny, and Hayan Yoon.

FORM 9.  Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Affinity Labs of Texas, LLC          **v.**          Samsung  Electronics Co., Ltd., et al.

Case No.          2016-1208

### CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
HTC Corp./HTC America, Inc.    certifies the following (use "None" if applicable; use extra sheets
if necessary):

1.      The full name of every party or amicus represented by me is:

    HTC Corp. and HTC America, Inc.

2.      The name of the real party in interest (Please only include any real party in interest
NOT identified in Question 3. below) represented by me is:

3.      All parent corporations and any publicly held companies that own 10 percent of the
stock of the party or amicus curiae represented by me are listed below. (Please list each party
or amicus curiae represented with the parent or publicly held company that owns 10 percent
or more so they are distinguished separately.)

    HTC Corp. is the parent corporation of HTC America, Inc.

4.  ☒    The names of all law firms and the partners or associates that appeared for the party
        or amicus now represented by me in the trial court or agency or are expected to appear
        in this court (and who have not or will not enter an appearance in this case) are:

    B. Todd Patterson and Jerry R. Selinger
    Patterson & Sheridan, LLP

| November 30, 2015 | /s/ Jerry R. Selinger |
|---|---|
| Date | Signature of counsel |

Please Note: All questions must be answered

cc:      All Counsel of Record

Jerry R. Selinger
Printed name of counsel

Reset Fields

-iii-

# TABLE OF CONTENTS

GLOSSARY ..................................................................................... xi

STATEMENT WITH RESPECT TO ORAL ARGUMENT ................................. xii

STATEMENT OF RELATED CASES ................................................ xiii

STATEMENT OF JURISDICTION ................................................................1

COUNTER-STATEMENT OF THE ISSUES ........................................2

STATEMENT OF THE CASE ........................................................................2

    A.    U.S. Patent No. 6,678,215 ("Treyz") ....................................7

    B.    U.S. Patent No. 6,711,622 ("Fuller") ....................................9

    C.    Affinity's '007 Patent ........................................................10

    D.    Procedural Background ......................................................11

        1.    Petitions for *Inter Partes* Review ............................12

        2.    Institution and Joinder ............................................14

        3.    Final Written Decision .............................................16

SUMMARY OF THE ARGUMENT ....................................................22

ARGUMENT ................................................................................................25

I.      STANDARD OF REVIEW ...........................................................25

II.     CONGRESS ACTED WELL WITHIN ITS CONSTITUTIONAL AUTHORITY IN AUTHORIZING THE PTO TO CONDUCT *INTER PARTES* REVIEWS ..................................................................27

    A.    The MCM Decision That *Inter Partes* Review Is Consistent With Article III Is Binding And Correct ......................................................28

    B.    The MCM Decision That *Inter Partes* Review Is Consistent With The Seventh Amendment Is Binding And Correct ...................................31

III.    THE BOARD CORRECTLY CONCLUDED THAT CLAIMS 1, 2, 5-8, AND 10 OF THE '007 PATENT ARE OBVIOUS ......................................32

    A.    Legal Standards—Obviousness............................................33

B.  The Board Correctly Found That Treyz Discloses A "Cellular Telephone" ......................................................................................34

1.  The Board correctly found that the Treyz device can be used to make and receive phone calls via a cellular connection...........35

2.  The Board correctly found that the Treyz device does not require a landline connection to operate as a telephone ..........36

3.  The Board correctly found that the Treyz device can be used over a "wide area"...................................................................38

C.  The Board Correctly Found That A POSITA Would Have Had A Reasonable Expectation of Success In Combining Treyz With Fuller....................................................................................................39

1.  The Board correctly found that Fuller generally teaches rate switching and is not limited to rate switching using Java applets ..................................................................................44

2.  The Board correctly found that even if Fuller's teachings were limited to rate switching using Java applets (it is not), a POSITA would have still had a reasonable expectation of success in combining Treyz with Fuller ...................................47

D.  The Board Made Sufficient Factual Findings To Support Its Conclusion Of Unpatentability.............................................................52

IV.  THE BOARD DID NOT ABUSE ITS DISCRETION IN DENYING AFFINITY'S MOTION TO EXCLUDE ......................................................54

CONCLUSION ..................................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*,
    607 F.3d 817 (Fed. Cir. 2010) ....................................................27, 52

*Atlas Roofing Co., Inc. v. Occupational Safety & Health Review Comm'n*,
    430 U.S. 442 (1977)...................................................................31

*Belden Inc. v. Berk-Tek LLC*,
    805 F.3d 1064 (Fed. Cir. 2015) ......................................26, 55, 57, 60

*Block v. Hirsh*,
    256 U.S. 135 (1921)...................................................................28

*Chen v. Bouchard*,
    347 F.3d 1299 (Fed. Cir. 2003) ...................................................26

*Commodity Futures Trading Comm'n v. Schor*,
    478 U.S. 833 (1986)...................................................................28

*Curtis v. Loether*,
    415 U.S. 189 (1974)...................................................................31

*Deckers Corp. v. United States*,
    752 F.3d 949 (Fed. Cir. 2014) .....................................................27

*Demko v. United States*,
    216 F.3d 1049 (Fed. Cir. 2000) ...................................................25

*Dickinson v. Zurko*,
    527 U.S. 150 (1999)..............................................................26, 27

*Donnelly Garment Co. v. NLRB*,
    123 F.2d 215 (8th Cir. 1942) ......................................................55

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
    800 F.3d 1375 (Fed. Cir. 2015) ...................................................59

*Ex parte Bakelite Corp.*,
    279 U.S. 438 (1929)...................................................................28

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989) ......................................................................................32

*In re Affinity Labs of Texas, LLC*,
    No. 2013-1393,
    550 F. App'x. 884 (Fed. Cir. Jan. 9, 2014) .......................................xiv

*In re Cuozzo Speed Techs.*,
    793 F.3d 1268 (Fed. Cir. 2015) ..............................................................26

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000) ..................................................26, 27, 34, 39

*In re Keller*,
    642 F.2d 413 (CCPA 1981) ................................................................21, 44

*In re Mouttet*,
    686 F.3d 1322 (Fed. Cir. 2012) ..............................................................44

*In re O'Farrell*,
    853 F.2d 894 (Fed. Cir. 1988) ................................................................33

*In re Rambus, Inc.*,
    753 F.3d 1253 (Fed. Cir. 2014) ..............................................................27

*In re Sullivan*,
    362 F.3d 1324 (Fed. Cir. 2004) ........................................................26, 54

*J.A. LaPorte, Inc. v. Norfolk Dredging Co.*,
    787 F.2d 1577 (Fed. Cir. 1986) ..............................................................54

*Joy Techs. v. Manbeck*,
    959 F.2d 226 (Fed. Cir. 1992) ....................................................29, 30, 32

*Kappos v. Hyatt*,
    132 S. Ct. 1690 (2012) ..............................................................................30

*Koch v. Koch Indus., Inc.*,
    203 F.3d 1202 (10th Cir. 2000) ..............................................................60

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398, 419 (2007) ....................................................................33, 34

*Litecubes, LLC v. N. Light Prods., Inc.*,
  523 F.3d 1353 (Fed. Cir. 2008) ......................................................25

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996)......................................................................31

*McCormick Harvesting Mach. Co. v. Aultman*,
  169 U.S. 606 (1898)......................................................................29

*MCM Portfolio LLC v. Hewlett-Packard Co.*,
  __ F.3d. __, No. 15-1091,
  2015 U.S. App. LEXIS 20848 (Fed. Cir. Dec. 2, 2015)...........................passim

*Merck & CIE v. Gnosis S.P.A.*,
  808 F.3d 829 (Fed. Cir. 2015) .........................................................53

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
  59 U.S. 272 (1855)........................................................................28

*Patlex Corp. v. Mossinghoff*,
  758 F.2d 594 (Fed. Cir. 1985),
  *modified on other grounds on reh'g*, 771 F.2d 480 (Fed. Cir. 1985).....29, 30, 32

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
  587 F. 3d 1324 (Fed. Cir. 2009) .................................................33, 34

*Progressive Casualty Ins. Co. v. Liberty Mutual Ins. Co.*,
  625 F. App'x 552 (Fed. Cir. Aug. 24, 2015) ......................................53

*Sears, Roebuck & Co. v. Stiffel Co.*,
  376 U.S. 225 (1964).......................................................................29

*Stern v. Marshall*,
  131 S. Ct. 2594 (2011)...............................................................28, 29

*Syntex (U.S.A.) LLC v. Apotex, Inc.*,
  407 F.3d 1371(Fed. Cir. 2005) ..................................................21, 45

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) .......................................................19

*Thomas v. Union Carbide Agr. Products Co.*,
  473 U.S. 568 (1985).......................................................................28

*Toth v. Grand Trunk R.R.*,
306 F.3d 335 (6th Cir. 2002) ...............................................................60

*Tull v. United States*,
481 U.S. 412 (1987)...........................................................................32

**CONSTITUTION**

U.S. Const. art. I .................................................................................29
U.S. Const. art. III................................................................................28
U.S. Const. amend. VII.........................................................................31

**STATUTES AND REGULATIONS**

Leahy-Smith America Invents Act,
Pub. L. No. 112-29, 125 Stat. 284 (2011) ....................................1, 26

5 U.S.C.
§ 706...............................................................................................26, 54

28 U.S.C.
§ 1295....................................................................................................1

35 U.S.C.
§ 102..................................................................................................7, 9
§ 103..............................................................................................passim
§ 131...................................................................................................29
§ 261.............................................................................................. 29-30
§ 311......................................................................................................1
§ 316.............................................................................................26, 53
§ 319......................................................................................................1

37 C.F.R.
§ 42.5..................................................................................................26
§ 42.23................................................................................................57
§ 42.24................................................................................................57
§ 42.63................................................................................................57

**ADDITIONAL AUTHORITIES**

Office Patent Trial Practice Guide,
77 Fed. Reg. 48,756 (Aug. 14, 2012) ..............................................59

Rules of Practice for Trials Before the Patent Trial and Appeal Board and
    Judicial Review of Patent Trial and Appeal Board Decisions,
    77 Fed. Reg. 48,612 (Aug. 14, 2012)  ......................................................... 56-57

## <u>GLOSSARY</u>

### *Parties*

| | |
|---|---|
| Affinity | Appellant Affinity Labs Of Texas, LLC |
| Samsung | Appellees Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc. |
| HTC | Appellees HTC Corp., and HTC America, Inc. |
| Petitioners | Appellees Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., HTC Corp., and HTC America, Inc. |

### *Patents and Publications*

| | |
|---|---|
| '007 Patent | U.S. Patent No. 8,359,007 |
| Treyz | U.S. Patent No. 6,678,215 |
| Fuller | U.S. Patent No. 6,711,622 |
| Hitson | U.S. Patent Pub. No. 2002/0010759 |

### *Defined Terms*

| | |
|---|---|
| AIA | Leahy-Smith America Invents Act |
| Board | Patent Trial and Appeal Board |
| FWD | Final Written Decision |
| IPR | *Inter Partes* Review |
| POSITA | Person of ordinary skill in the art |
| PTO | U.S. Patent and Trademark Office |

## <u>S</u>TATEMENT WITH <u>R</u>ESPECT TO <u>O</u>RAL <u>A</u>RGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a), Appellees Samsung Electronics Co., Ltd., Samsung Electronics America, Inc. (collectively, "Samsung"), HTC Corp., and HTC America, Inc. (collectively, "HTC") (collectively, "Petitioners") respectfully submit that the facts and legal arguments are adequately presented in the briefs and record. Because the facts and legal arguments weigh dispositively in favor of affirmance, oral argument is unnecessary. If, however, the Court believes oral argument would assist the Court in understanding any of the legal or factual issues presented, Petitioners would welcome the opportunity to present argument.

## STATEMENT OF RELATED CASES

Petitioners' counsel is unaware of any related proceedings within the meaning of Federal Circuit Rule 47.5(a).  Pursuant to Federal Circuit Rule 47.5(b), Petitioners state that this appeal arose from the United States Patent and Trademark Office Patent Trial and Appeal Board Proceeding No. IPR2014-00407 joined with No. IPR2014-00408, which in turn arose from the civil action pending before the U.S. District Court for the Northern District of California, *Affinity v. Samsung, et al.*, 4:14-cv-2717, 4:14-cv-2966.  Petitioners state that this Court's decision in this appeal may directly affect or be affected by all of the following additional matters because they concern patents that are related to U.S. Patent No. 8,359,007: *Affinity v. Samsung*, No. 15-1933 (Fed. Cir.); *Affinity v. Directv,* 15-1845 (Fed. Cir.); *Affinity v. NBA Media Ventures*, 15-1846 (Fed. Cir.); *Affinity v. NHL Enterprises*, 15-1847 (Fed. Cir.); *Affinity v. MLB Advanced Media*, 15-1848 (Fed. Cir.); *Affinity v. Amazon,* 15-2080 (Fed. Cir.); *Affinity v. Apple*, 16-1092 (Fed. Cir.); *Affinity v. Apple*, 16-1172 (Fed. Cir.); *In re Affinity*, 16-1173 (Fed. Cir.); *Affinity v. Samsung*, 4:14-cv-3030 (NDCA); *Affinity v. BlackBerry*, 4:14-cv-3031 (NDCA); *Samsung v. Affinity*, Nos. IPR2014- 01181, IPR2014-01182, IPR2014-01184 (PTAB);

*Volkswagen v. Affinity*, *Inter Parte*s Reexam No. 95/001,281 (PTAB); *Affinity v. Netflix,* 1:15-cv-849 (WDTX).[1]

---

[1]    In *In re Affinity Labs of Texas, LLC*, 550 F. App'x. 884 (Fed. Cir. Jan. 9, 2014) (per curiam), this Court affirmed the Board's holding that all claims of related U.S. Patent No. 7,486,926 are unpatentable.

## <u>STATEMENT OF JURISDICTION</u>

The U.S. Patent and Trademark Office ("PTO") had jurisdiction over the

Petitions for *Inter Partes* Review filed by Petitioners-Appellees under 35 U.S.C.

§ 311 and § 6(a) of the Leahy-Smith America Invents Act ("AIA").  This Court has

jurisdiction to review the Final Written Decision ("FWD") entered by the Patent

Trial and Appeal Board ("Board") on July 20, 2015 under 28 U.S.C.

§ 1295(a)(4)(A) and § 6(a) of the AIA as codified at 35 U.S.C. § 319.

## COUNTER-STATEMENT OF THE ISSUES

I.     Whether, especially in view of this Court's recent decision in *MCM Portfolio LLC v. Hewlett-Packard Co.*, __ F.3d __, No. 15-1091, 2015 U.S. App. LEXIS 20848 (Fed. Cir. Dec. 2, 2015), Congress acted within its constitutional authority in authorizing the PTO to conduct *inter partes* reviews ("IPRs").

II.     Whether the Board correctly concluded that claims 1, 2, 5-8, and 10 of U.S. Patent No. 8,359,007 ("the '007 Patent") are unpatentable under 35 U.S.C. § 103 over the combination of Treyz and Fuller, where substantial evidence supports the Board's findings that Treyz discloses a "cellular telephone" and that a person of ordinary skill in the art ("POSITA") would have found it obvious to incorporate Fuller's teachings of switching communication rates in implementing the portable device disclosed in Treyz.

III.     Whether the Board's decision to deny Appellant Affinity Labs of Texas, LLC's ("Affinity's") Motion to Exclude was not arbitrary, capricious, or an abuse of discretion.

## STATEMENT OF THE CASE

The central issue in Affinity's appeal is the combination of U.S. Patent No. 6,678,215 ("Treyz"), issued January 13, 2004 (provisional application filed December 28, 1999; non-provisional application filed March 20, 2000), with U.S. Patent No. 6,711,622 ("Fuller"), issued March 23, 2004 (filed December 31, 1997).

Affinity makes only two arguments with respect to the combination of Treyz and Fuller, both of which lack any merit – (1) that Treyz does not disclose a "cellular telephone" and (2) that the combination of Treyz and Fuller would not have been obvious to a POSITA. Affinity does not dispute that the combination of Treyz and Fuller teaches the remaining limitations of the challenged claims.

After careful review of the parties' arguments and evidence, the Board correctly held that Petitioners demonstrated by a preponderance of the evidence that "claims 1, 2, 5-8 and 10 would have been obvious over Treyz and Fuller." A7. In reaching this conclusion, the Board made detailed findings, supported by substantial evidence, regarding the disclosures of Treyz and Fuller and the rationale for combining the references. A7-18. The Board's holding should be affirmed.

As explained below, the Board's finding that the Treyz device is a "cellular telephone" is supported by substantial evidence. In the FWD, the Board construed "cellular phone" as a "telephone with access to a cellular radio system so it can be used over a wide area, without a physical connection to a network." A6. The parties do not dispute that the Board properly construed the term "cellular phone," but Affinity challenges the Board's finding that the Treyz device is a "cellular phone." The Board specifically found, however, that Treyz teaches that its device can send "cellular telephone transmissions" and has "built-in telephone functions"

for making and receiving phone calls.  A7-12 (citing A423, 1:65-2:2, 2:22-41; A424, 3:13-22; A426, 7:10-15, 8:35-40; A429, 13:42-50; A430, 16:52-60; A434, 24:22-30; A407, Fig. 4; A414, Fig. 10; A328 ¶49).  The Board also found that Treyz teaches wireless embodiments of its invention that allow a user to make phone calls using the cellular telephone connection.  A10 (citing A423, 2:32-41; A424, 3:13-22; A429, 13:42-50; A407, Fig. 4; A414, Fig. 10; A328 ¶49).  In addition, the Board found that the Treyz device can be used over a "wide area," as Treyz teaches it is "relatively easy" to move the wireless device for use in any "suitable location."  A8, 11-12 (citing A426, 7:10-15; A434, 24:22-30); *see also* A8, 11-12 (citing A426, 7:10-15, 8:35-40; A434, 24:22-30) (additionally finding that Treyz teaches that the device can be implemented in a "mobile platform" communicating using "bidirectional cellular links.").  In view of the overwhelming evidence in Treyz, the Board properly found that the Treyz device is indeed a "cellular telephone."

In addition, the evidence put forth by Petitioners and accepted by the Board shows that a POSITA would have been motivated to use Fuller's undisputed teachings of switching communication rates while streaming media content with the cellular telephone disclosed in Treyz.  A7-18.  The Board's findings confirmed that both Treyz and Fuller relate to delivering multimedia content to a client over a network.  A7-8 (citing A425, 5:32-38; A423, 1:56-60; A444, 1:15-17; A445, 4:46-

49; A447, 8:30-36; A439, Fig. 1; A440, Fig. 2, A441, Fig. 3); *see also* A219; A148 (citing A444, 1:14-17, 2:53-56; A403, Abstract).  Moreover, the Board found that Fuller expressly recognizes the benefit of switching communication rates—if a client is not receiving data at a "sufficient" rate, the client "can request a different rate of transmission."  A12 (citing A448, 10:11-17; A672-673 ¶¶41-42); A8-9 (citing A448, 10:11-17); *see also* A149.  For example, a client (such as the cellular telephone taught in Treyz) might not receive streaming audio data at a sufficient rate to provide a user with uninterrupted audio, resulting in substantial and perceivable quality degradation.  A9 (citing A148-150; A672-673 ¶¶41-43); A219. To address this problem and provide for the efficient and uninterrupted delivery of streaming content, a POSITA would have been motivated to implement Fuller's teachings of switching communication rates in the Treyz device.  A672-673 ¶42; A149; A9.  The Board credited Dr. Quackenbush's testimony that a POSITA would have found this combination to be routine and straightforward, yielding only predictable results.  A15-16 (citing A673 ¶43); *see also* A150; A12.

In considering the obviousness of the claims, the Board also carefully analyzed and rejected Affinity's arguments that a POSITA would have lacked a reasonable expectation of success in implementing the combination.  A12-18. Specifically, the Board rejected both prongs of Affinity's argument that: (1) Fuller was limited to teaching a Java-only implementation of switching communication

rates and (2) portable devices (such as the cellular telephone taught by Treyz) were not capable of running Java applets prior to March 28, 2000. *Id.*

The Board correctly rejected Affinity's first argument that Fuller was limited to teaching rate switching using only Java applets, finding that a POSITA would have understood that Fuller more generally taught rate switching. A12-16; *see also* A295 ¶15. The Board noted that Affinity did not challenge that it would have been obvious and straightforward to implement Fuller's general teaching of rate switching in the Treyz device. A12-13. The Board thus found that "Petitioner has demonstrated, by a preponderance of the evidence, that claims 1, 2, 5-8, and 10 are unpatentable under 35 U.S.C. § 103 as obvious over Treyz and Fuller." A15-16.

In addition, the Board correctly rejected Affinity's second argument and found that even if Fuller was limited to rate switching using Java applets (it is not), a POSITA would have still had a reasonable expectation of success in implementing Fuller's teachings in the Treyz device. A16-17. Specifically, the Board rejected Affinity's contention that portable devices (such as the cellular telephone disclosed in Treyz) could not run Java before March 28, 2000. The Board found that portable devices could run Personal Java and execute a Java applet prior to March 28, 2000, as confirmed by evidence in the record credited by the Board. A16-17 (citing A929-930; A944-945). The Board thus concluded that a POSITA would have found the combination of Treyz and Fuller obvious, even if

Fuller's teachings were limited to rate switching using Java applets.  A17-18.

The Board's factual findings are supported by substantial evidence, and nothing in Affinity's appeal provides a basis to overturn the Board's well-founded conclusions.

## A.    *U.S. Patent No. 6,678,215 ("Treyz")*

U.S. Patent No. 6,678,215 to Treyz issued on January 13, 2004.  A403-436. The provisional application leading to Treyz was filed on December 28, 1999, and the non-provisional application was filed March 20, 2000, making Treyz prior art to the '007 Patent under at least 35 U.S.C. § 102(e).  Treyz discloses a multifunctional portable device for receiving audio content over a wireless network.  A403, Abstract; *see also* A7.[2]  Treyz expressly discloses that its invention "may also be applied to audio devices other than clock radios such as stereos, portable digital audio players, automobile personal computers, web appliances, personal computers with audio cards and speakers, etc."  A426, 8:28-40; *see also* A7.  The Treyz device is "relatively easy" (A428, 11:11-12) to move from location to location and "may be located in the home or in any other suitable location" (A426, 7:10-11).  *See also* A8.

The Treyz device includes, *inter alia*, a display, non-volatile memory, and a

---

[2]    In its FWD, the Board made detailed findings with respect to the prior art. Those findings are reviewed for substantial evidence.  *See infra* § I (Standard of Review).  For the Court's convenience, Petitioners' Statement cites the Board's analysis of the prior art in the FWD, in addition to the underlying art itself.

processor.  A423, 1:48-51; A428, 12:46-55; A414, Fig. 10a; A666-668, A669

¶¶33, 34, 37; *see also* A7.  Treyz also discloses that the device can communicate

via wired connections, such as "universal serial bus" or "IEEE 1394 (FireWire)"

cable connections.  A423, 1:65-2:2, 2:22-35, 2:41; A426, 7:62-64; A429, 13:36-41;

A414, Fig. 10a; *see also* A7.  In addition, the Treyz device includes a locally saved

e-mail client that is operable to receive and play audio files received as e-mail

attachments.  A423, 1:32-32; *see also* A147.

    The Treyz device has "built-in telephone functions."  A424, 3:13-14; *see*

*also* A7; A423, 2:1-2 ("A clock radio of this type may include *telephone*

*capabilities*….");  A430, 16:52-60 ("Alarm clock radio … may have *built-in*

*telephone functions*").  Treyz further discloses that "*[i]f the telephone is not*

*answered*, the audio device may store messages like an answering machine."

A424, 3:14-16; *see also* A7.  In addition, Treyz discloses that the device may send

"*cellular telephone* transmissions."  A423, 2:22-35; *see also* A7.  The device may

also be "implemented using a mobile platform such as a car radio, automobile

personal computer, etc." that communicates via "*bidirectional cellular links*."

A434, 24:22-29; *see also* A8.

    The Treyz device also has a web browser to connect to the Internet and to

view and select available Internet radio stations.  A425, 6:11-15; A431, 18:12-16;

A413, Fig. 9b; *see also* A7-8.  A user may select the stations "by clicking on links

for stations that the user is interested in or by otherwise selecting the proper Internet addresses for the desired stations." A425, 5:32-38; *see also* A8. The selected audio may then be streamed to the user's device in real time and may be buffered using local memory to improve its quality. A423, 1:56-60; *see also* A8.

## B.    *U.S. Patent No. 6,711,622 ("Fuller")*

Fuller was filed December 31, 1997 and issued March 23, 2004, making it prior art to the '007 patent under at least 35 U.S.C. § 102(e). Fuller describes a system and method for streaming audio or video content to users. A437-449; A444, 1:15-17; *see also* A8. In Fuller, a web browser is used to review and select links for available content on a network, such as an audio jukebox or a collection of available internet radio stations. A445, 4:46-49; A447, 8:30-36; A439, Fig. 1; A440, Fig. 2; A441, Fig. 3; *see also* A8.

To improve the playback quality of the streaming content, Fuller discloses embodiments in which the client browser can request a different streaming data transmission rate. A448, 10:11-17 ("the corresponding Java applet, in some embodiments of the invention, *can request a different rate of transmission*"); *see also* A8. For example, if the streaming data is not being received by the client at a sufficient rate, the browser can request that the server stream at a lower transmission rate, and thus more appropriately match the transmission rate to the connection bandwidth available. *Id.*

-9-

### C.    *Affinity's '007 Patent*

*After* Treyz had already disclosed a portable device—with a display, non-volatile memory, processor, web browser, cellular telephone functionality, e-mail functionality, and physical interface for transmitting power and data—for displaying, selecting and delivering media content available over a network to the portable device; and *after* Fuller had already disclosed advantageously switching the transmission rate to a lower rate (to more appropriately match the bandwidth availability of the client) when a user is not receiving audio content at a sufficient rate, Affinity filed the applications that resulted in the '007 Patent that is the subject of this appeal.

The '007 Patent specification generally describes a system and method for communicating media content to various electronic devices such as a PC, portable device, or vehicle audio system.  A25-55; *see also* A4-5.  The supposed invention of the '007 Patent is described as allowing users to select multimedia content available on the Internet and deliver that content to a portable audio player.  A46-47, 2:58-3:3; A49, 7:2-8, 7:26-28, 8:14-20; A50, 9:61-10:2.  The '007 Patent also describes transmitting the media content to the portable device at a first communication rate, then switching the communication rate to a second, slower rate.  A48, 6:6-13.  In addition, the '007 Patent describes connecting the portable device to another electronic device, such as a vehicle audio system, via an interface

and "multiple conductive cable." A54, 17:19-47; A45, Fig. 9. The portable device can be "powered or recharged" from the vehicle power system and can communicate audio information to the vehicle audio system. A54, 17:26-35; A45, Fig. 9.

Claims 1-2, 5-8, and 10 are specifically directed to a system for delivering media to a portable device or cellular telephone over a network and switching the communication rate at which media is delivered. *See* A54-55. The claimed portable device/cellular telephone has a display, non-volatile memory, processor, web browser, e-mail capabilities, and a physical interface for transmitting power and data. *Id.*

As confirmed by the disclosures of Treyz and Fuller, each of these features and the remaining concepts claimed by the '007 Patent were all well known in the art *before* the earliest claimed priority date listed on the face of the '007 Patent (March 28, 2000). A140-141.

**D.    *Procedural Background***

In November 2012, Affinity filed a complaint in the Eastern District of Texas alleging that Samsung, HTC, and LG were infringing claims of four patents related to the '007 Patent: U.S. Patent No. 7,187,947, U.S. Patent No. 7,324,833, U.S. Patent No. 7,634,228, and U.S. Patent No. 7,953,390. In February 2013, Affinity filed an amended complaint adding the '007 Patent to the lawsuit. In all,

Affinity asserted that Samsung, HTC, and LG were infringing 37 patent claims across the five related patents.  In addition, Affinity filed complaints in the Western District of Texas alleging that Samsung and BlackBerry were infringing 13 claims of a sixth related patent, U.S. Patent No. 8,532,641.  Ultimately, all of the cases were transferred to the Northern District of California, where they were consolidated.  The cases are currently stayed pending various *inter partes* review, *inter partes* reexamination, and *ex parte* reexamination proceedings.

### 1.     *Petitions for* Inter Partes *Review*

On January 31, 2014, Samsung, HTC, and LG[3] filed two petitions for IPR of the '007 Patent asserting that claims 1-2, 5-8, and 10 of the '007 Patent are unpatentable as obvious under 35 U.S.C. § 103(a).  *See* A125-193; A56-124.  In IPR2014-00408, Petitioners asserted that Treyz in combination with Fuller discloses all the limitations of the challenged claims.  *See* A147-163.[4]

With the Petition, Petitioners provided the declaration of their expert, Dr. Quackenbush, regarding the disclosures of Treyz and Fuller.  A651-715.

The Petition identified numerous passages from Treyz teaching that the Treyz device is a "cellular telephone."  A150-151 (citing A423, 1:65-2:2, 2:22-35;

---

[3]     LG subsequently settled and is no longer party to these proceedings.

[4]     In the second proceeding, IPR2014-00407, Petitioners asserted that U.S. Patent Pub. No. 2002/0010759 ("Hitson") in combination with U.S. Patent No. 6,711,622 ("Fuller") discloses all the limitations of the challenged claims.  A79-102.  This combination is not at issue here.

A427, 9:50-10:24; A431, 18:34-35; A414, Figs. 10a-10c; A423, 1:61-64, 2:36-53; A426, 7:10-15, 7:62-64; A428, 12:15-16; A429, 13:42-55; A434, 24:21-30; A435, 26:54-62; A665-666 ¶32).  Dr. Quackenbush also confirmed that Treyz teaches a "cellular telephone."  A665-666 ¶32.

With respect to the combination of Treyz and Fuller, Dr. Quackenbush opined that "[i]t would have been obvious to a [POSITA] that the teaching in Fuller of selecting delivery of portions of media content at different communication rates could have been used with the device disclosed in Treyz and that it would be beneficial to provide this functionality."  A672 ¶41; A148-150. Dr. Quackenbush explained that Treyz and Fuller were in the same field of art, relating to the delivery of streaming multimedia content over a client/server network.  A672 ¶41; A148; A444, 1:14-17, 2:53-56; A403, Abstract.  In addition, Fuller itself expressly teaches the benefit of using two different transmission rates to deliver streaming media—specifically, a client that is not receiving data at a "sufficient" rate "can request a different rate of transmission."  A448, 10:11-17; A672-673 ¶¶41-42; A149.

Moreover, a POSITA would have recognized that the Treyz device, which also receives streaming media content, "may have difficulty receiving data at a sufficient rate to provide a user with uninterrupted audio or video." A672-673 ¶42; A149.  Indeed, Treyz explicitly recognizes that a buffer can be used to improve the

quality of streaming audio.  A429, 13:59-63; A672-673 ¶42; A149.  If a client, such as the Treyz cellular telephone, "does not receive sufficient data, the input buffer for the audio decoder may run out of data, and … the audio decoder would have to output silence, resulting in substantial and perceivable quality degradation."  A672-673 ¶42; A149.  To address this problem, which Treyz recognized, and to achieve "efficient and uninterrupted delivery of streaming content," a POSITA would have been motivated to implement Fuller's teachings of switching communication rates in the Treyz device.  A672-673 ¶42; A149.  A POSITA would have found it routine to add Fuller's teaching of switching communication rates in implementing the Treyz device, yielding nothing more than predictable results.  *See* A673 ¶43; A150.

2. *Institution and Joinder*

The Board instituted trial on all challenged claims.  The Board in its Institution Decision held that Petitioners had shown "a reasonable likelihood that Petitioners would prevail in showing the unpatentability of claims 1, 2, 5-8, and 10 of the '007 patent" under 35 U.S.C. § 103 as obvious over Treyz and Fuller.  A220-221; *see generally* A210-222.

The Board discussed and cited Petitioners claim charts, identifying where every limitation of the challenged claims was disclosed in Treyz and Fuller.  A218 (citing A150-163).  Furthermore, as both references were in the same field of art

(concerning the delivery of streaming media over a client/server network) and because Fuller advantageously taught switching communication rates to improve audio quality, the Board concluded that "Petitioners have set forth sufficient articulated reasoning with rational underpinning to support the proposed combination of references." A219-220.

At Petitioners' request, the two IPR proceedings regarding the '007 Patent—IPR2014-00407 and IPR2014-00408—were joined. As to the combination at issue in this appeal, Affinity filed a Consolidated Patent Owner's Response directed entirely—aside from its constitutional challenge—to the assertion that Treyz purportedly does not disclose a "cellular telephone" and also to the assertion that the combination of Treyz and Fuller was "impossible." *See* A223-257. With respect to Treyz's disclosure of a "cellular telephone," Affinity primarily argued that the Treyz device purportedly was limited to placing phone calls over a landline connection (A239); could only transmit audio data via the cellular connection (A238); and could not be used while moving over a "wide area" (A236-237).

With respect to the combination of Treyz and Fuller, Affinity argued that Fuller's teachings were limited to switching communication rates using Java applets, and that it was "not technically possible to implement Java on a mobile device at the time of invention." A251; *see generally* A239-251. Affinity did not dispute the benefits of Fuller's invention of rate switching, nor did Affinity dispute

that if Fuller generally taught switching rates (and was not limited to implementations using Java), a POSITA would have found the combination of Treyz and Fuller obvious and straightforward to implement. A239-251.

Petitioners filed a single Reply directly rebutting each of Affinity's erroneous assertions. A258-282; A283-329. The Board held a hearing on April 1, 2015. *See generally* A337-402.

### 3. *Final Written Decision*

On July 20, 2015, the Board entered a FWD in the joined IPR proceedings relating to the '007 Patent, holding that claims 1, 2, 5-8, and 10 are unpatentable. *See generally* A1-24. Specifically, the Board concluded that "Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 5-8, and 10 of the '007 patent are unpatentable under 35 U.S.C. § 103 as obvious over Treyz and Fuller." A17-18. The Board made detailed findings of Treyz's and Fuller's teachings and observed that Petitioner "identifies where every limitation of claims 1, 2, 5-8, and 10 is disclosed in the combination of Treyz and Fuller." A7-9 (citing A150-163).

The Board found that Treyz teaches a multifunctional device that can receive and process audio signals. A7. For example, the Treyz device has a display, non-volatile memory, processor, USB or IEEE 1394 (FireWire) connections, and web browser for viewing and selecting available audio content. A7-8 (citing A423,

1:48-51; A428, 12:46-55; A414, Fig. 10a; A666-667 ¶33; A667-668 ¶34; A669

¶37; A423, 1:65-2:2, 2:22-35, 2:41; A426, 7:62-64; A429, 13:36-41; A414, Fig.

10a; A425, 5:32-38, 6:14-15; A431, 18:12-16; A413, Fig. 9b; A423, 1:56-60). The

Board also noted that the Treyz invention may be "applied to audio devices other

than clock radios such as stereos, portable digital audio players, automobile

personal computers, web appliances, personal computers with audio cards and

speakers, etc." A7 (citing A423, 1:61-64; A426, 8:36-40).

The Board found that the Treyz device is a "cellular telephone."[5] The Board

explained that "[t]he [Treyz] device … has 'built-in telephone functions'

permitting the device to place and receive calls using 'cellular telephone

transmissions.'" A7 (citing A423, 1:65-2:2, 2:22-35; A424, 3:13-16; A430, 16:52-

60). Treyz also teaches that if an incoming call is not answered, the device may

store "messages like an answering machine." A7 (citing A424, 3:14-16). Further,

Treyz teaches that it is "relatively easy" to move the wireless device and that the

device "may be located in the home or in any other suitable location." A8 (citing

A426, 7:10-11; A428, 11:11-12). In addition, the Treyz invention may be

implemented using mobile platforms that communicate using "bidirectional

---

[5] The Board construed the term "cellular phone" as a "telephone with access to a
cellular radio system so it can be used over a wide area, without a physical
connection to a network." A6. In the IPR proceedings, Petitioners agreed that the
Board's construction was correct, and Affinity did not contest the construction.
A6; A223-257; A268-269.

cellular links." A8 (citing A434, 24:22-29).

The Board discussed and rejected each of Affinity's arguments as to why Treyz purportedly does not disclose a "cellular phone." The Board first rejected Affinity's argument that the Treyz device requires a land-line connection to operate as a phone, explaining that the single passage Affinity cites merely describes "one example" of the telephone device in Treyz and ignores the other passages in Treyz that teach that the device has "built-in telephone functions" and communicates using "cellular telephone transmissions." A9-10 (citing A423, 2:32; A424, 3:13-14).

The Board also rejected Affinity's arguments that the Treyz device is not able to place calls using cellular transmissions, explaining that Treyz teaches a device with a telephone handset that communicates via "cellular telephone transmissions" and saves "voice mail messages" when the phone is not answered. A10 (citing A423, 2:32-41; A424, 3:13-22; A407, Fig. 4; A414, Fig. 10). Thus, a POSITA reading Treyz would have understood that a user would be able to make a phone call with the Treyz device using the cellular telephone network. A10 (citing A328 ¶49).

Finally, the Board rejected Affinity's argument that Treyz does not disclose a cellular phone because the device cannot be used over a wide area *while* being moved around; the Board instead found that the ordinary meaning of "cellular

telephone" does not require that the device is capable of being used *while* being moved around, and the '007 Patent does not limit the meaning of "cellular telephone" in such a way. A11 (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)). Thus, Treyz's device, which can be placed in any "suitable location," can be used over a wide area and is a "cellular telephone," under the Board's construction, even if it requires connection to a power source. A11-12. And even if a "cellular telephone" were limited to devices that can communicate while moving over a wide area (it is not), the Board found that the Treyz device meets this requirement. A12, n.9 (citing A426, 7:10-15, 8:35-40; A434, 24:22-30). In particular, in finding that the Treyz device is operable while moving over a "wide area," the Board relied on Treyz's disclosure that the device may be a "mobile device" such as a "car radio" that uses "cellular modem technology." *Id.*

The Board also made detailed findings with respect to Fuller's disclosures. The Board found that Fuller teaches a system for providing streaming audio and video data to multiple users. A8 (citing A444, 1:15-17). In Fuller, a web browser is used to review and select links for available content on a network. A8 (citing A445, 4:46-49; A447, 8:30-36; A439-443, Figs. 1-5; A448-449, 10:56-11:6). With respect to the combination of Treyz and Fuller, the Board specifically found that Fuller teaches "the benefit of using two different transmission rates to deliver

streaming media." A12 (citing A448, 10:11-17; A672-673 ¶¶41-42). In particular, if audio or video data are not being received or processed at a sufficient rate, the client may instruct the server to reduce the rate of transmission to "more appropriately match the bandwidth availability of the client." A8-9 (citing A448, 10:11-17; A447, 8:37-41). A POSITA would have incorporated Fuller's method of switching rates in implementing the Treyz device to prevent the input buffer from running out of data, which would result in "substantial and perceivable" degradation of audio quality. A9 (citing A148-150 (citing A672-673 ¶¶41-43)). The Board credited Dr. Quackenbush's testimony and found that "one of ordinary skill in the art would have sought to use, and would have had a reasonable expectation of success in implementing, Fuller's idea of transmission rate switching in Treyz." A15 (citing A672-673 ¶¶41-43; A295-297 ¶¶15, 17); *see also* A12 (citing A664-665 ¶¶28-30; A671-673 ¶¶40-43).

In concluding that a POSITA would have found the challenged claims obvious over Treyz and Fuller, the Board rejected Affinity's argument that the combination would have been "impossible." Specifically, Affinity incorrectly argued that Fuller was limited to teaching switching rates using a Java applet and that portable devices (such as that disclosed in Treyz) could not run Java prior to March 28, 2000. A239; A240; A242.

The Board first found that Fuller is not limited to switching communication

rates using Java applets.  A13.  Citing *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012); *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005); and *In re Keller*, 642 F.2d 413, 425 (CCPA 1981), the Board rejected Affinity's incorrect assertions that Fuller was limited to the specific implementation of switching communication rates using Java, finding there was no indication in Fuller that it "cannot, or should not, be implemented by means other than Java applets."  A13.  The Board found that a POSITA would have understood Fuller to generally teach switching communication rates, as Dr. Quackenbush testified.  A12-16; A295 ¶15.[6]  The Board also credited Dr. Quackenbush's testimony that a POSITA would have sought to use and would have had a reasonable expectation of success in implementing Fuller's teaching of switching rates in the Treyz device.  A15 (citing A672-673 ¶¶41-43; A295-297 ¶¶15, 17). The Board thus concluded that in light of the evidence, "claims 1, 2, 5-8, and 10 are unpatentable under 35 U.S.C. § 103 as obvious over Treyz and Fuller."  A15-16.

The Board further found that even if Fuller were limited to the use of Java (it is not), a POSITA would have still had a reasonable expectation of success in combining Treyz and Fuller.  A16-17.  The Board found that Petitioners' evidence

---

[6] The Board rejected Affinity's attempt to mischaracterize Dr. Quackenbush's testimony in a different proceeding involving a different patent as somehow confirming that Fuller's teachings were limited to Java.  A13-14, n.10; A14 (citing A277; A497, 47:2-6; A497-498, 47:21-48:7; A295 ¶15).

demonstrated that Personal Java was available "for use in consumer electronic devices and mobile computing devices," including "handheld PCs, set-top Internet boxes, Web phones, and game controllers"; could run most Java applet packages; is "upward-compatible with the Java Platform" yet "still capable of executing in memory-constrained devices"; and may be tailored to specific application environments; thus, a POSITA would have had a reasonable expectation of success that Fuller's specific teachings of switching rates using Java applets could be implemented in the Treyz device.  A17 (citing A929-930; A944-945 at 1-2).

## SUMMARY OF THE ARGUMENT

This appeal relates to seven challenged system claims—claims 1, 2, 5-8, and 10 of the '007 Patent—which the Board properly invalidated under 35 U.S.C. § 103.

Affinity raises only two disputes on the core substantive issues in this appeal: (1) whether the Treyz device is a "cellular telephone" and (2) whether a POSITA would have had a reasonable expectation of success in combining Treyz with Fuller.  Affinity does not dispute that the remaining limitations of the '007 Patent are disclosed by the combination of Treyz and Fuller.

The Board's finding that Treyz discloses a "cellular telephone," as construed by the Board, is supported by substantial evidence.  Affinity attempts to cast Treyz as an "alarm clock" having "discrete functionalities" (Affinity Br. 42), but ignores

Treyz's plain disclosures that the multifunctional device sends "*cellular telephone transmissions*" and has "built-in *telephone* functions" for making and receiving telephone calls.  These teachings provide ample support for the Board's finding that the Treyz device is not limited to transmitting only *audio data* via a cellular connection; indeed, such an interpretation would read out the term "telephone" from "cellular *telephone* transmissions."  In addition, Treyz describes wireless embodiments of its invention where the telephone functionality is implemented using the cellular telephone connection; thus the Board correctly found that Treyz is not limited to a wired landline telephone connection (described in Treyz as "one example"), as Affinity asserts.  Moreover, the Treyz device can be used over a wide area, as Treyz teaches it is "relatively easy" to move the wireless device for use in any "suitable location."  And while not required by the Board's construction, Treyz also teaches that its device can be used *while* moving over a wide area, as the device can be implemented in a "mobile platform" communicating using "bidirectional cellular links."  Thus, the Board's finding that Treyz teaches a "cellular telephone" is supported by substantial evidence and should be affirmed.

With respect to the combination of Treyz and Fuller, Affinity does not dispute that Treyz and Fuller are in the same field of art, and that the teachings of Fuller were advantageous to provide for the efficient and uninterrupted delivery of streaming media content to a portable device.  Rather, Affinity incorrectly

contends that Fuller's teachings are limited to switching rates using Java applets and that prior to March 28, 2000, it would have been "impossible" to run a Java applet on the Treyz device.

The Board specifically credited Petitioners' expert and cited evidence that provides substantial support that Fuller was not so limited. Contrary to Affinity's arguments, a POSITA would have understood that Fuller more generally teaches switching communication rates while streaming media, and is not limited to a Java-only implementation. Furthermore, Affinity does not contest (and thus concedes) that a POSITA would have found the general idea of switching communication rates obvious and straightforward to implement in the Treyz device.

In addition, even if Fuller's teachings were limited to rate switching using Java applets (it is not), the Board correctly found that a POSITA would have had a reasonable expectation of success in implementing Fuller's teachings in Treyz's device. In fact, the combination of Treyz and Fuller was *not* "impossible," as Affinity asserts; and various publications and actual devices available prior to March 28, 2000, confirm that portable devices, such as the cellular telephone disclosed in Treyz, were capable of running Java and executing Java applets.

As the Board correctly held, Petitioners demonstrated by a preponderance of the evidence that claims 1, 2, 5-8, and 10 of the '007 Patent are unpatentable as obvious over Treyz and Fuller. The Board's factual findings regarding Treyz's

disclosure of a "cellular telephone" and underlying its conclusion of obviousness over Treyz and Fuller are supported by substantial evidence.  In the FWD, the Board carefully and fully rejected each of the same arguments Affinity raises here, and this Court should do the same.

Faced with a record heavily in Petitioners' favor on the core substantive issues, Affinity manufactures a meritless procedural argument with respect to its Motion to Exclude that the Board properly denied.  The Board's findings and conclusions, based on a careful review of the documentary and testimonial evidence, are amply supported and should be affirmed.

Finally, Affinity's argument that *inter partes* review is unconstitutional in violation of the separation of powers and the Seventh Amendment should be rejected in view of this Court's decision in  *MCM Portfolio LLC v. Hewlett-Packard Co.*, __ F.3d __, No. 15-1091, 2015 U.S. App. LEXIS 20848 (Fed. Cir. Dec. 2, 2015), and, in any event, lacks merit.

**ARGUMENT**

## I.    Standard of Review

This Court reviews its own jurisdiction *de novo*.  *See Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1360 (Fed. Cir. 2008).  This Court also reviews *de novo* a constitutional challenge to an Act of Congress.  *See Demko v. United States*, 216 F.3d 1049, 1052 (Fed. Cir. 2000).

The AIA and its implementing regulations provide the Board with broad discretion to "administer the proceedings" and otherwise "determine a proper course of conduct." 35 U.S.C. § 316(a)(4); 37 C.F.R. § 42.5(a). "This [C]ourt reviews Board decisions using the standard set forth in the Administrative Procedure Act, 5 U.S.C. § 706." *In re Sullivan*, 362 F.3d 1324, 1326 (Fed. Cir. 2004) (citing *Dickinson v. Zurko*, 527 U.S. 150, 154 (1999)). Under 5 U.S.C. § 706(2)(A), this Court only overturns Board decisions if they "are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *In re Sullivan*, 362 F.3d at 1326; 5 U.S.C. § 706(2)(A); *see also Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1077-78 (Fed. Cir. 2015) (citing *Chen v. Bouchard*, 347 F.3d 1299, 1307 (Fed. Cir. 2003)).

This Court reviews the Board's factual findings as to whether a limitation is disclosed by the prior art for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1319 (Fed. Cir. 2000). The Board's conclusion on obviousness is a legal conclusion based on underlying factual findings. *See, e.g.*, *In re Cuozzo Speed Techs.*, 793 F.3d 1268, 1280 (Fed. Cir. 2015). This Court reviews the Board's legal conclusion of obviousness *de novo* and the Board's underlying factual findings for substantial evidence. *See, e.g.*, *id.*; *Gartside*, 203 F.3d at 1316; 5 U.S.C. § 706. Thus, the Board's factual findings—including its findings on the scope and content of the prior art, level of ordinary skill in the art, the differences

between the claimed invention and the prior art, and motivation to combine—must be sustained so long as they are based on substantial evidence. *Gartside*, 203 F.3d at 1311-1313, 1319-1320; *see Dickinson*, 527 U.S. at 164. "Substantial evidence is more than a 'mere scintilla of evidence' but something less than the 'weight of the evidence.'" *In re Rambus, Inc.*, 753 F.3d 1253, 1256 (Fed. Cir. 2014) (citations omitted).[7]

This Court does not reweigh the Board's findings as to witnesses' credibility. *See Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 832 (Fed. Cir. 2010).

## II.    Congress Acted Well Within Its Constitutional Authority In Authorizing The PTO To Conduct *Inter Partes* Reviews

Affinity's constitutional challenge to *inter partes* review is squarely foreclosed by circuit precedent. In *MCM Portfolio LLC v. Hewlett-Packard Co.*, this Court held that *inter partes* review is constitutional, rejecting the same arguments Affinity raises here.[8] 2015 U.S. App. LEXIS 20848. In any event, this

---

[7] Affinity's argument (Affinity Br. 10-11) that this Court should apply the "clearly erroneous" standard of review to the Board's factual findings has already been rejected by the Supreme Court in *Dickinson v. Zurko*, 527 U.S. 150 (1999), which expressly held that the Federal Circuit must apply the "substantial evidence" standard, not the "clearly erroneous" standard, in reviewing factual findings made by the PTO.

[8] This Court is bound by its prior precedent "unless relieved of that obligation by an en banc order of the court or a decision of the Supreme Court." *Deckers Corp. v. United States*, 752 F.3d 949, 959 (Fed. Cir. 2014).

Court should reject Affinity's meritless arguments. As confirmed by this Court,

nothing in Article III or the Seventh Amendment barred Congress from enacting

the *inter partes* review scheme. *Id.* at *8-22.

    **A.**    **The MCM Decision That Inter Partes Review Is Consistent With Article III Is Binding And Correct**

    This Court squarely held in *MCM* that "the inter partes review provisions do

not violate Article III," rejecting the same arguments Affinity raises here. *Id.* at

*17; *see also* U.S. Const. art. III; Affinity Br. 13-27.  In so holding, *MCM*  found

that "Supreme Court precedent demonstrates that … the inter partes review

provisions[] do not violate Article III."  2015 U.S. App. LEXIS 20848 at *12-15.

The Court discussed the well-settled principle that Congress has the power to

delegate disputes over public rights to non-Article III courts. *Id.* at *12-16;

*Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855);

*Thomas v. Union Carbide Agr. Products Co.*, 473 U.S. 568, 571, 593-94 (1985);

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 854 (1986); *Stern v.

Marshall*, 131 S. Ct. 2594 (2011).  The public rights exception has been applied to

disputes between the government and private parties, as well as disputes between

private parties concerning public rights. *Murray's Lessee*, 59 U.S. at 284; *Block v.

Hirsh*, 256 U.S. 135, 158 (1921); *Ex parte Bakelite Corp.*, 279 U.S. 438, 460-61

(1929); *MCM*, 2015 U.S. App. LEXIS 20848, at *12-13.  "[W]hat makes a right

'public' rather than private is that the right is integrally related to particular federal government action." *Stern*, 131 S. Ct. at 2613.

This Court held in *MCM* that patent rights are quintessential *public rights*, and accordingly, "assigning review of patent validity to the PTO is consistent with Article III." *See MCM*, 2015 U.S. App. LEXIS 20848, at *16-17; *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 603-04 (Fed. Cir. 1985), *modified on other grounds on reh'g*, 771 F.2d 480 (Fed. Cir. 1985); *Joy Techs. v. Manbeck*, 959 F.2d 226, 228-29 (Fed. Cir. 1992).[9]  In finding that patent rights are public rights, *MCM* explained that "[t]he patent right 'derives from an extensive federal regulatory scheme,' *Stern*, 131 S. Ct. at 2613, and is created by federal law." 2015 U.S. App. LEXIS 20848, at *15.  Thus, contrary to Affinity's assertions (Affinity Br. 17), patent rights "exist only by virtue of statute."  *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 229 n.5 (1964).  Specifically, Article I, § 8, cl. 8 of the Constitution authorizes Congress to create and regulate a patent system.  Thus, patent rights do not exist without statutory law providing for such rights.  *See* 35 U.S.C. § 131. Moreover, while Affinity relies on 35 U.S.C. § 261 to argue that patents are

---

[9] Contrary to Affinity's argument (*see* Affinity Br. 15-16), *MCM* discussed and rejected the contention that *McCormick Harvesting Mach. Co. v. Aultman*, 169 U.S. 606, 608-09 (1898), compels a finding that patent rights are private rights, reasoning that *McCormick* "did not address Article III and certainly did not forbid Congress from granting the PTO the authority to correct or cancel an issued patent." 2015 U.S. App. LEXIS 20848, at *11.

"private rights" (Affinity Br. 16), § 261 also makes clear that patent rights are purely statutory in nature: "*Subject to the provisions of this title*, patents shall have the attributes of personal property."

*MCM* also found that it was bound by Federal Circuit precedent in *Patlex* and *Joy Technologies*, which held that patent rights are public rights. *MCM*, 2015 U.S. App. LEXIS 20848, at *18. While *Patlex* and *Joy Technologies* concerned the constitutionality of reexamination proceedings, *MCM* found no basis to distinguish reexamination from *inter partes* review for purposes of determining whether *inter partes* review is constitutional. *Id.* at *18-19. *MCM* explained that "Congress viewed inter partes review as 'amend[ing] ex parte and inter partes reexamination,' and as a descendant of … the administrative 'reexamination' process, through which the USPTO could review the validity of already-issued patents…" *Id.* at *18; *cf.* Affinity Br. 22-26.

Moreover, "Congress created the PTO, 'an executive agency with specific authority and expertise' in the patent law, *Kappos v. Hyatt*, 132 S. Ct. 1690, 1696 (2012), and saw powerful reasons to utilize the expertise of the PTO for an important public purpose—to correct the agency's own errors in issuing patents in the first place." *Id.* at *15-16. Indeed, it would be "odd" if "Congress could not authorize the PTO to reconsider its own decisions." *Id.* at *16. In sum, *MCM* correctly found that governing Supreme Court and Federal Circuit authority

"require rejection of [the] argument that inter partes review violates Article III." *Id.* at \*19.

For at least these reasons, *inter partes* review is consistent with Article III, and this Court should reject Affinity's arguments.

### B.  *The MCM Decision That* **Inter Partes** *Review Is Consistent With The Seventh Amendment Is Binding And Correct*

This Court also held in *MCM* that *inter partes* review comports with the Seventh Amendment, rejecting the same arguments Affinity raises here.  *Id.* at \*19-22; *see also* U.S. Const. amend. VII; Affinity Br. at 27-31.  The Supreme Court has stated that "the Seventh Amendment is generally inapplicable in administrative proceedings."  *Curtis v. Loether*, 415 U.S. 189, 194 (1974). Moreover, "[w]hen Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the [Seventh Amendment]."  *Atlas Roofing Co., Inc. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 455 (1977). *MCM* thus properly held that "[b]ecause patent rights are public rights, and their validity susceptible to review by an administrative agency, the *Seventh Amendment* poses no barrier to agency adjudication without a jury."[10]  *See MCM*, 2015 U.S.

---

[10] *MCM* further found that *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 377 (1996), which concerned patent infringement (*see* Affinity Br. at 29), is inapposite in deciding whether there is a jury right in an administrative adjudication of patent validity. 2015 U.S. App. LEXIS 20848, at \*20.  Contrary to

App. LEXIS 20848, at \*22; *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53-54 (1989); *Tull v. United States*, 481 U.S. 412, 418 n.4 (1987); *Patlex*, 758 F.2d at 604–05; *Joy Techs.*, 959 F.2d at 228.

For at least these reasons, *inter partes* review is consistent with the Seventh Amendment, and this Court should reject Affinity's arguments.

## III.  The Board Correctly Concluded That Claims 1, 2, 5-8, And 10 Of The '007 Patent Are Obvious

As the Board correctly concluded, Treyz in view of Fuller renders obvious each of the challenged claims of the '007 Patent.  Affinity disputes only the Board's determinations that the Treyz device is a "cellular phone" and that a POSITA would have found the combination of Treyz and Fuller obvious. Ultimately, Affinity's disagreement is with the Board's factual findings that the Treyz device is a "cellular phone" and the Board's factual findings in support of its obviousness determination (that Fuller generally teaches switching rates and that portable devices such as the Treyz device could execute a Java applet before March 28, 2000).  These factual findings are subject to very deferential review on appeal, and are all amply supported by the Board's decision and the record before it.

---

Affinity's assertions (*see* Affinity Br. 27), *MCM* analyzed the "correct right" expressly holding that "[b]ecause *patent rights are public rights*, and their validity susceptible to review by an administrative agency, the Seventh Amendment poses no barrier to agency adjudication without a jury."  *MCM*, at \*22 (emphasis added).

## A.    *Legal Standards—Obviousness*

A claim is obvious in view of the prior art if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). "What matters is the objective reach of the claim. If the claim extends to what is obvious, it is invalid under § 103." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419 (2007). "The question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art." *Id.* at 420. "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.* at 421. A combination of references is likely obvious if it is nothing "more than the predictable use of prior art elements according to their established functions." *Id.* at 417. "For obviousness under § 103, all that is required is a reasonable expectation of success." *In re O'Farrell*, 853 F.2d 894, 904 (Fed. Cir. 1988). In addition, a "motivation to combine [the references] may be found explicitly or implicitly ... in the prior art references themselves." *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009). Furthermore, "*KSR* expanded the sources of information for a properly flexible obviousness inquiry to include market forces; design incentives; the 'interrelated teachings of multiple patents'; 'any need or problem known in the

field of endeavor at the time of invention and addressed by the patent'; and the background knowledge, creativity, and common sense of the person of ordinary skill." *Id*. (quoting *KSR*, 550 U.S. at 418-21).

**B.     *The Board Correctly Found That Treyz Discloses A "Cellular Telephone"***

The Board's conclusion that Treyz discloses a "cellular phone" is supported by substantial evidence. *See Gartside*, 203 F.3d at 1319 (reviewing the Board's fact-finding as to whether a limitation is disclosed for substantial evidence).

In the IPR proceedings, the Board correctly construed "cellular phone" as a "telephone with access to a cellular radio system so it can be used over a wide area, without a physical connection to a network." A6. The '007 patent supports the Board's construction. *See* A48, 5:30-32; A48-49, 6:65-7:1; A47, 4:27-32; A47-48, 4:63-5:3; A268-269. In the IPR proceedings, Petitioners agreed with the Board's construction. A268-269. Affinity did not challenge the Board's construction of "cellular phone" during the IPR proceedings, nor does Affinity challenge the Board's construction here. A6.

The Board correctly found that Treyz discloses a cellular phone as construed by the Board. Specifically, the Board found that Treyz "has '*built-in telephone functions*' permitting the device to place and receive calls using '*cellular telephone transmissions*.'" A7 (citing A423, 1:65-2:2, 2:22-35; A424, 3:13-14; A430, 16:52-60) (emphasis added). Treyz teaches throughout its disclosure that the audio

-34-

device "*may include telephone capabilities*" (A423, 1:65-2:2) and "*may have built-in telephone functions*" (A423, 2:22-35; A430, 16:52-60). Treyz also teaches that the device has telephone functionality for placing and receiving calls. A430, 16:52-60 ("*If the telephone is not answered*, the audio device may store messages like an answering machine."); *see also* A424, 3:14-16; A7; A272. Treyz further expressly teaches that its portable device sends and receives "*cellular telephone transmissions.*" A423, 2:22-35.

1.   *The Board correctly found that the Treyz device can be used to make and receive phone calls via a cellular connection*

The Board also correctly found that a user could make cellular phone calls using the Treyz device, rejecting Affinity's argument (Affinity Br. 42) that Treyz is limited to transmitting only *audio data* via a cellular connection. (Affinity Br. 42). A10. The Board explained that the Treyz device includes "a telephone handset that communicates using 'cellular telephone transmissions' and saves 'voice mail messages' when 'the telephone is not answered.'" A10 (citing A423, 2:32-41; A424, 3:13-22, A407, A414, Figs. 4, 10); *see also* A271-273; A423, 1:65-2:2, A430, 16:52-60. The Board further explained that a POSITA would have understood that a user of the Treyz device could communicate with another telephone user over the cellular telephone network, crediting Dr. Quackenbush's testimony. A10 (citing A328 ¶49); *see also* A273.

Contrary to Affinity's assertion (Affinity Br. 45), Treyz does not use the terms "cellular telephone network," "cellular telephone link," and "cellular telephone transmissions" "exclusively in reference to the transfer of audio data." Rather, the passages Affinity cites (Affinity Br. 45 - citing A423, 2:21-32; A427, 9:44-10:6, 10:13-19; A428, 12:13-22; A429, 13:29-48, 14:36-45) use those terms to describe generally the capabilities of the Treyz device. As an example, one passage Affinity cites (A423, 2:22-35) broadly teaches that "signals may also involve" other types of transmissions, including paging transmissions, messaging transmissions, e-mail transmissions, or "*cellular telephone transmissions*." A423, 2:22-35. Indeed, Affinity cannot avoid the fact that each of these terms expressly includes the word "telephone": "cellular *telephone* network," "cellular *telephone* link," and "cellular *telephone* transmission."

2.     *The Board correctly found that the Treyz device does not require a landline connection to operate as a telephone*

The Board also correctly rejected Affinity's argument (Affinity Br. 45) that the Treyz device requires a "land-line" connection to operate as a telephone (A9-10 (citing A423, 1:66-2:2))—finding that the passage Affinity relies on (A423, 1:66-2:2) merely describes "one example" of Treyz's telephone capabilities and does not "clearly and unambiguously limit all telephone embodiments in Treyz to the use of a land-line connection." A10 (citing A273-274); *see also* A328 ¶49. Moreover, limiting Treyz to Affinity's interpretation would ignore Treyz's clear

-36-

disclosures throughout that "the audio device may have built-in telephone functions" and communicates via "cellular telephone transmissions."  A10 (citing A423, 2:32; A424, 3:13-14); *see also* A273-274 (citing A423, 2:22-35; A429, 14:36-48; A324-326 ¶47; A328 ¶49).

Figure 2 of Treyz confirms that the Treyz device, with its "built-in telephone functions," is not limited to a "wired" connection.  For example, Treyz teaches that its wireless portable device (item 12a in Figure 2 (A405)) does not need a connection to a "land-line" to operate as a telephone and can instead communicate wirelessly via path 42, which Treyz teaches is a "long-range wireless link[]" such as a "*cellular telephone* link[]."  A427, 10:14-19; A150.



FIG. 2

A405, Fig. 2; A157; *see also* A427, 9:50-10:24; A354-356; A429, 13:42-50; A407, Fig. 4; A10.

      3.     *<u>The Board correctly found that the Treyz device can be used over a "wide area"</u>*

The Board also correctly rejected Affinity's argument (Affinity Br. 45) that the Treyz device cannot be used over a wide area, without a physical connection to a network—finding that the Treyz device can be moved around and used in different locations, thus spanning a "wide area." A11. The Board first explained that there is no requirement that a "cellular telephone" must be capable of being used *while* it is moving over a wide area, and the '007 patent does not limit a cellular telephone to such devices either.[11] *See* A11. Accordingly, the Treyz device, which is "relatively easy" to move around and which "may be located in the home or in any other suitable location" can be used over a wide area. A8 (citing A426, 7:10-11; A428, 11:11-12).

Moreover, the Board correctly found that even if a "cellular telephone" is limited to a phone that can be used *while* moving over a wide area, Treyz nonetheless discloses such a device. The Board found that Treyz teaches that its

---

[11]In IPR proceedings for the related '641 patent, which shares a common specification with the '007 patent, Affinity has stated that "[t]he '641 patent does not explicitly define a 'wireless telephone device,' but indicates that the device should communicate wirelessly over a cellular communications network." A268-269 (citing IPR2014-01181, Paper 8 at 6-7; IPR2014-01182, Paper 8 at 6; IPR2014-01184, Paper 8 at 6).

"device may also be 'implemented using *a mobile platform* such as a car radio, automobile personal computer, etc.' *that communicates using*, *inter alia*, '*bidirectional cellular links*.'"  A12 (citing A426, 7:10-15, 8:35-40; A434, 24:22-30); *see also* A274-275 (citing A426, 7:10-15; A434, 24:22-30; A323-324 ¶46; A326-327 ¶48).  Affinity does not address any of these disclosures in Treyz. (Affinity Br. 42-46).

After carefully analyzing the parties' arguments and evidence, the Board found that Treyz indeed teaches a "cellular phone."  The Board's analysis, with numerous citations to Treyz's express disclosures, is thoroughly reasoned and supported by substantial evidence.

## C.     *The Board Correctly Found That A POSITA Would Have Had A Reasonable Expectation of Success In Combining Treyz With Fuller*

The Board's decision that claims 1, 2, 5-8, and 10 of the'007 Patent are rendered obvious over Treyz and Fuller is supported by substantial evidence.  *See Gartside*, 203 F.3d at 1319 (holding that the Board's underlying factual findings supporting a conclusion of obviousness are reviewed for substantial evidence).

The Petition set forth a *prima facie* case of obviousness over Treyz and Fuller, explaining how each element of the challenged claims was disclosed by the cited references and why the combination would have been obvious to a POSITA. A139-163; A663-684 ¶¶27-60.  The Petition, supported by the Declaration of Dr. Quackenbush, explained that Treyz, which discloses a multi-functional device that

-39-

can receive delivery of streaming media, in combination with Fuller, which teaches switching communication rates while streaming media, renders obvious all of the limitations of the challenged claims.  A125-163; A663-684 ¶¶27-60.  The Petition provided detailed analysis explaining why a POSITA would have found it obvious to use Fuller's teaching of switching communication rates with Treyz's device.  A148-150 (citing A444, 1:14-17, 2:53-56; A403, Abstract; A448, 10:11-14; A429, 13:59-63; A672-673 ¶¶41-43).

Specifically, the Petition explained that both Treyz and Fuller are in the same field of art and concern the delivery of streaming multimedia content over a client/server network.  A148 (citing A444, 1:14-17, 2:53-56; A403, Abstract).  Fuller further teaches an improvement in the field of streaming media, and recognizes that if a client is not receiving data at a "sufficient" rate, then the client advantageously "can request a different rate of transmission."  A448, 10:11-17; A672-673 ¶¶41-42; A149.  In support of the Petition, Dr. Quackenbush testified that "a [POSITA] would recognize that a client receiving a real time audio or video stream using a personal device, such as that disclosed in Treyz, may have difficulty receiving data at a sufficient rate to provide a user with uninterrupted audio or video."  A672-673 ¶42; A149.  In addition, Treyz recognizes that a buffer can be used to improve the quality of streaming audio.  A429, 13:59-63; A672 ¶42; A149.  If a client (such as the client device taught in Treyz) "does not receive sufficient

data, the input buffer for the audio decoder may run out of data, and … the audio decoder would have to output silence, resulting in substantial and perceivable quality degradation." A672-673 ¶42; A149. The Petition explained that to address this problem and to achieve "efficient and uninterrupted delivery of streaming content," a POSITA would have been motivated to implement Fuller's teachings of switching communication rates in the Treyz device. A672-673 ¶42; A149. It would have been routine for a POSITA to implement Fuller's teaching of switching communication rates while streaming media in Treyz's device, because in combination each element (Treyz's device and Fuller's teaching of switching communication rates) merely performs the same function as it does separately, yielding only predictable results. A150; A673 ¶43.

In the Institution Decision, the Board analyzed Petitioners' "claim charts" and the Declaration of Dr. Schuyler Quackenbush (A150-163; A651-715) showing how the combination of Treyz and Fuller rendered the challenged claims obvious. The Board discussed the "rationale for combining the two references" (citing A148-149; A672-673 ¶¶41-43) and found that Petitioners had "set forth sufficient articulated reasoning with rational underpinning to support the proposed combination of references." A218-219. The Board further rejected each of Affinity's arguments made in its Preliminary Patent Owner Response, and ultimately concluded that there was a "reasonable likelihood that Petitioners would

prevail in showing the unpatentability of claims 1, 2, 5-8, and 10 of the '007 patent."  A221.

In its Patent Owner Response, Affinity disputed whether the combination of Treyz and Fuller would have been obvious, primarily arguing that the combination of Treyz and Fuller was "impossible" because (1) Fuller was allegedly limited to teaching switching rates using Java applets and (2) portable devices such as that disclosed in Treyz allegedly could not run Java applets before March 28, 2000. A223-257.

In the FWD, the Board held that the challenged claims were obvious over Treyz and Fuller.  A1-24.  The Board made detailed findings of Treyz and Fuller's teachings, observing that Petitioner "identifies where every limitation of claims 1, 2, 5-8, and 10 is disclosed in the combination of Treyz and Fuller."  A7-8; A9 (citing A150-163).

The Board found that Treyz describes a portable device that has a display, non-volatile memory, processor, USB or IEEE 1394 (FireWire) connections, web browser for viewing and selecting available audio content, and cellular telephone functionality.  A7-8 (citing A423, 1:61-64; A426, 8:36-40; A423, 1:48-51; A428, 12:46-55; A414, Fig. 10a; A666-667 ¶33; A667-668 ¶34; A669 ¶37; A423, 1:65-2:2, 2:22-35, 2:41; A426, 7:62-64; A429, 13:36-41; A414, Fig. 10a; A425, 5:32-38, 6:14-15; A431, 18:12-16; A413, Fig. 9b; A423, 1:56-60; A423, 1:65-2:2, 2:22-

35; A424, 3:13-14; A430, 16:52-60; A424, 3:14-16; A426, 7:10-11; A428, 11:11-

12; A434, 24:22-29).

The Board found that Fuller teaches a system for providing streaming audio

and video content to multiple users using two different transmission rates. A8-9

(citing A444, 1:15-17; A445, 4:46-49; A447, 8:30-41; A448-449, 10:11-17, 10:56-

11:6; A439-443, Figs. 1-5). The Board further found that Fuller teaches "the

benefit of using two different transmission rates to deliver streaming media." A12

(citing A448, 10:11-17; A672-673 ¶¶41-42). The Board discussed Fuller's

teachings that if audio or video data are not being received or processed at a

sufficient rate, the client may instruct the server to reduce the rate of transmission

to "more appropriately match the bandwidth availability of the client." A8-9

(citing A448, 10:11-17; A447, 8:37-41). As Dr. Quackenbush testified, a POSITA

would have incorporated Fuller's method of switching rates in implementing the

Treyz device to provide for the efficient and uninterrupted delivery of audio to the

Treyz device, thus improving audio quality for the user. A672-673 ¶¶41-43; *see*

*also* A9; A12; A15. The Board credited Dr. Quackenbush's testimony and found

that "one of ordinary skill in the art would have sought to use, and would have had

a reasonable expectation of success, in implementing Fuller's idea of transmission

rate switching in Treyz." A15 (citing A672-673 ¶¶41-43; A295-296 ¶¶15, 17); *see*

*also* A12 (citing A664-665 ¶¶28-30; A671-673 ¶¶40-43).

As explained in detail below, the Board correctly rejected Affinity's arguments that the proposed combination of Treyz and Fuller would have been "impossible," finding that a POSITA would have had a reasonable expectation of success in combining the teachings of Treyz with Fuller. In rejecting Affinity's arguments, the Board found that (1) Fuller is not limited to switching communication rates using a Java applet, and (2) even if Fuller is limited to the use of Java applets (it is not), a POSITA would have still had a reasonable expectation of success in implementing Fuller's rate switching in the Treyz device. A12-18. The Board's ultimate conclusion of obviousness in the FWD is correct, and the Board's underlying factual findings are supported by substantial evidence. This Court should affirm.

1.     *The Board correctly found that Fuller generally teaches rate switching and is not limited to rate switching using Java applets*

The Board correctly found that Fuller generally teaches rate switching and is not limited to rate switching only using Java applets, as Affinity asserts. *See* A12-14; A155-156; A277. The Board explained, "[t]he test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference," but "*what the combined teachings of the references would have suggested to those having ordinary skill in the art*." *In re Keller*, 642 F.2d 413, 425 (CCPA 1981); *see also In re Mouttet*, 686 F.3d 1322,

1332 (Fed. Cir. 2012) (declining to limit the teachings of a prior art reference to the specific optical implementation disclosed therein); *Syntex (U.S.A.) LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005) ("What a reference teaches a person of ordinary skill in the art is not ... limited to what a reference specifically 'talks about' or what is specifically 'mentioned' or 'written' in the reference.").[12]

With respect to Fuller's teachings, Dr. Quackenbush provided testimony credited by the Board that a POSITA would have understood that "*Java is a general purpose programming language* and that *the functionality of requesting a different rate of transmission … could be implemented in any general purpose programming language*."  A295 ¶15; *see also* A14; A277.  Thus, a POSITA reading Fuller would have understood that Fuller generally teaches communication rate switching and is not otherwise restricted to rate switching using only Java applets.

In an attempt to avoid a straightforward case of obviousness, Affinity resorts to asserting that the Petition and Dr. Quackenbush understood Fuller as only teaching switching communication rates *using Java applets* (Affinity Br. 34-35).  But the Petition relied on Fuller's general teaching of rate switching.  In particular, the Petition cited Fuller at 10:11-17 and emphasized Fuller's teachings of

---

[12] The Board did not "shift the burden of proof to Affinity" (*see* Affinity Br. 36), but rather simply applied the correct law, which Affinity fails to address at all in its brief.

"*request[ing] a different rate of transmission*" and "*request[ing] a lower rate.*" A156 (citing A448, 10:11-17).  The Board thus properly found, "[w]e understand this to be a citation to where the idea of transmission rate switching is disclosed in Fuller, and not a concession by Petitioner that transmission rate switching is only to be implemented using Java applets."  A13-14, n.10 (citing A156).

Likewise, the Board also properly found that Dr. Quackenbush never testified that Fuller is limited to rate switching using Java applets, as Affinity asserts (Affinity Br. 35).  A14-15.  Affinity's questions during Dr. Quackenbush's deposition—and thus Dr. Quackenbush's answers—were directed to only Fuller's use of Java applets, and not the general idea of transmission rate switching discussed in the Petition.  A14; A497-498, 47:2-6, 47:21-48:7; A488; *see also* A277.  The Board thus correctly found that "we understand Dr. Quackenbush's testimony as simply confirming that a device that relies on Java applets to perform transmission rate switching would need Java applet capability to operate, and not as an admission that the combination of Treyz and Fuller set forth in the Petition is limited to the use of Java applets."  A14-15.

Affinity did not challenge that it would have been obvious and straightforward to implement the general idea of transmission rate switching (as the Board found was disclosed in Fuller) in implementing the Treyz device.  A12-13.  Affinity only argued that Fuller is limited to transmission rate switching using

a Java applet, and that Java could not be implemented in the Treyz device.  A13.

The Board thus properly concluded after careful review and analysis of the

evidence (*see* § III.C) that a POSITA would have found it obvious to incorporate

Fuller's teaching of switching communication rates in implementing the Treyz

device.

> 2. *The Board correctly found that even if Fuller's teachings were limited to rate switching using Java applets (it is not), a POSITA would have still had a reasonable expectation of success in combining Treyz with Fuller*

The Board also correctly found that even if Fuller's disclosure were limited

to rate switching using Java applets (it is not), a POSITA would have still found

the combination of Treyz and Fuller obvious.  Specifically, Affinity incorrectly

asserted that the combination of Treyz and Fuller was "impossible" because Fuller

was allegedly limited to teaching rate switching using Java applets and portable

devices before March 28, 2000 allegedly could not execute Java applets (A239;

A240; A242).  After reviewing the evidence in the record, however, the Board

correctly found that contrary to Affinity's assertions, portable devices before

March 28, 2000 could indeed run Personal Java and execute Java applets.  A16-18;

*see also* A277-281.

As the Board explained, the book, Java 2 Platform Unleashed (Ex. 1129),

published in 1999, stated that "*Personal Java* has been defined as a subset of the

Java Platform *for use in consumer electronic devices and mobile computing*

*devices.* Examples of *Personal Java applications include handheld PCs*, set-top

Internet boxes, *Web phones*, and game controllers." A929-930; *see also* A16-17.

The book also explained that "Personal Java is designed to be *upward-compatible*

*with the Java Platform* but still capable of executing in memory-constrained

devices." *Id.* The book further confirmed that Personal Java could run Java

applets and could be tailored to other application environments. *Id.* The Board

also cited a June 7, 1999 article (Ex. 1133) as evidence that Personal Java was

available for use in handheld devices prior to March 28, 2000. A17 (citing A944-

945). The 1999 article discussed using Personal Java for "general purpose

handheld PCs running Windows CE technology" and running Java applets on such

devices. *Id.*

The evidence cited by Affinity (Affinity Br. 42) falls considerably short of

"confirm[ing] that mobile devices could not run Java applets." In particular, the

cited article merely reports on accessing the Web from a single device, the "Palm

Pilot," and does not report on the dozens of other contemporary mobile devices

available at the time. A912; *see also* A310 ¶33. Affinity's blanket assertion that

this article "confirms that mobile devices could not run Java applets" (Affinity Br.

42) is simply baseless and incorrect.

Moreover, contrary to Affinity's arguments (Affinity Br. 41), a POSITA

would have had a reasonable expectation of success in implementing Fuller's

specific teachings of switching rates using Java applets in the Treyz device.  A17 (citing A672-673 ¶¶41-43; A295 ¶15; A301-316 ¶¶24-41; A929-930; A423, 1:47-51).  Dr. Quackenbush's testimony, which the Board credited, confirmed that a POSITA would have understood that the device disclosed in Treyz could implement the teachings of Fuller.  A672-673 ¶¶41-43; A296-297 ¶17; A300 ¶22; A280; A15; A17.  And the Board expressly noted that Treyz discloses that "additional memory, in the form of solid-state memory circuits, hard drives, or any other suitable storage arrangement, may be added to the device of Treyz as needed."  A17 (citing A423, 1:47-51).  Treyz further teaches that its device could be a "handheld computing device" or "personal computer," either of which could have run Personal Java.  A435, 26:57-62; A7; A923-926, A929-930 ("Examples of Personal Java applications include *handheld PCs*"); A16-17; A272; A293; A158-159; A423, 1:61-62; A426, 8:32-40.  In view of the foregoing evidence, the Board properly concluded that "Petitioner has demonstrated by a preponderance of the evidence that claims 1, 2, 5–8, and 10 of the '007 patent are unpatentable under 35 U.S.C. § 103 as obvious over Treyz and Fuller, even if the combination of Treyz and Fuller requires the use of Java applets as argued by Patent Owner."  A17-18.

Affinity also discusses at length in its brief Petitioners' rebuttal evidence demonstrating that other available portable devices could execute a Java applet

before March 28, 2000.  The Court need not consider that discussion because the Board did not rely on this evidence in concluding that a POSITA would have found the combination of Treyz and Fuller obvious.  Notably, however, this evidence nonetheless also refutes Affinity's argument that the combination of Treyz and Fuller was "impossible."

For example, the Cassiopeia E-105 with Windows CE could run Personal Java and execute a Java applet.[13]  A934-A936, A937; A941-944; A907; A769 at i; A303-307 ¶¶26-29.  In addition, portable laptop computers with web browsers, such as Internet Explorer 3.0, included Java and could execute a Java applet before March 28, 2000.  A277; A948, A950; A299 ¶21; A300-301 ¶¶23-24; A310-311 ¶33; A315-316 ¶¶40-41; A554-555, 104:17-105:8.

Also, the Psion Series 5mx handheld device, available in 1999, had a web browser that could run a Java applet.  A277; A953-955, A957 ("Today, the JVM [Java Virtual Machine] lets *Psion Series 5mx* users *view Java applets* via the built-in microbrowser."); A958-962, A963 ("[w]hen you open a Web page which includes a *Java applet*, the Web program will *run the applet*"); A968; A299 ¶21;

---

[13] Affinity argues that Ex. 1132A and Ex. 1133A do not show "what types of applet could be used on certain devices" (Affinity Br. 41), but a POSITA would have understood that "prior to March 28, 2000 … there were mobile device platforms that supported Java applets, that the Java applet functionality cited in Fuller (*i.e.*, switching communication rates) was simple enough to implement on these mobile devices, and it would be clear that it would work and provide the expected functionality."  A311 ¶34; A396.

A301-303 ¶25; A310-311 ¶33; A315-316 ¶¶40-41.  Moreover, Affinity's assertion that the Psion Series 5mx did not run *Personal* Java (*see* Affinity Br. 41) is irrelevant, as the handheld Psion Series 5mx ran *Java and could execute java applets*.  It is also irrelevant whether the Psion Series 5mx "could play media files like the device in Treyz" (*see* Affinity Br. 41), as Petitioners submitted evidence of the Psion Series 5mx simply to refute Affinity's assertion that it was impossible to run Java applets in a portable computing device.

Finally, Affinity also asserts, without support, that Fuller is limited to implementation on a "personal computer" "because it was not possible to implement the invention on a device like that in Treyz or a cellular telephone at the time." (Affinity Br. 38).  To the contrary, Fuller is not limited to implementations on a PC, as Fuller more generally teaches that "the *client* executes the Java applets (A447, 8:42) and that "Java applets generally work across the Internet *regardless of the type of client*" (A445, 4:29-36). *See also* A276-277; A298-300 ¶¶19-22; A311 ¶34; A313-314 ¶38.  Fuller also teaches that "[t]he client 112 represents a computer, such as a PC compatible computer" (A447, 7:47-48), and a POSITA would have understood that a PC compatible computer includes a portable laptop computer (A295 ¶14).  *See also* A398.

For these reasons, Petitioners respectfully submit that the Board had substantial evidence supporting its finding that a POSITA would have had a

reasonable expectation of success in implementing Fuller's teaching of switching transmission rates in Treyz's multifunctional device. The Board's conclusion that the challenged claims are obvious over Treyz and Fuller is supported by substantial evidence, and this Court should affirm.

### D.    *The Board Made Sufficient Factual Findings To Support Its Conclusion Of Unpatentability*

To avoid cancellation of the challenged claims, Affinity vaguely asserts that the Board "failed to adequately articulate the reasons for its decision as required by § 103 and the Administrative Procedure Act" (Affinity Br. 46-47). As explained above, however, the Board's finding that the challenged claims are unpatentable is supported by extensive analysis and citations to the evidence (A7-18). Moreover, Affinity points to no specifics as to how the Board's decision is allegedly deficient. In addition, Affinity's argument that the Board "failed to weigh the credibility of the expert witnesses" is disproved by the Board's findings throughout the FWD, crediting and relying on Dr. Quackenbush's opinions and rejecting Dr. Zhong's opinions as incorrect and inconsistent with the evidence. *See, e.g.*, A7-18. This Court does not reweigh witnesses' credibility. *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 832 (Fed. Cir. 2010).

Having concluded in its Institution Decision that Petitioner had "set forth sufficient articulated reasoning with rational underpinning to support the proposed combination of references" (A220), and after summarizing again in the FWD

Petitioner's arguments and making express findings about the teachings of Treyz and Fuller and the rationale for combining the references (A7-18), there was no error in the Board structuring its other analysis around the counter-arguments advanced in the Patent Owner's Response.

The Board's task, in reaching its FWD, is to evaluate all of the evidence put forth by both parties to determine if Petitioners have met their ultimate burden of persuasion to show the claims were not patentable. *See* 35 U.S.C. § 316(e) ("In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence."). There is no question that the Board completed that task here, and should be affirmed. *See Progressive Casualty Ins. Co. v. Liberty Mutual Ins. Co.*, 625 F. App'x. 552, No. 14-1466, 2015 U.S. App. LEXIS 14826, at *8-10, 15-16 (Fed. Cir. Aug. 24, 2015) (non-precedential, *see* A990-A995) (holding that while the Board's FWD was "cursory," its analysis, consisting "of a single-paragraph recitation of three points from [Petitioner's] petition, some not even addressing motivation to combine, followed by the Board's declaration of agreement," was nonetheless sufficient and that the rationale for combining the references "is apparent when the decisions are read as a whole."); *Merck & CIE v. Gnosis S.P.A.*, 808 F.3d 829, 836-837 (Fed. Cir. 2015) (declining to "overturn the Board's decision for failure to state expressly that a person of ordinary skill would have had

a reasonable expectation of success," explaining that "[b]y rejecting [patent owner's] argument that the prior art taught away from combining [the references], the Board impliedly found a reasonable expectation of success."); *J.A. LaPorte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577, 1580-81 (Fed. Cir. 1986) ("Although not stated *in haec verba*, the thrust of the district court's holding is that there was a sale, not merely an offer to sell ….").

## IV. The Board Did Not Abuse Its Discretion In Denying Affinity's Motion to Exclude

Faced with no real path to attack the substance of the Board's decision, Affinity challenges the Board's FWD on a meritless procedural ground.  Affinity asserts that the Board erred in denying its Motion to Exclude, but as explained below, the Board properly denied Affinity's Motion, which was procedurally flawed to begin with and, in any event, substantively baseless.  A21; *see also* A972-981. The Board's decision was not "arbitrary, capricious, [or] an abuse of discretion," and this Court should affirm.  *See In re Sullivan*, 362 F.3d at 1326; 5 U.S.C. § 706(2)(A).

As an initial matter, Affinity improperly violated the Rules in filing a Motion to Exclude to challenge the proper scope of reply evidence—and not to challenge the admissibility of any evidence.  The Office Patent Trial Practice Guide clearly states that a motion to exclude "*must explain why the evidence is not admissible* (e.g., relevance or hearsay) *but may not be used to challenge the*

*sufficiency of the evidence* to prove a particular fact."  Office Patent Trial Practice

Guide, 77 Fed. Reg. 48756, 48767 (Aug. 14, 2012) (emphasis added); A21.

Affinity itself confirmed this understanding of the Rules.  IPR2014-00209, Pap. 40

at 2 ("[Affinity] ... acknowledged that *a Motion to Exclude would not be the right*

*vehicle to remove the supplemental information* as [Affinity] was not questioning

the admissibility of that evidence at present.").[14]  Thus, the Board properly denied

Affinity's Motion to Exclude *for the simple reason that the Motion did not*

*challenge the admissibility of any evidence*.  A21; *see also* IPR2013-00236, Paper

42 at 3 (dismissing portion of motion to exclude that argued reply arguments and

evidence exceeded scope of reply); IPR2014-01393, Paper 11 at 2 ("We instructed

the parties not to use a Motion to Exclude Evidence to address any issue

concerning an alleged improper scope of a reply or reply evidence."); *Donnelly*

*Garment Co. v. NLRB*, 123 F.2d 215, 224 (8th Cir. 1942) ("One who is capable of

ruling accurately upon the admissibility of evidence is equally capable of sifting it

accurately after it has been received, and, since he will base his findings upon the

---

[14] *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064 (Fed. Cir. 2015) did not hold that "a
motion to exclude is a proper avenue to remove improper reply evidence from the
record," as Affinity incorrectly asserts (Affinity Br. 51).  In *Belden*, the Board
expressly noted that including briefing about the propriety of the reply and any
supporting evidence in a motion to exclude was improper; the patent owner was
only allowed to include such briefing in its motion to exclude, because the Board
issued a supplemental order expressly authorizing it to do so.  IPR2013-00057,
Pap. 46 at 43-44 (PTAB Mar. 18, 2014).  Here, Affinity did not seek and the Board
did not issue any such order.

evidence which he regards as competent, material and convincing, he cannot be injured by the presence in the record of testimony which he does not consider competent or material.").

Consistent with the Board's own obligations under the Rules, the Board noted in the FWD that "to the extent Petitioner's Reply evidence does not respond to specific arguments or evidence presented in the Patent Owner Response, or seeks to establish an element necessary to make out its case-in-chief, it has not been considered." A21.  Affinity does not point out, much less discuss, any part of the Board's FWD that relies on any alleged improper evidence.  Affinity Br. 49-52. Furthermore, as explained below, Petitioners' Reply and each piece of supporting evidence was proper rebuttal evidence under the Rules.  To the extent the Board relied on Petitioners' rebuttal evidence, the FWD makes clear that such evidence was used to explain *why it rejected Affinity's arguments*—not to find that Petitioners had made a *prima facie* showing of obviousness in their Petition.  A9-18.

Affinity complains that Petitioners should have filed their own motion to supplement (Affinity Br. 49-50), but *does not address at all that Petitioners' Reply and evidence is simply proper rebuttal evidence*—precisely the sort contemplated by the governing rules. *See* Rules of Practice for Trials Before the Patent Trial and Appeal Board and Judicial Review of Patent Trial and Appeal Board Decisions, 77

Fed. Reg. 48,612, 48,620 (Aug. 14, 2012) ("replies may rely upon appropriate

evidence to support the positions asserted"); 37 C.F.R. §§ 42.24(c) (page limits for

"Replies" do "not include ... appendix of exhibits"), 42.63(a) ("Exhibits required.

Evidence consists of affidavits, transcripts of depositions, documents, and things").

In particular, Petitioners' Reply and the Rebuttal Declaration of Dr. Quackenbush

expressly link each piece of Reply evidence with each argument of Affinity's that

is being rebutted. A258-282; A283-329; *see Belden*, 805 F.3d at 1077-78 (finding

no abuse of discretion in Board's decision that expert declaration submitted with

petitioners' reply did not violate 37 C.F.R. § 42.23 where each statement of the

declaration responded to a statement in patent owner's expert declaration

submitted with its response).

Affinity also argues incorrectly for the first time here that "[t]he Petition

itself failed to mention whether there would be a reasonable expectation of success

in combining Treyz and Fuller" (Affinity Br. 50), but the Petition plainly stated,

with support from Petitioners' expert, that "*it would have been obvious to combine

Treyz with Fuller because, in combination, each element* (*e.g.*, Treyz's device and

Fuller's teachings of streaming multimedia content at two different communication

rates and a web browser utilizing HTTP) *merely performs the same function as it

does separately, yielding only predictable results*."  A150 (citing A673-674 ¶¶43,

45).  As explained in detail above (see § III.C), the Petition set forth a *prima facie* case of obviousness over Treyz and Fuller.

Moreover, Affinity's Motion to Exclude failed to identify with particularity *any* argument or evidence that it contended was "new."  A330-336.  Affinity now argues, for the first time, that "Petitioners presented new evidence regarding alleged capabilities of Personal Java on the Psion Series 5mc and the Cassiopeia E-105 devices," and that this evidence "relates to whether a POSITA would have had a reasonable expectation of success in combining the Treyz and Fuller references" Affinity Br. 50.  To begin with, Affinity's arguments regarding the Psion Series 5mx and Cassiopeia E-105 devices are irrelevant as the Board did not rely on these devices in finding the challenged claims unpatentable.  Nevertheless, Petitioners' reply evidence concerning Personal Java, the Psion Series 5mx, and the Cassiopeia E-105 was submitted to demonstrate that portable devices could run Java applets prior to March 28, 2000—directly rebutting Affinity's specious argument that "[p]ortable devices simply could not execute Java applets until well after the March 28, 2000 priority date of the '007 patent."  A243; A277-278; *see* CBM2012-00010, CBM2013-00002 at EX2300 at 19 (Aug. 22, 2013 Telephonic Hearing) (Judge Lee: "[S]ometimes … references come in not as a primary reference, they come in just to show what is the level of the ordinary skill in the art. If you have a declarant that says no one would have known this, it's perfectly

proper for the other party to cite references to say, hey, that testimony isn't true because here's 10 that show exactly what you say didn't exist.").  Indeed, Affinity is unable to explain anywhere in its brief why this evidence is not proper rebuttal evidence.  The FWD confirms that Petitioners' Reply and evidence on this issue was proper rebuttal to Affinity's arguments in its Patent Owner response. A16-18 (*e.g.*, "*In response*, Petitioner cites to a 1999 book, titled 'Java 2 Platform Unleashed'") (emphasis added).

Affinity's argument that it was "deprived of an opportunity to submit expert testimony or other evidence to refute the new evidence and arguments" (Affinity Br. 51) ignores the fact that Petitioners bear the burden of demonstrating invalidity in an *inter partes* review, and thus Petitioners are provided under the Rules with the last word. *See* 35 U.S.C. §316(e); *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378-80 (Fed. Cir. 2015); CBM2012-00010, EX2300 at 9. Moreover, the Rules do allow the patent owner to address reply evidence through cross-examination of the Petitioners' expert and a motion for observation on cross examination. *See* A983, A985-987. Affinity chose to do neither here. The Rules also permit a party to file a motion to exclude evidence believed to be inadmissible. Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,758, 48,767 (Aug. 14, 2012); A985-986.  But, as discussed above, Affinity chose not to contest the admissibility of any reply evidence. A21. In addition, Affinity did not

seek permission to file a sur-reply to address Petitioners' rebuttal evidence. Affinity cannot claim that it was "prejudiced" by its alleged lack of ability to respond, as it chose not to utilize any of the means for responding to reply evidence provided by the Rules. *See* Affinity Br. 51.

Moreover, to the extent that Affinity argues that such evidence *could* have been brought as a part of Petitioners' *prima facie* case, this is not the test: evidence relating to whether portable electronic devices could execute Java applets before March 28, 2000 is simply proper rebuttal. *See Belden Inc.*, 805 F.3d at 1079 (Fed. Cir. 2015) ("Evidence admitted in rebuttal to respond to the patent owner's criticisms will commonly confirm the prima facie case. That does not make it necessary to the prima facie case."); *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 347 (6th Cir. 2002) ("[Whether] the rebuttal testimony ... could have been offered in the case-in-chief ... is irrelevant, as long as the rebuttal is offered to refute new evidence in the defendant's case in chief."); *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1224 (10th Cir. 2000) ("Where the evidence rebuts new evidence or theories proffered in the defendant's case-in-chief, that the evidence may have been offered in the plaintiff's case-in-chief does not preclude its admission in rebuttal.") (citation omitted).

For these reasons, the Board did not abuse its discretion in denying Affinity's improper Motion to Exclude.

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, Petitioners-Appellees respectfully request that this Court affirm the determinations of the Patent Trial and Appeal Board that claims 1, 2, 5-8, and 10 of the '007 Patent are unpatentable.

Respectfully submitted,

Dated: February 29, 2016

/s/ *Douglas H. Hallward-Driemeier*

Douglas H. Hallward-Driemeier
J. Steven Baughman
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006-6807
Phone:  (202) 508-4600

Gabrielle E. Higgins
ROPES & GRAY LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303-2284
Phone:  (650) 617-4000

Brian P. Biddinger
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Phone:  (212) 596-9000

*Counsel for Appellees Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.*

/s/ *Jerry R. Selinger*

Jerry R. Selinger
PATTERSON & SHERIDAN LLP
1700 Pacific Avenue, Suite 2650
Dallas, TX 75201
Phone:  (214) 272-0957

B. Todd Patterson
PATTERSON & SHERIDAN LLP
24 Greenway Plaza, Suite 1600
Houston, TX, 77046
Phone (713) 577-4801

*Counsel for Appellees HTC Corp. and HTC America, Inc.*

## CERTIFICATE OF SERVICE

On February 29, 2016, the undersigned caused the foregoing document to be

filed electronically by using the Court's CM/ECF system.  All parties are

represented by registered CM/ECF users and will be served by the appellate

CM/ECF system.


/s/ *Douglas H. Hallward-Driemeier*
Douglas H. Hallward-Driemeier
*Counsel for Appellees Samsung*
*Electronics Co., Ltd. and Samsung*
*Electronics America, Inc.*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 13,961 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

/s/ *Douglas H. Hallward-Driemeier*
Douglas H. Hallward-Driemeier
*Counsel for Appellees Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.*