Case No. 16-1208

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### AFFINITY LABS OF TEXAS, LLC,

*Patent Owner-Appellant,*

v.

### SAMSUNG ELECTRONICS CO., LTD; SAMSUNG
### ELECTRONICS AMERICA, INC.; HTC CORP., and
### HTC AMERICA, INC.,

*Petitioners-Appellees.*

On Appeal from the United States Patent and Trademark Office,
Patent and Trademark Appeal Board,
Case Nos. IPR2014-00407 and IPR2014-00408

### OPENING BRIEF FOR APPELLANT
### AFFINITY LABS OF TEXAS, LLC

Ryan M. Schultz
Emily E. Niles
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402-2015
Tel.: (612) 349-8500

*Attorneys for Patent Owner-Appellant*
*Affinity Labs of Texas, LLC*

January 15, 2016

FORM 9.  Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Affinity Labs of Texas, LLC     v.     Samsung Electronics Co., Ltd., et al.

Case No.     16-1208

### CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Affinity Labs of Texas, LLC     certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Affinity Labs of Texas, LLC

2.     The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3. below) represented by me is:

The party named in the caption is the real party in interest.

3.     All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below. (Please list each party or amicus curiae represented with the parent or publicly held company that owns 10 percent or more so they are distinguished separately.)

None

4.  ☒   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Robins Kaplan LLP: Ryan M. Schultz, Emily E. Niles, and Thomas R. DeSimone

| 11/30/2015 | /s/Ryan M. Schultz |
|---|---|
| Date | Signature of counsel |

Please Note: All questions must be answered

| | Ryan M. Schultz |
|---|---|
| cc:     Counsel of record | Printed name of counsel |

Reset Fields

i

# TABLE OF CONTENTS

<u>Page</u>

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES.................................................................. v

STATEMENT OF RELATED CASES ................................................ 1

STATEMENT WITH RESPECT TO ORAL ARGUMENT ............... 2

JURISDICTIONAL STATEMENT ...................................................... 2

STATEMENT OF THE ISSUES ......................................................... 2

STATEMENT OF THE CASE............................................................. 3

I.     Proceedings Before the PTAB......................................................... 3

II.    The '007 Patent.............................................................................. 4

III.   Prior Art ....................................................................................... 6

       A.     Treyz ................................................................................ 6

       B.     Fuller ................................................................................ 6

SUMMARY OF ARGUMENT............................................................. 7

ARGUMENT ...................................................................................... 9

I.     Standard of Review......................................................................... 9

II.    *Inter partes* review unconstitutionally violates the separation of powers and
       the Seventh Amendment because Affinity has the right to adjudicate its
       private patent rights in an Article III court and before a jury. ..................... 11

       A.     The *MCM* decision is not binding on this Court because it failed to
              account for precedent addressing the private nature of patent rights.12

       B.     Removing adjudication of Affinity's private patent right from an
              Article III court violates the separation of powers. ............................ 13

1.  Patent rights are private rights. ........................................................ 14

2.  The treatment of patents as common law establishes that patent rights are private rights. ..................................... 20

3.  The *MCM* court incorrectly relied on the *Patlex* and *Joy Technologies* decisions which analyzed distinguishable *ex parte* reexamination proceeding. ............................................. 22

C.  The Seventh Amendment guarantees Affinity the right to litigate its private patents right before a jury. ........................... 27

III.  The Board erred in finding claims 1, 2, 5-8, and 10 of the '007 patent unpatentable because Petitioners failed to prove the combination of Treyz and Fuller rendered the claims obvious by a preponderance of the evidence. ................................................................................. 31

A.  The Board applied improper hindsight because the evidence showed a POSITA would not have been motivated to combine Treyz and Fuller. ......................................................................... 33

1.  The Board erred in finding that Fuller discloses switching transmission rates through means other than Java applets. ....... 34

2.  The Board erred in finding a POSITA would have had a reasonable expectation of success in combining Fuller with Treyz. .......................................................................... 36

a.  The Petition failed to prove by a preponderance of the evidence that Treyz and Fuller could be combined with a reasonable expectation of success. ......................... 38

b.  Petitioners' Reply brief also failed to prove by a preponderance of the evidence that Treyz and Fuller could be combined with a reasonable expectation of success. ......................... 40

B.  The Board's finding that Treyz discloses a cellular telephone is not supported by substantial evidence because Treyz does not disclose a device for making phone calls over a cellular radio system. ................ 42

C.  The Final Written Decision lacks sufficient analysis to support the Board's determination of unpatentability. .............................................. 46

IV.  The Board erred in denying Affinity's motion to exclude Petitioners'
     improper new reply evidence and by failing to identify which evidence was
     improper and thus should not have been considered....................................47

     A.  Affinity has legal standing for judicial review of the Board's
         procedural actions. ...................................................................... 48

     B.  The Board erred in denying Patent Owner's motion to exclude
         Petitioners' improper new reply evidence. ............................................ 49

RELIEF SOUGHT ................................................................................ 53

ADDENDUM

CERTIFICATE OF COMPLIANCE

PROOF OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Affinity Labs of Texas, LLC v. Samsung Elecs. Co., Ltd.*,
   1:12-cv-557 (E.D. Tex.) ................................................. 1

*Affinity Labs of Texas, LLC v. Samsung Elecs. Co., Ltd. et al.*,
   1:14-cv-2717, 14-cv-2966 (N.D. Cal.) ................................. 1, 50

*Animal Legal Def. Fund v. Quigg*,
   932 F.2d 920 (Fed. Cir. 1991) ........................................ 48

*In re Antor Media Corp.*,
   689 F.3d 1282 (Fed. Cir. 2012) ....................................... 43

*Arnstein v. Porter*,
   154 F.2d 464 (2d Cir. 1946) .......................................... 29

*Atl. Thermoplastics Co. v. Faytex Corp.*,
   970 F.2d 834 (Fed. Cir. 1992) ........................................ 12

*Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*,
   430 U.S. 442 (1977) ................................................. 15, 19

*Belden Inc. v. Berk-Tek LLC*,
   805 F.3d 1064 (Fed. Cir. 2015) ....................................... 51

*Blackberry Corp. v. Mobilemedia Ideas LLC*,
   IPR2013-00016, Paper 32 (PTAB Feb. 25, 2014) ........................ 24, 30

*Block v. Hirsch*,
   256 U.S. 135 (1921) .................................................. 20

*Bond v. United States*,
   131 S.Ct. 2355 (2011) ................................................ 13

*Bonito Boats v. Thunder Craft Boats*,
   489 U.S. 141 (1989) .................................................. 16

*Brown v. Duchesne,*
  60 U.S. 183 (1857) .................................................................................... 15

*Cammeyer v. Newton,*
  94 U.S. 225 (1876) .................................................................................... 21

*Citizens to Preserve Overton Park v. Volpe,*
  401 U.S. 402 (1971) .................................................................................. 47

*Consol. Fruit-Jar Co. v. Wright,*
  94 U.S. 92 (1876)....................................................................................... 15

*Crowell v. Benson,*
  285 U.S. 22 (1932) ..................................................................................... 16

*In re Cuozzo Speed Techs.,*
  778 F.3d at 1276........................................................................................ 24

*In re Cuozzo Speed Techs.,*
  793 F.3d 1268............................................................................................ 30

*Dairy Queen, Inc. v. Wood,*
  369 U.S. 469 (1962) .................................................................................. 29

*Eurand, Inc. v. Mylan Pharms., Inc.,*
  676 F.3d 1063 (Fed. Cir. 2012) ............................................................... 10

*Feltner v. Columbia Pictures Television, Inc.*
  523 U.S. 340 (1998) .................................................................................. 29

*In re Fine,*
  837 F.2d 1071 (Fed. Cir. 1988) ............................................................... 43

*Garmin Int'l Inc. v. Cuozzo Speed Tech. LLC,*
  IPR2012-00001, Paper 26 (PTAB Mar. 5, 2014) .................................... 31

*In re Gordon,*
  733 F.2d 900 (Fed. Cir. 1984) ................................................................. 37

*Graham v. John Deere Co. of Kan. City,*
  383 U.S. 1 (1966) ...................................................................................... 32

*Granfinanciera v. Nordberg,*
  492 U.S. 33 (1989) ..................................................................................... 28

*Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.*,
  340 U.S. 147 (1950) ................................................................................. 19

*Joy Techs., Inc. v. Manbeck*,
  959 F.2d 226 (Fed. Cir. 1992) ................................................................. 25

*Juniper Networks, Inc. v. Brixham Solutions, Ltd.*,
  IPR2014-00425 Paper 16 (PTAB Aug. 1, 2014) ..................................... 50

*K/S Himpp v. Hear-Wear Techs., LLC*,
  751 F.3d 1362 (Fed. Cir. 2014) ............................................................... 11

*In re Kahn*,
  441 F.3d 977 (Fed. Cir. 2006) ................................................................. 46

*Kaiser Aetna v. United States*,
  444 U.S. 164 (1979) ................................................................................. 16

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ................................................................................. 32

*In re Lee*,
  277 F.3d 1338 (Fed. Cir. 2002) ............................................................... 46

*Marbury v. Madison*,
  5 U.S. 137 (1803) ..................................................................................... 21

*Markman v. Westview Instruments*,
  517 U.S. 370 (1996) ........................................................................... 21, 29

*McCormick Harvesting Mach. Co. v. Aultman*,
  169 U.S. 606 (1898) ................................................................. 15, 18, 21, 22

*MCM Portfolio LLC v. Hewlett-Packard Co.*,
  2015-1091, 2015 U.S. App. LEXIS 20848 (Fed. Cir. Dec. 2, 2015) ................... *passim*

*Microsoft Corp. v. i4i Ltd. P'ship*,
  131 S. Ct. 2238 (2011) ............................................................................... 9

*Microsoft Corp. v. Proxyconn, Inc.*,
  789 F.3d 1292 (Fed. Cir. 2015) ................................................................. 9

*Minesen Co. v. McHugh*,
  671 F.3d 1332 (Fed. Cir. 2012) ............................................................... 11

*Murray's Lessee v. Hoboken Land & Improvement Co.,*
    59 U.S. 272, 18 How. 272, 15 L. Ed. 372 (1856) ................................................ 14, 21

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.,*
    719 F.3d 1346 (Fed. Cir. 2013) ............................................................... 10

*In re O'Farrell,*
    853 F.2d 894 (Fed. Cir. 1988) ............................................................ 40, 41

*Patlex Corp. v. Mossinghoff,*
    758 F.2d 594 (Fed. Cir. 1985) ................................................. 22, 23, 25, 26

*Pfizer, Inc. v. Apotex, Inc.,*
    480 F.3d 1348 (Fed. Cir. 2007) ............................................................... 37

*Power Integrations, Inc. v. Kappos,*
    6 F. Supp. 3d 11, 18 (D.D.C. 2013) ......................................................... 24

*Preminger v. Sec'y of VA,*
    517 F.3d 1299 (Fed. Cir. 2008) ............................................................... 12

*Prestonettes, Inc. v. Coty,*
    264 U.S. 359 (1924) ........................................................................... 16

*Randall Mfg. v. Rea,*
    733 F.3d 1355 (Fed. Cir. 2013) ............................................................... 9

*Ruiz v. A.B. Chance Co.,*
    357 F.3d 1270 (Fed. Cir. 2004) .................................................... 32, 37, 46

*ScentAir Tech., Inc. v. Prolitec, Inc.,*
    IPR2013-00179 ................................................................................. 22

*Schillinger v. United States,*
    155 U.S. 163 (1894) ........................................................................... 18

*St. Jude Med., Cardiology Div., Inc. v. Volcano Corp.,*
    749 F.3d 1375 (Fed. Cir. 2014) ............................................................... 24

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ............................................................................ 12

*Stern v. Marshall,*
    131 S.Ct. 2594 (2011) ................................................................*passim*

*Tec Air, Inc. v. Denso Mfg. Mich., Inc.*,
    192 F.3d 1353 (Fed. Cir. 1999) ................................................... 37

*In re Tech. Licensing Corp.*,
    423 F.3d 1286 (Fed. Cir. 2005) ................................................... 29

*Thomas v. Union Carbide Agric. Prods. Co.*,
    473 U.S. 568 (1985) ................................................... 20

*Ex parte Wood & Brundage*,
    22 U.S. 603 (1824) ................................................... 21, 29

**Statutes**

U.S.C. § 316 ................................................... 30

5 U.S.C. § 551 *et. seq.*, Administrative Procedure Act ................................................... *passim*

5 U.S.C. § 702 ................................................... 48

5 U.S.C. § 704 ................................................... 47

5 U.S.C. § 706 ................................................... 10, 47

7 U.S.C. §136 *et seq.* (1996), Federal Insecticide, Fungicide, and
    Rodenticide Act ................................................... 20

15 U.S.C. 1051, America Invents Act ................................................... 26, 48

28 U.S.C. § 1295(a)(4)(A) ................................................... 2

35 U.S.C. § 103 ................................................... 3, 46

35 U.S.C. § 141 ................................................... 2

35 U.S.C. § 141(c) ................................................... 2

35 U.S.C. § 142 ................................................... 2

35 U.S.C. § 261 ................................................... 7, 16

35 U.S.C. § 271 ................................................... 16

35 U.S.C. § 315(e)(2) ................................................... 9

35 U.S.C. § 316(e) ..................................................................... 9, 36

35 U.S.C. § 318(a) ........................................................................ 2

35 U.S.C. § 319 ............................................................................. 2

**Regulations**

37 C.F.R. § 42.23 ........................................................................ 49

37 C.F.R. § 42.100(b) ................................................................ 30

37 C.F.R. § 42.123 ...................................................................... 49

37 C.F.R. § 90.3(a) ....................................................................... 2

*Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,767 (Aug. 14,
  2012) ........................................................................................ 49

**Rules**

Fed. R. App. P. 34(a) .................................................................... 2

Fed. R. App. P. 34(a)(2) ............................................................... 2

Federal Circuit Rule 47.5 ............................................................. 1

**Constitutional Provisons**

U.S. Const., amd. 7 ...........................................................*passim*

U.S. Const. art. I ......................................................................... 26

U.S. Const. art. I, § 8, cl. 8 ....................................................... 14

U.S. Const., art. III ...........................................................*passim*

U.S. Const. art. III, § 1 ............................................................. 26

U.S. Const. art. III, § 2, cl. 1 ................................................... 13

**Other Authorities**

3 Steven Alan Childress & Martha S. Davis, *Federal Standards of Review*
  § 15.04 (4th ed. 2010) .............................................................. 11

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Appellant, Affinity Labs of Texas, LLC ("Affinity"), states as follows:

(a)    No other appeal in or from the same proceeding was previously before this or any other appellate court; and

(b)    The Appellees are defendants in the following pending cases that will be directly affected by this Court's decision in the pending appeal: *Affinity Labs of Texas, LLC v. Samsung Electronics Co., Ltd. et al.*, 1:14-cv-2717, 14-cv-2966 (N.D. Cal.) (transferred from *Affinity Labs of Texas, LLC v. Samsung Electronics Co., Ltd.*, 1:12-cv-557 (E.D. Tex.). In addition, Patent Owner has appealed from the Final Written Decision in IPR2014-00209 and joined proceeding IPR2014-00212, which may be impacted by this Court's decision because the proceedings involve the related U.S. Patent 7,953,390 and the same parties, Affinity, as patent owner/appellant, and Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., HTC Corp. and HTC America, Inc. as petitioners/appellees. Three additional pending *inter partes* review (proceedings may be impacted by this Court's decision—IPR2014-01181, IPR2014-01182, and IPR2014-01184—and involve related U.S. Patent 8,532,641 and Affinity, as patent owner/appellant, and Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc., as petitioners.

1

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a), Appellant Affinity Labs of Texas, LLC ("Affinity") respectfully requests oral argument in this matter. Oral argument is appropriate because this matter meets the standards of Rule 34(a)(2) for oral argument, in that (a) this appeal is not frivolous, (b) the dispositive issues raised in this appeal have not been recently and authoritatively decided, and (c) in addition to the parties respective briefs, the decisional process would be significantly aided by oral argument.

## JURISDICTIONAL STATEMENT

Pursuant to 35 U.S.C. § 141(c), Affinity appeals from the July 20, 2015 Final Written Decision of the Patent Trial and Appeal Board ("PTAB" or "Board") under 35 U.S.C. § 318(a), in the joined and consolidated *inter partes* review proceedings, IPR2014-00407 and IPR2014-00408. Affinity timely filed a notice of appeal on September 21, 2015 pursuant to 35 U.S.C. § 142 and 37 C.F.R. § 90.3(a). This Court has jurisdiction under 35 U.S.C. §§ 141, 319 and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1.    Whether the litigation of private patent rights in *inter partes* review proceedings violates the separation of powers and unconstitutionally deprives a patent owner of its right to adjudicate its private rights in an Article III court and to a jury trial under the Seventh Amendment.

2.     Whether the Board erred in finding claims 1, 2, 5-8, and 10 of U.S. Patent 8,359,007 ("the '007 patent") unpatentable under 35 U.S.C. § 103 over the combination of Treyz and Fuller.

2.     Whether the Board erred in denying Affinity's motion to exclude Petitioners' improper supplemental reply evidence and in considering that evidence.

## STATEMENT OF THE CASE

### I.     Proceedings Before the PTAB

Appellees Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., HTC Corp., and HTC America, Inc. (collectively "Petitioners") filed Corrected Petitions in IPR2014-00407 and IPR2014-00408 requesting review of claims 1, 2, 5-8, and 10 of the '007 patent, owned by Affinity Labs of Texas, LLC ("Affinity"). A63, A132. The Board instituted *inter partes* review to determine whether claims 1, 2, 5-8, and 10 of the '007 patent are unpatentable under 35 U.S.C. § 103 as obvious over the combinations of Hitson and Fuller, and Treyz and Fuller. A208, A221.

Following institution, Affinity submitted a Consolidated Patent Owner Response. *See* A223-A257. Petitioners submitted a Reply supported by 37 new exhibits, A261-265, including a new 46-page declaration from Petitioners' expert. *See* A283-329. The Reply brief relied on new evidence, for example, new evidence concerning technical capabilities of Personal Java on certain devices. A276-280. Affinity sought relief through a motion to exclude Petitioners' improper reply

evidence. A330-336. An oral hearing was held on April 1, 2015, and the parties presented their respective arguments on the asserted prior art combinations.

The Final Written Decision was issued on July 20, 2015. The Board denied Affinity's motion to exclude Petitioners' improper new reply evidence, ruling that a motion to exclude may only present arguments regarding why evidence is not admissible. A20-21. The Board stated:

> a reply may "only respond to arguments raised in the corresponding opposition" and may not add new evidence necessary to make out its case-in-chief of unpatentability of a claim. *Id.* Thus, to the extent that Petitioner's Reply evidence does not respond to specific arguments or evidence presented in the Patent Owner Response, or seeks to establish an element necessary to make out its case-in-chief, it has not been considered.

A21. The Board did not identify which evidence was improper. The Board also determined Petitioners failed to meet their burden to prove claims 1, 2, 5-8, and 10 obvious based on the combination of Hitson and Fuller. A20. The Board found claims 1, 2, 5-8, and 10 unpatentable as obvious over Treyz and Fuller. A18.

## II. The '007 Patent

The '007 patent is entitled, "System and method for communication media center" and issued from a continuation application claiming priority back to the filing of U.S. Application 09/537,812 ("the '812 application") with an effective filing date of March 28, 2000. A25. The '812 application disclosed Russell White's and Kevin Imes' invention for a new media ecosystem utilizing a portable media device as a media hub. The '812 application broadly addressed the problem of accessing,

managing, and communicating digital audio and video content. The application disclosed a number of inventions relating to a new media ecosystem which included a portable electronic device, such as an MP3 player or cellular phone. Numerous patents resulted from this innovative disclosure, including the '007 patent.

The '007 patent generally claims the ability to communicate media content from a network resource to a personal electronic device, such as a cellular phone, while allowing different portions of the content to utilize different communication rates. 46 at 1:21-23, 2:55-58. The claimed invention improved the way that content could be transferred to the cellular phone or computing device. For example, the '007 patent disclosed novel techniques for formatting selected content and transmitting selected content to a portable device. A48 at 5:21-23. The'007 patent identifies several ways content can be segmented, formatted, and delivered to facilitate transmissions to a cellular phone or computing device, including segmenting, compressing, modifying, and/or storing content data in different compressed and uncompressed multimedia formats. A47 at 3:20-26, 3:49-59. The various portions of a selected media can be stored at respective network locations with network addresses for those locations included in a playlist. A47 at 3:42-56. And the portable device can make requests for the sequential portions. *See, id.* The claimed invention also offered a novel approach to facilitate a device's ability to choose various portions of selected content, by requesting individual segmented portions of content that are formatted for different data rates. A48 at 5:50-6:16.

5

## III.  Prior Art

### A.  Treyz

U.S. Patent 6,678,215 ("Treyz") entitled "Digital Audio Devices" was filed on October 21, 2008 and issued on February 9, 2010. Treyz relates to an improved audio device, namely "alarm clocks, clock radios, or the like." A423 at 1:33-34. The alarm clock audio devices of Treyz can handle audio signals other than traditional radio broadcasts. A423 at 1:30-33. For example, the alarm clock audio device could handle internet music content, MP3s, email content, or other audio content formats. A426 at 8:37-44. An in-home network, utilizing short-range wireless communications circuitry, can deliver audio from an in-home computer to the alarm clock audio device. A435 at 26:18-37. The specification also mentions that optionally the alarm clock audio device may contain a built-in telephone function. A424 at 3:19-20. Treyz does not mention a cellular telephone, but does mention that the alarm clock audio device may utilize cellular transmissions to send and receive audio data. A423 at 2:29-41.

### B.  Fuller

U.S. Patent 6,711,622, ("Fuller") entitled "Video and Audio Streaming for Multiple Users," was filed on December 31, 1997 and issued on March 23, 2004. Fuller describes a system and method of providing streaming audio and video data to multiple users. A444 at 2:53-54. To provide the requested content, Fuller only discloses the implementation of a Java applet executing on a personal computer. A447 at 8:55-65. Fuller defines Java as "a programming language whose programs (called

6

applets) can travel over the Internet for use by clients . . . Many browsers include Java capabilities so Java applets require no installation." A445 at 4:29-36. Fuller discloses that the server-supplied Java applet can be used to vary the rate of data transmission dependent upon the availability of the client's bandwidth. A448 at 10:11-17. The client receives the compressed audio data, decompresses the audio data as commanded by the Java audio applet, and plays the audio information through its audio system. A448 at 9:34-37. The web server will continue serving the data as long as the client is connected to the web server through the Java audio applet. A448 at 9:43-45. According to the specification, the client is a computer, such as a PC, running a browser application. A447 at 7:47-48; A448 at 10:40-43. Fuller does not disclose the use of a cellular telephone.

## SUMMARY OF ARGUMENT

First, *inter partes* review proceedings unconstitutionally remove adjudication of private patent rights from Article III courts in violation of the separation of powers, the Seventh Amendment. The *MCM* decision is not binding on this Court because it failed to account for over a century of precedent characterizing a patent owner's constitutionally founded rights in his patent as a private property rights. *MCM Portfolio LLC v. Hewlett-Packard Co.*, 2015-1091, 2015 U.S. App. LEXIS 20848, at *8-19 (Fed. Cir. Dec. 2, 2015). Federal law demands that "patents shall have the attributes of personal property." 35 U.S.C. § 261. Further, the common law treatment of patent rights established that patent rights must be adjudicated in an Article III court before

7

a jury. Patent rights have always been and continue to be private property rights. Through *inter partes* review, Congress improperly created an alternate unconstitutional venue for adjudicating patent rights outside of Article III courts and without a jury as guaranteed by the Seventh Amendment. Therefore, *inter partes* review is unconstitutional and the Board's decision must be vacated.

Second, the Board's determination that claims 1, 2, 5-6, and 10 of the '007 patent were obvious is incorrect, because the underlying factual determination are clearly erroneous and not supported by substantial evidence of motivation to combine or a reasonable expectation of success in combining Treyz and Fuller. The Board's determination that the alarm clock audio device of Treyz could (or would ever) be successfully combined with Fuller's rate switching functionality utilizing Java applets is clearly erroneous and not supported by any evidence, let alone substantial evidence. Thus, the Board's decision must be reversed.

Third, the Board's denial of Affinity's motion to exclude Petitioners' improper reply evidence violated the Administrative Procedure Act ("APA") as an arbitrary and capricious decision that denied Affinity's right to fair proceedings and harmed Affinity's ability to defend its patent rights. Thus, the Board's decision should be reversed because it relied on improper reply evidence, or alternatively this case should be remanded for proceedings consistent with such a determination.

# ARGUMENT

## I.   Standard of Review

This Court reviews issues of law *de novo*, including the Board's ultimate determination on the question of obviousness. *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362 (Fed. Cir. 2013). Factual issues determined by the PTAB should be reviewed for clear error.[1] Congress designed *inter partes* review "as part of 'a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs.'" *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1308 (Fed. Cir. 2015) (citing H.R. Rep. No. 112-98, pt. 1, at 40 (2011), *reprinted* in 2011 U.S.C.C.A.N. 67, 69). *Inter partes* review only requires a petitioner to prove invalidity by a preponderance of the evidence. 35 U.S.C. § 316(e). And the PTAB's determination on validity is final and estoppel provisions apply following any appeal to the Federal Circuit. 35 U.S.C. § 315(e)(2). Thus, it is imperative that the PTAB's decision be reviewed, and any factual errors corrected.

In district court, in comparison, patents are presumed valid and an accused infringer has a higher burden, and must prove obviousness by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). A district court's

---

[1]     In Fed. Cir. Case No. 15-1933, Affinity acknowledged that the Board's rulings on issues of fact have been reviewed for substantial evidence. However, in these proceedings, Affinity argues that the clear error standard of review should apply. Nonetheless, the Board made erroneous certain factual determinations that should be reversed under either the clear error or substantial evidence standards of review.

underlying factual findings related to obviousness are reviewed for clear error. *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1354 (Fed. Cir. 2013). A patent validity determination in district court, benefits from live witness testimony, and thus from a greater amount of information on witness credibility. The PTAB's factual determinations do not benefit from any live witness testimony, and instead must rely solely on briefing, expert declarations and expert deposition transcripts. Discovery of information on secondary indicia of nonobviousness is rarely allowed by the PTAB, even though this Court has determined such information to be most valuable in deciding questions of obviousness. *See Eurand, Inc. v. Mylan Pharms., Inc.*, 676 F.3d 1063, 1079 (Fed. Cir. 2012) (Consideration of secondary indicia of nonobviousness "guard as a check against hindsight bias . . . by preventing a fact finder from "develop[ing] a hunch that the claimed invention was obvious, and then construct[ing] a selective version of the facts that confirms that hunch."). A more exacting standard of review, clear error, should be applied to the factual determinations made by the PTAB, which serves in the role analogous to a district court judge.

This Court has previously reviewed the PTAB's factual determinations in *inter partes* review proceedings for substantial evidence under the APA. 5 U.S.C. § 706. The highly deferential "substantial evidence" standard fails to carry out the legislative purpose of improving the quality of issued patents, because it holds administrative decisions by the PTAB to a lower standard than district court decisions on factual

issues underlying determinations of patent validity. Under the substantial evidence standard, this Court must only determine whether the PTAB's decision was reasonable, rather than determining whether the decision was correct. *See* 3 Steven Alan Childress & Martha S. Davis, Federal Standards of Review § 15.04 (4th ed. 2010) ("*De novo* and clearly erroneous review go straight to the question of whether the decision under review is correct; substantial evidence review, if properly performed, does not reach that question."; *K/S Himpp v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1364 (Fed. Cir. 2014) ("A finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding."). This Court should apply a standard of review of clear error to correct the PTAB's mistakes, and further Congress's intention to improve the quality of patents through the correct application of patent law—rather than merely a reasonable determination of facts in the application of patent law.

## II. *Inter partes* review unconstitutionally violates the separation of powers and the Seventh Amendment because Affinity has the right to adjudicate its private patent rights in an Article III court and before a jury.

This Court must decide the constitutional challenge relating to Article III jurisdiction before reaching any other issue on appeal. *Minesen Co. v. McHugh*, 671 F.3d 1332, 1337 (Fed. Cir. 2012) ("[W]e are generally obligated to resolve jurisdictional challenges first, Supreme Court precedent only requires federal courts to answer questions concerning their Article III jurisdiction—not necessarily their statutory

11

jurisdiction—before reaching other dispositive issues.'"); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95-97, 101 (1998).

### A.   The *MCM* decision is not binding on this Court because it failed to account for precedent addressing the private nature of patent rights.

The panel in *MCM Portfolio LLC v. Hewlett-Packard Co.*, examined whether *inter partes* review proceedings were unconstitutional for violating Article III and the Seventh Amendment. No. 2015-1091, 2015 U.S. App. LEXIS 20848, at *20 (Fed. Cir. Dec. 2, 2015). Generally, previous opinions by Federal Circuit panels are precedential for later panels. *Preminger v. Sec'y of VA*, 517 F.3d 1299, 1309 (Fed. Cir. 2008). But where the previous panel fails to consider Supreme Court precedent, a later panel is not bound if it determines "that the prior panel would have reached a different conclusion if it had considered controlling precedent." *Atl. Thermoplastics Co. v. Faytex Corp.*, 970 F.2d 834, 838 n.2 (Fed. Cir. 1992).

In the *MCM* decision, the analysis of the right to petition for *inter partes* review and the system built to perform *inter partes* review fails to scrutinize the critical question — do a patent owner's rights in its issued patent constitute public rights or private rights. If the *MCM* court had properly considered the Supreme Court precedent and the constitutional foundation for the private nature of patent rights, it would not have concluded that a patent owner's rights in his issued patent are public rights. Furthermore, if the *MCM* court had considered Supreme Court precedent on a patent owner's right to a jury trial, it would have ruled that *inter partes* review is

unconstitutional for depriving a patent owner of his Seventh Amendment right to a jury trial. Despite the Federal Circuit decision in *MCM*, this Court should find that an issued patent is the patent owners' private right, which cannot be adjudicated through *inter partes* review proceedings outside of an Article III court or without a jury.

### B. Removing adjudication of Affinity's private patent right from an Article III court violates the separation of powers.

Article III of the Constitution directs that "[t]he judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority." U.S. Const. art. III, § 2, cl. 1. The separation of power between the judiciary, executive, and legislative branches serves "to protect each branch of government from incursion by the others" and to "protect the individual as well." *Bond v. United States*, 131 S.Ct. 2355, 2365 (2011). "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decision-making if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Stern v. Marshall*, 131 S.Ct. 2594, 2609 (2011).

The boundaries between the judiciary, executive, and legislative branches must be maintained in order to preserve the benefits of the separation of powers.

> That is why we have long recognized that, in general, Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272, 284, 15 L. Ed. 372 (1856). When a suit is made of "the stuff of the traditional actions at common law tried by the courts at Westminster in

> 1789," *Northern Pipeline*, 458 U.S., at 90, 102 S. Ct. 2858, 73 L. Ed. 2d 598 (Rehnquist, J., concurring in judgment), and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts. The Constitution assigns that job—resolution of "the mundane as well as the glamorous, matters of common law and statute as well as constitutional law, issues of fact as well as issues of law"—to the Judiciary. *Id.*, at 86-87, n. 39, 102 S. Ct. 2858, 73 L. Ed. 2d 598 (plurality opinion).

*Stern*, 131 S.Ct. at 2609. Only a limited set of rights—those properly within the public rights exception—may be adjudicated outside of an Article III court in accordance with the separation of powers established by the Constitution. *Murray v. Hoboken Land & Improv. Co.*, 59 U.S. 272, 284 (1856) ("there are matters, involving public rights . . . which congress may or may not bring within the cognizance of the courts of the United States").

### 1.    Patent rights are private rights.

The *MCM* court failed to account for the fact that patent rights are rooted in the Constitution. The Constitution gives Congress the power "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. Congress, however, was not granted the power to do so in any manner. Instead, the Constitution explicitly established the means to do so—"by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." *Id.* This constitutional creation of a private right can "scarcely be questioned" as the rights to inventions "belong to the inventors." The Federalist No. 43, at 214 (James Madison) (L. Goldman ed. 2008). Thus, a patent is an exclusive private property right derived

from the Constitution. As a property right rooted in the Constitution, patent rights are private rights that do not fall within the public rights exception, and must be adjudicated in an Article III court. *Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 442, 458 (1977).

Controlling Supreme Court precedent has repeatedly recognized the constitutional foundation and private nature of patent rights. *See e.g.*, *Brown v. Duchesne*, 60 U.S. 183, 197 (1857) ("For, by the laws of the United States, the rights of a party under a patent are his private property; and by the Constitution of the United States, private property cannot be taken for public use without just compensation."); *Consol. Fruit-Jar Co. v. Wright*, 94 U.S. 92, 96 (1876) ("a patent for an invention is as much property as a patent for land. The right rests on the same foundation, and is surrounded and protected by the same sanctions."). The *MCM* court failed to account for this precedent. *See* 2015 U.S. App. LEXIS 20848, at *8-12.

> It has been settled by repeated decisions of [the Supreme Court] that when a patent has received the signature of the Secretary of the Interior, countersigned by the Commissioner of Patents, and has had affixed to it the seal of the Patent Office, it has passed beyond the control and jurisdiction of that office, and is not subject to be revoked or cancelled by the President, or any other officer of the Government. . . It has become the property of the patentee, and as such is entitled to the same legal protection as other property.
> The only authority competent to set a patent aside, or to annul it, or to correct it for any reason whatever, is vested in the courts of the United States, and not in the department which issued the patent.

*McCormick Harvesting Mach. Co. v. Aultman*, 169 U.S. 606, 608-09 (1898) (internal citations omitted). In over one hundred years since *McCormick*, no Supreme Court

15

case has characterized patents differently. *See e.g.*, *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 366 (1924) ("Trade marks are protected upon the theory that they are private property and the right to the exclusive use of a trade mark is a private monopoly, something akin to that based upon a patent."); *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 162 (1989) (describing the exclusive domain of private patent rights under federal law "allowing for the development of a uniform body of law in resolving the constant tension between private right and public access.").

In further support of a patent being a private right, federal law declares that "patents shall have the attributes of personal property." 35 U.S.C. § 261. Patent rights are private rights that create "liability of one individual to another under the law as defined." *Crowell v. Benson*, 285 U.S. 22, 50-51 (1932). A patent is private property made up of a bundle of associated legal rights, including the right to exclude others from making, using, offering for sale, selling, or importing the claimed invention by providing a private cause of action for infringement. 35 U.S.C. § 271; *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979) ("one of the most essential sticks in the bundle of rights that are commonly characterized as property—[is] the right to exclude others"). The bundle of right rests solely in the hands of the patent owner. In describing private rights, the *Stern* court explained that "**matters 'of private right [are matters] of the liability of one individual to another under the law as defined.'**" 131 S. Ct. at 2612 (citing *Crowell v. Benson*, 285 U.S. 22, 50, 51, 52 S. Ct. 285, 76 L. Ed. 598 (1932) (emphasis added)).

16

The definition of a public right is not met with respect to patent rights, which are not statutorily-created public rights, but instead private rights rooted in the Constitution. The public rights exception includes a limited class of rights known as public rights, which may be adjudicated outside of an Article III court. In the *Stern v. Marshall* case, the Court examined the distinction between private and public rights. 131 S.Ct. 2594 (2011). The *MCM* decision relied on the analysis and holding in the *Stern* case. 2015 U.S. App. LEXIS 20848, at * 14-16 (discussing 131 S. Ct. 2594 (2011)). The *Stern* court explained that the Supreme Court's "discussion of the public rights exception . . . has not been entirely consistent, and the exception has been the subject of some debate," and "varied formulations." 131 S. Ct. 2594 at 2611, 2614. Then, the *Stern* court discussed the various inconsistent formulations of the public rights exception. *Id.* at 2611-14.

The Stern court explained the public rights exception extends only to cases "where the Government is involved in its sovereign capacity under . . . [a] statute creating enforceable public rights," *Id.* at 2613 (citing *Atlas Roofing*, 430 U.S. at 458); and "'only to matters that historically could have been determined exclusively by' the Executive and Legislative Branches." *Id. (citing N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 68 (1982)). In contrast, **"[w]holly private tort, contract, and property cases, as well as a vast range of other cases . . . are not at all implicated"** by the private rights exception. *Id.* (citing *Ex parte Bakelite Corp.*, 279 U.S. 438, 451-452 (1929) (emphasis added). Whether a patent owner is asserting his rights

17

to exclude others through a claim for patent infringement, or an individual is challenging the validity of a patent, the dispute lies between two private parties over the scope of a patent owner's private property rights. Indeed, patent infringement is a tort. *Schillinger v. United States*, 155 U.S. 163, 169 (1894) ("That this action [for patent infringement] is one sounding in tort is clear."). A patent owner does not need Congressional approval to file an infringement action. Accordingly, the private nature of patent disputes involving two parties, supports the determination that patents are private rights.

To qualify as a "public right," like the rights created by Congress through the Environmental Protection Agency, the Federal Communications Commission, or the U.S. Food and Drug Administration, the dispute about that right must be between the agency and the right holder. This is not the case with patents. Patents do not fit within the public rights exception because, as explained above, patent rights are rooted in the Constitution, and patent rights create liability between two private parties. Congress was given the power to establish and maintain a system for vetting patent applications and issuing patents. But as *McCormick* made clear, once a patent is issued, the patent rights themselves are private property rights rooted in the Constitution. 169 U.S. at 608-09. *Stern* held that a state law tort claim could not be decided by a non-Article III bankruptcy court because it did not fall within any of those varied formulations. 131 S. Ct. at 2613. Likewise, a patent right is not a public right and thus cannot be decided outside of an Article III court.

Among the inconsistent formulations of the public rights doctrine, and specifically the cases discussed by *MCM*, were "cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority." *MCM Portfolio*, 2015 U.S. App. LEXIS 20848, at * 14 (citing *Stern*, 131 S. Ct. at 2613). The public rights exception has also been described as limited to cases "where the Government is involved in its sovereign capacity under . . . [a] statute creating enforceable public rights." *Atlas Roofing*, 430 U.S. at 458. A patent owner's rights in his issued patent do not fall within the formulations of the public rights exception addressed by *MCM*. First, a patent owner's constitutionally based rights in its issued patent are not merely the product of a federal regulatory scheme because patent rights are grounded in the Constitution. Congress did not create the right to obtain a patent, the Constitution did. Congress merely established the means of developing a system to properly issue patents. Second, this is not simply a "situation in which Congress devised an expert and inexpensive method of dealing with a class of questions of fact." *MCM Portfolio*, 2015 U.S. App. LEXIS 20848, at * 15-16. "The standard of patentability is a constitutional standard; and the question of validity of a patent is a question of law." *Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 155 (1950). Therefore, patent rights do not fall within the second formulation described by the *Stern* court.

Cases cited in the *MCM* decision upholding adjudication of disputes between private parties as to public rights are distinguishable, because the rights at issue in those decisions were not private property rights established through the Constitution. *Block v. Hirsch*, 256 U.S. 135, 158 (1921) (analyzing the statutory creation of a commission to determine whether the rent, service and other terms and conditions of the use and occupancy of apartments, hotels and other rental property in the District of Columbia, were fair and reasonable."); *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 571 (1985) (analyzing whether Congress has the power to authorize administrative proceedings for "the voluntary participants in a complex regulatory scheme to allocate costs and benefits" under the Federal Insecticide, Fungicide, and Rodenticide Act.). Subsequent actions by Congress to build and modify a federal system for granting patents cannot transform the private nature of issued patent rights established by the Constitution into public rights. Thus, private disputes between two parties involving a patent owner's private property rights in his patent can only be adjudicated in Article III court.

## 2. The treatment of patents as common law establishes that patent rights are private rights.

The treatment of patents at common law supports the conclusion that patent rights are private rights. The earliest Supreme Court case defining the public rights exception provided that "any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty," does not fall within the public rights

exception. *Murray's Lessee,* 59 U.S. at 284. Only an Article III court has the authority to determine whether a private property right may be revoked. *Marbury v. Madison*, 5 U.S. 137, 154-56, 166 (1803); *Cammeyer v. Newton*, 94 U.S. 225, 234-35 (1876) ("Agents of the public have no more right to take such private property than other individuals under that provision, as it contains no exception warranting any such invasion of the private rights of individuals."). The same rules have consistently been applied to patent rights.

Adjudication of patent rights, including cases of patent infringement and patent validity have historically taken place in courts. "Equally familiar is the descent of today's patent infringement action from the infringement actions tried at law in the 18th century, and there is no dispute that infringement cases today must be tried to a jury, as their predecessors were more than two centuries ago." *Markman v. Westview Instruments*, 517 U.S. 370, 377 (1996). In addition, patent validity challenges also historically occurred in Article III courts through a writ *scire facias*:

> [It] is ORDERED by the Court . . . that the said Judge do award a process, in the nature of a *scire facias*, to the patentees, to show cause why the said patent should not be repealed . . . the said Judge do proceed to try the cause upon the pleadings filed by the parties, and the issue joined thereon; and that if the issue be an issue of fact, the trial thereof be by a jury; if an issue of law then by the Court, as in other cases.

*Ex parte Wood & Brundage*, 22 U.S. 603, 615 (1824) (ordering a jury trial on the issue of whether a patent should be repealed); *McCormick* 169 U.S. at 609 ("The only authority competent to set a patent aside, or to annul it, or to correct it for any reason whatever,

is vested in the courts of the United States, and not in the department which issued the patent." (internal citations omitted)). Article III courts have properly continued to decide disputes over patent rights.

The rules governing adjudication of patent rights are akin to the rules regarding adjudication of rights in a patent in land, which could only be decided in Court:

> a patent for an invention stands in the same position and is subject to the same limitations as a patent for a grant of lands. The power to issue either one of these patents comes from Congress and is vested in the same department. In the case of a patent for lands it has been held that when one has obtained a patent from the Government he cannot be called upon to answer in regard to that patent before the officers of the Land Department, and that the only way his title can be impeached is by suit.

*Id.* Thus, a patent is private property that only be revoked by an Article III court.

### 3. The *MCM* court incorrectly relied on the *Patlex* and *Joy Technologies* decisions which analyzed distinguishable *ex parte* reexamination proceeding.

The *MCM* court incorrectly relied on the *Patlex* and *Joy Technologies* decisions based on flawed determination that "**we see no basis to distinguish the reexamination proceeding in Patlex from inter partes review**." 2015 U.S. App. LEXIS 20848, at * 15-19 (emphasis added). This statement is simply incorrect. **"An *inter partes* review is not original examination, continued examination, or reexamination of the involved patent. Rather, it is a trial, adjudicatory in nature and constituting litigation**." *ScentAir Tech., Inc. v. Prolitec, Inc.*, IPR2013-00179, Paper 9 at 4 (Apr. 16, 2013) (emphasis added). The *MCM* court's reliance on

*Patlex* and *Joy Technologies* highlights this error and fails to account for the vast differences in rules, procedures, and burdens of proof in *inter partes* review as compared to *ex parte* reexamination. Even the PTAB admits that *inter partes* review is litigation, as opposed to examination. The contrast between the *ex parte* reexamination and *inter partes* review litigation renders the analysis in *Patlex and Joy Technologies* immaterial to the analysis of whether *inter partes* review is constitutional.

The *Patlex* court's decision was based, in part, on the finding that:

> The reexamination statute's purpose is to correct errors made by the government, to remedy defective governmental (not private) action, and if need be to remove patents that should never have been granted. We do not read *McCormick Harvesting* as forbidding Congress to authorize reexamination to correct governmental mistakes, even against the will of the patent owner. A defectively examined and therefore erroneously granted patent must yield to the reasonable Congressional purpose of facilitating the correction of governmental mistakes. This Congressional purpose is presumptively correct, and we find that it carries no insult to the Seventh Amendment and Article III.

*Patlex Corp. v. Mossinghoff,* 758 F.2d 594, 604 (Fed. Cir. 1985). This basis for upholding the constitutionality of *ex parte* reexamination does not extend to *inter partes* review proceedings because the two proceedings have markedly different characteristics.

*Ex parte* reexamination involves a back-and-forth exchange between the patent owner and the patent office. A third-party may submit a request for reexamination of another parties' patents, providing prior art and asserting a substantial new question of patentability. After the request is filed, the third-party is precluded from further

involvement in the proceedings. Alternatively, a patent owner could consent to *ex parte* reexamination of his own patent rights. The patent office and the patent owner proceed to reexamine the patent based on the submitted prior art references. The patent owner is allowed to freely amend the claims and to correct an error made by the government during the original examination. Finally, all decisions made during *ex parte* reexamination proceedings were subject to *de novo* review by a district court. *Power Integrations, Inc. v. Kappos*, 6 F. Supp. 3d 11, 18 (D.D.C. 2013) ("Congress intended to preserve *de novo* review in district court for patent owners who receive adverse decisions from the BPAI in *ex parte* reexamination proceedings.). As the title suggests, *ex parte* reexamination is essentially a re-examining of a patent application.

Inter partes* review, on the other hand, is akin to litigation, not examination. The purpose of *inter partes* review is not to correct governmental errors. It is instead, a proceeding specifically designed to move adjudication of patent validity disputes between patent owners and alleged infringers from the judicial branch to the executive branch. The proceedings are distinct from *ex parte* reexamination, which involves the government and the patent owner, instead, *inter partes* review involve opposing briefing and trial before the PTAB between the patent owner and a third-party. There is no presumption of validity in *inter partes* review. *Blackberry Corp. v. Mobilemedia Ideas LLC*, IPR2013-00016, Paper 32 at 20 (PTAB Feb. 25, 2014). Finally, in contrast to *ex parte* reexamination, not every decision in *inter partes* review may be appealed. *St. Jude Med., Cardiology Div., Inc. v. Volcano Corp.*, 749 F.3d 1373, 1375-76 (Fed. Cir. 2014); *In re*

*Cuozzo Speed Techs.*, 778 F.3d at 1276. Accordingly, as the purpose of correcting governmental errors is not central to *inter partes* review, and thus the *Patlex* decision does not control the determination of whether an *inter partes* review involving patent rights falls within the public rights exception. Ultimately, this Court does not need reach the issue of whether *ex parte* reexamination is constitutional; it must only determine whether *inter partes* review is constitutional.

The *Patlex* decision does not overturn the Supreme Court jurisprudence on the treatment of patent rights, and is inconsistent with subsequent Supreme Court precedent defining the limited public rights exception. The *Patlex* court reasoned that:

> the grant of a valid patent is primarily a public concern. Validity often is brought into question in disputes between private parties, but the threshold question usually is whether the PTO, under the authority assigned to it by Congress, properly granted the patent. At issue is a right that can only be conferred by the government.

758 F.2d at 604. Based on this line of reasoning—which fails to recognize the differences between the USPTO's role of considering the allowability of a patent application and the court's role in overseeing an alleged infringer's validity challenge to an already issued patent—the court incorrectly characterized patent rights as public rights. Even while doing so, the court recognized that "it is beyond reasonable debate that patents are property." *Id.* at 599; *Joy Techs., Inc. v. Manbeck*, 959 F.2d 226, 229 (Fed. Cir. 1992) (following the decision in *Patlex*). If being of public interest transforms a private property right into a public right, then Congress could make all rights (property, contract, etc.) subject to a politicized administrative process and remove the

protection of Article III courts by simply creating a statutory scheme. *Stern*, 131 S.Ct. at 2612 ("In those cases it depends upon the will of congress whether a remedy in the courts shall be allowed at all, so Congress could limit the extent to which a judicial forum was available." (internal quotation omitted)). Contrary to the flawed reasoning in the *Patlex* and *Joy Technologies* decisions, merely being of public concern or including a regulatory review scheme to vet the granting of private rights does not transform the private property right in an issued patent into a public right. Instead, the public rights exception can only applied in a manner consistent separation of powers, which prohibits Congress from withdrawing adjudication of private rights from the judiciary.

In conclusion, the *MCM* court improperly relied on the distinguishable analysis in *Patlex* and *Joy Technologies* and failed to account for controlling precedent describing the private nature of patent rights. Thus, *MCM* is not binding on this Court. Congress improperly shifted power from Article III courts to the PTAB, an Article I executive-controlled agency, by creating *inter partes* review proceedings under the America Invents Act to adjudicate the validity of a private patent right. Article III requires that "[t]he judicial Power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1.

> As its text and our precedent confirm, Article III is "an inseparable element of the constitutional system of checks and balances" that "both defines the power and protects the independence of the Judicial Branch."

*Stern*, 131 S.Ct. at 2608 (citing *Northern Pipeline*, 458 U.S. at 58.). Only cases falling within the public rights exception may be removed by Congress from adjudication in Article III courts. Under every analysis of the public rights exception, only a right that is statutorily created as a public right can fall within this limited exception. Patent rights are not public rights. Patent rights are, and always have been private property rights, and thus Affinity's private right in the '390 patent was unconstitutionally adjudicated in *inter partes* review proceedings ant the Board's decision must be vacated.

### C.    The Seventh Amendment guarantees Affinity the right to litigate its private patents right before a jury.

The *MCM* court failed to analyze the correct right at issue with respect to the Seventh Amendment—adjudication of a patent owner's private rights in his patent—not the right to petition for *inter partes* review. Specifically, the *MCM* court ruled that "when Congress created the new statutory right to inter partes review, it did not violate the Seventh Amendment by assigning its adjudication to an administrative agency." 2015 U.S. App. LEXIS 20848, at *20. Indeed, there is no right to *inter partes* review. The statutory creation of a new administrative proceeding to challenge patents cannot supersede a patent owner's private rights in his issued patent. In its analysis of the Seventh Amendment, the *MCM* court again erroneously relies on the finding that patent rights are public rights. For the reasons discussed above, this is not correct—precedent establishes that patents are private property rights.

Based on the incorrect determination that patent rights are public rights, *MCM* improperly followed precedent that "the Seventh Amendment is generally inapplicable to administrative proceedings, where jury trials could be incompatible with the whole concept of administrative adjudication and would substantially interfere with [the agency's] role in the statutory scheme." 2015 U.S. App. LEXIS 20848, at * 19 (*citing Curtis v. Loether*, 415 U.S. 189, 194, 94 S. Ct. 1005, 39 L. Ed. 2d 260 (1974). But this precedent does not apply here, to adjudication of constitutionally derived private patent rights.

> Congress may devise novel causes of action involving public rights free from the strictures of the Seventh Amendment if it assigns their adjudication to tribunals without statutory authority to employ juries as factfinders. But it lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury. As we recognized in *Atlas Roofing*, **to hold otherwise would be to permit Congress to eviscerate the Seventh Amendment's guarantee** by assigning to administrative agencies or courts of equity all causes of action not grounded in state law, whether they originate in a newly fashioned regulatory scheme or possess a long line of common-law forebears. 430 U.S., at 457-458. The Constitution nowhere grants Congress such puissant authority. "[L]egal claims are not magically converted into equitable issues by their presentation to a court of equity," *Ross v. Bernhard*, 396 U.S. 531, 538 (1970), nor can Congress conjure away the Seventh Amendment by mandating that traditional legal claims be brought there or taken to an administrative tribunal.

*Granfinanciera v. Nordberg*, 492 U.S. 33, 51-52 (1989) (emphasis added). "**Congress [cannot] conjure away the Seventh Amendment by mandating that traditional legal claims be brought there or taken to an administrative tribunal.**" *Id.* at 42 n.4 (emphasis added).

The Seventh Amendment has consistently afforded owners of statutorily created intellectual property the right to a trial before a jury. *See Markman*, 517 U.S. 370, 377 (1996); *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946) ("That it is founded solely on a statute does not deprive either party of a right to a trial by jury"); *Feltner v. Columbia Pictures Television, Inc.* 523 U.S. 340, 355 (1998); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477, 479-80 (1962). Patents, trademarks, and copyrights are all subject to pre-issuance examination, but the associated administrative and regulatory schemes do not permit Congress to deny intellectual property owners the right to assert and defend their private property rights before juries. By creating alternative administrative avenues for litigation of private patent rights without a jury, Congress has eviscerated the Seventh Amendment's guarantees of a jury trial.

Issues of patent validity have historically been decided exclusively before a jury. *See Ex parte Wood & Brundage*, 22 U.S. at 615 (ordering a jury trial on the issue of whether a patent should be repealed). It is true that this Court has held that where a patent owner seeks only equitable relief for violation of its patent rights, it is not entitled to a jury trial. *See In re Tech. Licensing Corp.*, 423 F.3d 1286, 1291 (Fed. Cir. 2005) ("seeking only equitable relief on its claim of infringement, confers no jury trial right on TLC"). However, Affinity has at no point consented to the adjudication of its patent rights separate from a jury trial by pursuing only equitable relief, and Affinity has never consented to *inter partes* review proceedings. A252-253. Throughout the proceedings, Affinity challenged the constitutionality of *inter partes* review. A251-255.

Before Petitioners commenced these *inter partes* review proceedings, Affinity sought both legal relief in the form of damages and equitable relief against Petitioners when it filed its suit for infringement of the '390 patent. A252. Affinity was thereby entitled to a jury trial on the issues of infringement and validity in accordance with the Seventh Amendment.

There are stark differences between *inter partes* review and litigation before a jury in an Article III court. Unlike in an Article III court, there is no presumption of validity in *inter partes* review. *Blackberry Corp. v. Mobilemedia Ideas LLC*, IPR2013-00016, Paper 32, at 20 (PTAB Feb. 25, 2014) ("There is no presumption of validity as to the challenged claims or substitute claims in an *inter partes* review."). A party challenging a patent in court can only overcome the presumption of patent validity by presenting clear and convincing evidence of invalidity. A lower standard applies in *inter partes* review, and the Petitioner need only prove invalidity by a preponderance of evidence. 35. U.S.C. § 316. In addition, the standard for claim construction is more liberal in *inter partes* review proceedings as compared to district court litigation. The PTAB construes claims based on the "broadest reasonable construction in light of the specification as it would be interpreted by one of ordinary skill in the art." 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs.*, 793 F.3d 1268. Correct claim constructions are necessary for accurate determinations of patent validity.

The PTAB also recognizes "in *inter partes* review, discovery is limited as compared to that available in district court litigations. Limited discovery lowers the

cost, minimizes the complexity, and shortens the period required for dispute resolution." *Garmin Int'l Inc. v. Cuozzo Speed Tech. LLC*, IPR2012-00001, Paper 26 at 4-7 (PTAB Mar. 5, 2014). However, limited discovery stymies a patent owner's ability to fully investigate and present evidence in defense of its private patent rights.

In conclusion, this Court should vacate the Board's decision because Affinity's right to a jury trial under the Seventh Amendment has been eviscerated by Congress's establishment of *inter partes* review as a quick and cheap alternative means of litigation.

### III. The Board erred in finding claims 1, 2, 5-8, and 10 of the '007 patent unpatentable because Petitioners failed to prove the combination of Treyz and Fuller rendered the claims obvious by a preponderance of the evidence.

The Board's factual findings regarding Fuller's disclosure relating to transmission rate switching and Treyz's disclosures regarding an alarm clock audio device are not supported by substantial evidence, much less under the clear error standard. The Board erred in finding motivation to combine Treyz and Fuller. The evidence in the record shows that the Java applets of Fuller could not be implemented on a cellular telephone in 2002, let along the audio alarm clock device in Treyz. Furthermore, Treyz and Fuller do not even disclose a cellular telephone, a limitation required by claims 1, 2, 5, 6, and 10 of the '007 patent.

In determining whether a claim is invalid as obvious, the Board must decide, from the perspective of one of ordinary skill in the art pertinent, whether,

the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 405 (2007). Claims must be examined as a whole because, as this Court has recognized, "[i]nventions typically are new combinations of existing principles or features. *Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1275 (Fed. Cir. 2004) (citing *Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 698 (Fed. Cir. 1983) (noting that "virtually all [inventions] are combinations of old elements.")).

The Board was required to heed instructions to "be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning." *KSR*, 550 U.S. at 421; *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 36 (1966) (warning against the "temptation to read into the prior art the teachings of the invention in issue" and instructing factfinders to "guard against slipping into use of hindsight."). Failure to heed such warnings causes erroneous determinations of obviousness because:

> an obviousness assessment might break an invention into its component parts (A + B + C), then find a prior art reference containing A, another containing B, and another containing C, and on that basis alone declare the invention obvious. This form of hindsight reasoning, using the invention as a roadmap to find its prior art components, would discount the value of combining various existing features or principles in a new way to achieve a new result - often the very definition of invention.

*Ruiz*, 357 F.3d at 1275. The Board's findings regarding the combination of Treyz and Fuller's disclosures are based on improper hindsight, using the '007 patent as a

roadmap to cobble together disparate disclosures from Treyz and Fuller. No motivation existed to combine Treyz and Fuller in March 2000, and such a combination could not have worked. Therefore, the Board's determination that claims 1, 2, 5-8, and 10 of the '007 patent are obvious over the combination of Treyz and Fuller is based on clearly erroneous factual determination, is not supported by substantial evidence, and should be reversed.

### A. The Board applied improper hindsight because the evidence showed a POSITA would not have been motivated to combine Treyz and Fuller.

The Board erred in finding that the combination of Treyz and Fuller renders claims 1, 2, 5-8 and 10 of the '007 patent obvious, because a person of ordinary skill in the art ("POSITA") would not have been motivated to combine the two references. The Board's finding that Fuller discloses the general idea of transmission rate switching is erroneous. Fuller only provides the specific disclosure of transmission rate switching through the use of Java applets. Treyz discloses an alarm clock audio device that all the evidence showed would not have been capable of utilizing Java applets in March 2000. Accordingly, a POSITA would not have had a reasonable expectation of success in combining Treyz and Fuller, and as such, would not have been motivated to combine the references. Thus, the Board's determination that claims 1, 2, 5-8 and 10 of the '007 patent are obvious over the combination of Treyz and Fuller should be reversed.

### 1.     The Board erred in finding that Fuller discloses switching transmission rates through means other than Java applets.

The Board's characterization of Fuller, unreasonably broadens the actual disclosures made in Fuller. Specifically, the Board found that "[a]t a high level, Fuller discloses the benefit of using two different transmission rates to deliver streaming media." A12. But the Board's characterization fails to take into account the process actually Fuller discloses to achieve use of two different transmission rates for media delivery.

Fuller only discloses the use of Java applets to achieve transmission rate switching on a personal computer. A234, A240-242. <u>The invention of rate switching disclosed in Fuller is inseparable from use of Java applets</u>. The only time Fuller explains use of transmission rate switching, it does so in connection to Java applets:

> If it is the case that the audio, or the video, information is not being received by the client 112 at a sufficient data rate, the corresponding Java applet, in some embodiments of the invention, can request a different rate of transmission. The Java applet can request a lower rate corresponding to a lower audio or video signal, that will more appropriately match the bandwidth availability of the client 112.

A448 at 10:11-17. Petitioners only relied on this disclosure to argue that Fuller "discloses embodiments in which the client browser can request a different streaming data transmission rate. *Id.* at 10:11-17." A148, A155-156. A second discussion of transmission rate switching in Fuller again only discloses rate switching in connection with Java applets:

> a user is allowed to modify the video rate, shown in frames per second, by selecting one of the video rate selectors 510. A result of selecting one of the various video rate selectors 510 would be that the corresponding video Java applet will communicate with its corresponding process in the web server 131. The Java applet would request a change in the video frame per second rate being supplied by the process in the Web server 131. Similarly, a set of audio rate selectors 512 allow the user to select a higher or lower quality audio signal. The corresponding Java audio applet would communicate with its corresponding process in the Web server 131 to request the change in the audio rate.

A448-449 at 10:61-11:6. Petitioners did not, and could not, prove Fuller discloses an invention for rate switching broader than the use of Java applets on personal computers to achieve different transmission rates. Dr. Zhong, Affinity's expert, and Dr. Quackenbush, Petitioners' expert, both provided testimony that a POSITA would understand Fuller's invention to only work for transmission rate switching through use of Java applets. A488; A497-498; A595-596; A631-636.

The evidence in the record makes it clear that the only method for rate switching disclosed in Fuller requires Java applets. The Board justified its overbroad reading of Fuller's disclosures by explaining that "Patent Owner and Dr. Zhong identify no disclosure in Fuller that transmission rate switching cannot, or should not, be implemented by means other than Java applets." A13. There is no authority for putting the burden on the patent owner as the Board did here.

It would be impossible to overcome obviousness challenges if patent owners were required to point out negative statements in references that discuss the very elements that are actually missing from the reference. Affinity cannot be required to

35

point to statements in Fuller for why a cellular telephone could not run the Java applet when Fuller does not include the words "cellular telephone." Fuller's inventors never imagined the Java applet's would be use on a telephone, because they (like the experts) knew it would not work. Here, the Board improperly shifted the burden of proof to Affinity. But Petitioners "have the burden of proving a proposition of unpatentability by a preponderance of the evidence." 35 U.S.C. § 316(e). Notably, neither Petitioners nor the Board identified any disclosure in Fuller that transmission rate switching could be achieved through means other than Java applets. A277. The Board's understanding of Fuller is clearly erroneous and not supported by substantial evidence, because Fuller only discloses utilizing Java applets to achieve transmission rate switching.

### 2.    The Board erred in finding a POSITA would have had a reasonable expectation of success in combining Fuller with Treyz.

A POSITA would not have had a reasonable expectation of success in combining Treyz and Fuller, because Treyz's alarm clock audio device could not use Java applets, and, therefore, could not utilize Fuller's transmission rate switching which requires Java applets. The Board erred in finding that "even if the proposed combination was in fact limited to use of Java applets . . . we are not persuaded that such a combination would have been impossible." A16. The Board did not agree with Affinity's argument that it was impossible to implement Java applets on devices like Treyz in March 2000. But Affinity's argument was not limited to whether the combination was impossible. Affinity argued under the proper test that "one of skill

36

in the art would not have a reasonable expectation of success in implementing the method disclosed in Fuller regarding data transmission rates . . . on an alarm clock audio device, such as those disclosed in Treyz, at the time of invention for the '007 patent." A249. The Board erred by **only determining whether it would have been impossible** to implement Java applets in the Treyz alarm clock audio device, **rather than whether there was a reasonable expectation of success in combining the references**.

Case law is clear that if the combination of disclosures in Treyz and Fuller would not work together, then the combination cannot render the '007 patent obvious. A modification that relies upon an impossible or otherwise non-enabled combination cannot render a claimed invention obvious. *Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353, 1360 (Fed. Cir. 1999); *In re Gordon*, 733 F.2d 900, 902, (Fed. Cir. 1984). "While the references need not expressly teach that the disclosure contained therein should be combined with another, the showing of combinability must be 'clear and particular.'" *Ruiz*, 234 F.3d at 665 (citing *In re Dembiczak*, 175 F.3d 994, 999 (Fed. Cir. 1999)). "[T]he burden falls on the challenger of the patent to show . . . that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007). Affinity presented sufficient evidence, including

Dr. Zhong's testimony and articles, establishing that the disclosures of Treyz and Fuller were not compatible. A242-251, A626-A635, A912-922.

Petitioners had the burden to show a clear and particular compatibility in the disclosures of Treyz and Fuller to prove a reasonable expectation of success in March 2000, and that the combination was equivalent to the claimed invention of the challenged patent. Petitioners failed on both counts. The Board's decision of obviousness was based on its erroneous finding that "we are not persuaded by Patent Owner's argument that it would have been impossible to execute Fuller's Java applets in the device of Treyz." A17.

### a.    The Petition failed to prove by a preponderance of the evidence that Treyz and Fuller could be combined with a reasonable expectation of success.

Petitioners failed to prove by a preponderance of the evidence that a POSITA would have had a reasonable expectation of success in combining Treyz and Fuller. Petitioners could not set forth evidence to satisfy this burden, because Java applets could not be used on portable devices such as the alarm clock audio device disclosed in Treyz in March 2000. A242-251, A626-A635, A912-922. Fuller only references use of its invention on a "personal computer," because it was not possible to implement the invention on a device like that in Treyz or a cellular telephone at the time. A447 at 7:47-48; A448 at 10:11-17, 10:40-43. The Petition only argued

> it would have been obvious to combine Treyz with Fuller because, in combination, each element (e.g., Treyz's device and Fuller's teachings of streaming multimedia content at two different communication rates and

a web browser utilizing HTTP) merely performs the same function as it does separately, yielding only predictable results. Ex. 1017 ¶¶43, 45.

A150. The only evidence cited in the Petition in support of this proposition was the testimony of Petitioners' expert, Dr. Quackenbush. Dr. Quackenbush's opinion likewise did not cite any evidence to support its conclusions:

> It would have been routine for a person of ordinary skill in the art to use Fuller's teaching of streaming multimedia content at two different communication rates with the device disclosed by Treyz and it would be clear to a person of ordinary skill in the art that such a use would work and provide the expected functionality.

A673. The Petition did not set forth any evidence to prove by the preponderance of evidence that Treyz and Fuller were clearly and particularly compatible and that the combination would have had a reasonable expectation of success. Remarkably, the Board concluded that the conclusory statements "as a whole, [are] not so conclusory to be unreliable or of no probative value."

> In contrast, Affinity presented evidence that:

> At the time of the invention of the '007 patent and as disclosed in Fuller, Java could only be implemented on home computers. Java was not available on browsers installed on mobile devices during that time period. See, Ex. 2103 at ¶¶ 46, 48-50; Ex. 2121 at ¶¶ 46, 48-50; Ex. 2107; Ex. 2102.

A239-A251. Dr. Zhong provided examples of devices and specific evidence regarding the inability of audio devices and portable devices to implement Java applets in support of his opinion that "neither Java applets nor JavaScript support was available for mobile devices on or before March 2000." A598. In spite of this stark contrast in

evidence presented by the parties and their experts, the Board apparently credited Dr. Quackenbush's testimony over Dr. Zhong's. While there is not requirement that a prior art combination actually be reduced to practice, there must be reasonable expectation of success. *In re O'Farrell*, 853 F.2d 894, 904 (Fed. Cir. 1988). Dr. Zhong's testimony and evidence regarding lack of any devices capable of implementing Java applets supports the conclusion that a POSITA would not have had a reasonable expectation of success in combining Treyz and Fuller.

> **b.   Petitioners' Reply brief also failed to prove by a preponderance of the evidence that Treyz and Fuller could be combined with a reasonable expectation of success.**

In an attempt to address the shortcomings in Petitioners' *prima facie* case, Petitioners presented new evidence in their Reply and arguing that portable devices utilized Java applets in 2000. [IPR2014-00407, Paper 34 at 11-15]. Affinity had no substantive opportunity to rebut the Petitioners' improper reply evidence, other than a motion to exclude, which the Board denied. Petitioners' improper reply evidence should not have been considered by the Board.

Petitioners' Reply included a new argument that one of skill in the art would have created "software" for the alarm clock audio device in Treyz to perform data rate switching. A276-278, A295-296. This is an entirely new element created by Petitioners, but not found in the actual prior art references at issue. Treyz does not present any disclosure of how such software could be used, and neither did Petitioners or Dr. Quackenbush. The mere suggestion by Petitioners that someone may have created software to somehow implement transmission rate switching is not prior art and fails

to prove by a preponderance of the evidence that a POSITA would have had a reasonable expectation of success in combining the disclosures of Treyz and Fuller.

Petitioners, for the first time in the Reply, presented new arguments and evidence alleging that two specific devices could run Java applets. A277-279. These two devices are the Psion Series 5mx and the Cassiopeia E-105. *Id.* With respect to the Cassiopeia E-105, Petitioners made the new argument that the device used Windows CE 2.1.1 and could therefore utilize Personal Java. A278; A264; A769; A907-909. This argument fails because Petitioners did not present any evidence that Personal Java could be used on devices such as the alarm clock audio device in Treyz. A379-381.

Petitioners also relied on new evidence merely mentioning that an unspecified device could run Personal Java 1.1.1 applets and applications, without any disclosure of what types of applet could be used on certain devices or the specifications of device. A303-304; A923-A933. Petitioners relied on new evidence from Exhibit 1132A and 1133, which explained that NSI.com's CrEme (java virtual machine) may execute applets. A278, A305-307, A937-938. The article does not explain what types of applets could be executed using CreEme. Petitioners also failed to account for the fact that additional components would be required for CrEme. A378-379. Thus, Petitioners attempted to add multiple new references to the proposed combination, failed to prove that those new references were prior art or could actually utilize Java applets for transmission rate switching.

With respect to the Psion Series 5mx device, the new evidence relied on by Petitioners did not show that the device could run Personal Java, or that the device could play media files like the device in Treyz. A381-388. There simply was no

41

evidence that the Cassiopeia E-105 or the Psion Series 5mx devices could have used Personal Java or Java applets for transmission rate switching.

Contrary to Petitioners' arguments, Java applets, with or without using Personal Java, would not have worked on a portable device like a cellular telephone within the meaning of the '007 patent or with the alarm clock audio device of Treyz in March 2000. Peer reviewed literature presented by Affinity, from after the priority date, confirms that mobile devices could not run Java applets. A912. Petitioners failed to set forth any evidence that reasonably would suggest that Java applets could have been implemented on a portable device like Treyz in March 2000. A367-382. The combination of Treyz and Fuller cannot render claims 1, 2, 5-8, and 10 of the '007 patent obvious because Fuller's disclosure of rate switching with Java applets could not be implemented on Treyz's alarm clock audio device. Therefore, the Board's determination of unpatentability is based on clearly erroneous factual determinations, is not supported by substantial evidence, and should be reversed.

## B. The Board's finding that Treyz discloses a cellular telephone is not supported by substantial evidence because Treyz does not disclose a device for making phone calls over a cellular radio system.

The Board erred in finding that Treyz discloses a "cellular telephone" as claimed in the '007 patent, because while Treyz mentions that its audio device may "have built-in telephone functions" and separately that the audio device can receive audio data "via cellular telephone transmissions," these discrete functionalities do not transform Treyz's alarm clock audio device into a "cellular telephone" within the meaning of the claims of the '007 patent. Fuller also does not disclose a cellular telephone.

42

The invention disclosed by Treyz relates "to audio devices, and more particularly, to audio devices such as alarm clocks and radios." A423 at 1:15-30. Treyz goes on to mention a plethora of characteristics and capabilities. Specifically the Board relied on the following statement for the proposition that Treyz discloses a cellular telephone:

> the features of the invention may also be applied to audio devices other than alarm clock radios such as stereos, portable digital audio players, automobile personal computers, web appliances, personal computers with audio cards and speakers, etc.

A426 at 8:25-29. But there is no disclosure that the audio device in Treyz could be a cellular telephone. Essentially, the Board reads Treyz as disclosing any device with audio capabilities. But Treyz's disclosures must be viewed in light of the knowledge of one of ordinary skill in the pertinent art. *In re Antor Media Corp.*, 689 F.3d 1282, 1291 (Fed. Cir. 2012). One of ordinary skill in the art would not read Treyz as disclosing a cellular telephone within the meaning of the '007 patent. This Court's precedent makes clear that "[o]ne cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to depreciate the claimed invention. *In re Fine*, 837 F.2d 1071, 1075 (Fed. Cir. 1988). Accordingly, the disparate disclosures in Treyz cannot be cobbled together by the Board or the Petitioners to assemble a cellular telephone within the meaning of the claims in the '007 patent.

Treyz does not disclose a "cellular telephone" under the Board's claim construction. The Board construed the term "cellular telephone" as a "telephone with access to a cellular radio system so it can be used over a wide area, without a physical

connection to a network." A216. In contrast, Treyz does not disclose a cellular telephone or an audio device with the features of a "cellular telephone," such as being capable of being used over a wide area, according to the Board's construction. The Board determined that Treyz discloses a cellular telephone based on the following features:

- "a device with a telephone handset,"

- "cellular telephone transmissions," and

- "saves 'voice mail messages' when 'the telephone is not answered.'"

A10. But the Board erred in finding that these disclosures fulfill the Board's construction of the term "cellular telephone." These disclosures fail to show that the disparate disclosures of various possible features of the Treyz audio device constitute "cellular telephone" within the meaning of the claims of the '007 patent.

Treyz does not disclose a telephone using a cellular radio system as required by the Board's construction of the term "cellular telephone." At best, Treyz discloses an audio device with access to a cellular radio system for communication of audio data:

> Suitable communications technologies for providing audio to the audio device include technologies based on . . . wireless links . . . etc. . . . Signals may also involve . . . cellular telephone transmissions . . .

A423 at 2:22-35. Audio data within the meaning of Treyz involves recorded songs, news broadcasts, or other files capable of storing audible data. In contrast, a telephone is capable of receiving real-time transmission of audible data, which

44

enables callers to interact in real-time. But Treyz does not disclose utilizing a cellular radio system for placing phone calls, as would be a required function of a cellular telephone. The terms "cellular telephone network," "cellular telephone link," or "cellular telephone transmissions" are used exclusively in reference to the transfer of audio data to the alarm clock audio device and not for making telephone calls. A423 at 2:21–32; A427 at 9:44–10:6, 10:13–19; A428 at 12:13–22; A429 at 13:29–48, 14:36–45. Separately, Treyz discloses the possibility of including telephone capabilities in the audio device through use of telephone lines, but not through cellular telephone transmissions.

> [A] clock radio device may receive digital audio over telephone lines using modem circuitry. A clock radio of this type may include telephone capabilities if desired.

A423 at 1:65-2:2. Thus, Treyz does not disclose a cellular telephone that functions without "a physical connection to a network" as required by the Board's construction of "cellular telephone." A636-637. The disclosure of telephone capabilities using a land line and separately disclosure of an audio device capable of receiving audio data through cellular telephone transmissions does not amount to the disclosure of a cellular telephone. Petitioners failed to present proof by a preponderance of the evidence that Treyz discloses a cellular telephone with the ability to make a phone call over a cellular radio system over a wide area, without physical connection to a network as contemplated by the Board's construction. A271-279. Thus, the Board's finding that Treyz discloses a cellular telephone is clearly erroneous and not supported by

substantial evidence. The Board's determination of unpatentability based on the combination of Treyz and Fuller should be reversed as to claims 1, 2, 5, 6, and 10 of the '007 patent, which include the limitation of a cellular telephone not disclosed by Treyz or Fuller.

### C.    The Final Written Decision lacks sufficient analysis to support the Board's determination of unpatentability.

The Board failed to make the necessary factual findings or identify specific evidence supporting a determination that Petitioners had proven unpatentability by a preponderance of the evidence. Therefore, the decision must be vacated according to Federal Circuit precedent and under the requirements of the APA. *See Ruiz,* 234 F.3d at 660 ("Because the district court failed to make factual findings on obviousness . . . we must vacate the judgment of invalidity and remand to the district court."); *In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("The agency tribunal must set forth its findings and the grounds thereof, as supported by the agency record, and explain its application of the law to the found facts. . . .This standard requires that the agency not only have reached a sound decision, but have articulated the reasons for that decision."); *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." (internal citations omitted)). The Board failed to adequately articulate the reasons for its decision as required by § 103 and the

46

Administrative Procedure Act. Instead, the Board's Final Written Decision merely summarizes the arguments and evidence set forth by the parties without engaging in the required substantive analysis. For example, the Board failed to weigh the credibility of the expert witnesses, indicate the actual weight accorded to each expert's testimony, or the factual basis for doing so. Therefore, Patent Owner respectfully requests, at a minimum, that this case be remanded and the Board be instructed to reexamine and fully document its obviousness analysis and factual determinations. However, for all the reasons stated above, the Board's decision should be reversed.

## IV. The Board erred in denying Affinity's motion to exclude Petitioners' improper new reply evidence and by failing to identify which evidence was improper and thus should not have been considered.

The Board's procedural decisions are subject to review under the Administrative Procedure Act ("APA"). The APA provides for review of "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable . . . on the review of the final agency action." 5 U.S.C. § 704. The Act further provides that a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706. In determining whether an agency decision is arbitrary and capricious, courts must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

### A.    Affinity has legal standing for judicial review of the Board's procedural actions.

Affinity has standing to receive judicial review of the Board's actions because Affinity is "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702. A party has standing to seek judicial review under the Administrative Procedure Act if the following factors are met: (1) injury in fact; (2) causation; (3) redressability; and (4) zone of interest. *Animal Legal Def. Fund v. Quigg*, 932 F.2d 920, 925 (Fed. Cir. 1991). Affinity meets this test and, thus, has standing to challenge the Board's decisions under the Administrative Procedure Act.

First, Affinity has suffered injury in fact through invalidation of claims 1, 2, 5-8 and 10 of the '007 patent. The Board's decision denying Affinity's motion to exclude Petitioners' improper reply evidence impaired Affinity's ability to defend the validity of its patent, thereby causing the injury in fact. This Court has the power to redress this injury by vacating the Board's decision or remanding for further proceedings. Congress created *inter partes* review under America Invents Act for the purpose of providing a quick and efficient litigation for defendants in patent infringement lawsuits to challenge the validity of patents, and Affinity's interests in fair and reasonable procedural decisions related to its patent rights in the underlying *inter partes* review proceedings fulfills the zone of interest requirement for standing.

## B.  The Board erred in denying Patent Owner's motion to exclude Petitioners' improper new reply evidence.

The Board's decision to deny Affinity an avenue to exclude Petitioners' improper new reply evidence was arbitrary and capricious. *Inter partes* review requires Petitioners to set forth their *prima facie* case for invalidity in the Petition. On February 2, 2015, Petitioners filed a Reply brief relying on thirty-seven new exhibits, including an additional 46-page declaration from Petitioners' expert. These materials set forth new evidence and arguments not originally set forth in the Petition, and therefore constitute improper evidence that should not have been considered by the Board.

The rules are clear— Petitioners cannot submit new arguments and evidence for the first time in a reply. "A reply that raises a new issue or belatedly presents evidence will not be considered. The Board will not attempt to sort proper from improper portions of the reply." *Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012). "A reply may only respond to arguments raised in the corresponding opposition or patent owner response." 37 C.F.R. § 42.23. "[I]ndications that a new issue has been raised in a reply include new evidence necessary to make out a *prima facie* case for . . . patentability or unpatentability . . . and new evidence that could have been presented in a prior filing." *Id.*[2]

---

[2]  Furthermore, under 37 C.F.R. § 42.123, "[a] party seeking to submit supplemental information more than one month after the date the trial is instituted, must request authorization to file a motion to submit the information. The motion to submit supplemental information must show why the supplemental information reasonably could not have been obtained earlier, and that consideration of the

Petitioners submitted new evidence in their Reply. Petitioners presented new evidence regarding alleged capabilities of Personal Java on the Psion Series 5mc and the Cassiopeia E-105 devices. This evidence relates to whether a POSITA would have had a reasonable expectation of success in combining the Treyz and Fuller references. A276-281. The Petition itself failed to mention whether there would be a reasonable expectation of success in combining Treyz and Fuller. *See* A143-150.[3] Thus, Petitioners failed to argue and present evidence of a reasonable expectation of success in combining Treyz and Fuller in the Petition setting forth its *prima facie* case for obviousness. Affinity's Consolidated Patent Owner Response presented evidence that a POSITA would not have had a reasonable expectation of success in combining Treyz and Fuller. In its Reply, Petitioners improperly attempted to shore up its *prima facie* case for obviousness by providing arguments and evidence as to why one of ordinary skill in the art would have had a reasonable expectation of success in

---

supplemental information would be in the interests-of-justice." Petitioners did not file this required motion to submit supplemental information.

[3]     Petitioners simply cited to the declaration of Petitioners' Expert Dr. Quackenbush, which merely stated that "it would be clear to a person of ordinary skill in the art that such a use would work and provide the expected functionality." The Petition failed to set forth the argument, and instead improperly incorporated by reference Dr. Quackenbush's statements. *See Juniper Networks, Inc. v. Brixham Solutions, Ltd.*, IPR2014-00425, Paper 16 at 11-12 n.1 (PTAB Aug. 1, 2014) (declining to consider any of petitioner's argument made solely by incorporation by reference to an expert declaration); *Cisco Systems, Inc. v. C-Cation Technologies, LLC*, IPR2014-00454 (PTAB Aug. 29, 2014) (refusing to consider argument in the Petition only citing to an expert declaration "to support conclusory statements for which the Petition does not otherwise provide an argument or explanation.").

combining Treyz and Fuller. Accordingly, the Reply and any associated exhibits, which included new evidence and arguments regarding whether there was an expectation of success, should have been excluded by the Board.

Affinity was deprived of an opportunity to submit expert testimony or other evidence to refute the new evidence and arguments improperly included in Petitioners' Reply. Affinity's ability to defend its patent rights was thereby prejudiced by the Board's decision. The Board's failure to consider and weigh these factors, relevant to the relief sought by Affinity, evidences the arbitrary and capricious nature of the Board's decision.

The Board's decision denying Affinity's motion to exclude cannot be justified and it arbitrarily and capriciously deprived Affinity of the ability to remove Petitioners' improper reply evidence from the record without observance of the procedure required by law. The rationale for the Board's decision was that motions to exclude cannot be used to exclude improper reply evidence.

> Here, Patent Owner does not assert that any of the evidence relied upon in the Reply is inadmissible, for example, because it is irrelevant, unauthenticated, or hearsay. Accordingly, we deny the Motion to Exclude.

A21. In contrast, the Federal Circuit has made clear that a motion to exclude is a proper avenue to remove improper reply evidence from the record. *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1081-82 (Fed. Cir. 2015). While the Board admitted that it should not consider improper reply evidence, it refused to exclude the improper reply

evidence, and, furthermore, failed to take the essential action of determining if Petitioners' evidence was improper reply evidence. The Board merely provided a hypothetical and self-serving statement that "to the extent that Petitioner's Reply evidence does not respond to specific arguments or evidence presented in the Patent Owner Response, or seeks to establish an element necessary to make out its case-in-chief, it has not been considered." A21. A theoretical statement that the Board has not considered evidence to the extent it secretively determined it to be improper, without an identification of the improper evidence, suggests that a determination of which information was improper was not made at the time of the Final Written Decision. The Boards' Final Written Decision does not address whether the Board found evidence to be improper reply evidence. In light of the fact that the Petition, without the Reply, failed to prove obviousness on its own by a preponderance of evidence, it is clear the Board relied on the Reply at some level. It is also clear that such reliance was improper. For these reasons, the Board's Final Written Decision should be reversed, or alternatively remanded for the Board to determine whether Petitioners' Reply contained improper evidence and proceedings taking this determination into account in the ultimate determination of patentability.

## RELIEF SOUGHT

I.    An order finding *inter partes* review proceedings unconstitutional and vacating the Final Written Decision.

II.   Reversal of the Final Written Decision finding claims 1, 2, 5-8, and 10 of the '007 patent unpatentable.

III.  Reversal of the decision based on the denial Affinity's motion to exclude and the Board's reliance on improper reply evidence, or remand for proceedings to determine the scope of improper reply evidence.


Dated: January 15, 2016              Respectfully submitted,

                                     */s/ Emily E. Niles*
                                     Ryan M. Schultz
                                     Emily E. Niles
                                     **ROBINS KAPLAN LLP**
                                     800 LaSalle Avenue, Suite 2800
                                     Minneapolis, MN 55402-2015
                                     Tel.: (612) 349-8500

                                     *Counsel for Patent Owner-Appellant*
                                     *Affinity Labs of Texas, LLC*

# ADDENDUM

# TABLE OF CONTENTS
## TO ADDENDUM

<u>Pages</u>

Final Written Decision ...........................................................................A1-24

U.S. Patent 8,359,007 ........................................................................ A25-55

[Trials@uspto.gov](mailto:Trials@uspto.gov)                           Paper 48
571-272-7822                                    Entered: July 20, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____


SAMSUNG ELECTRONICS CO., LTD;
SAMSUNG ELECTRONICS AMERICA, INC.;[1]
HTC CORP., and
HTC AMERICA, INC.,
Petitioners,

v.

AFFINITY LABS OF TEXAS, LLC,
Patent Owner.
_____

Case IPR2014-00407[2]
Patent 8,359,007 B2
_____


Before KEVIN F. TURNER, LYNNE E. PETTIGREW, and
JON B. TORNQUIST, *Administrative Patent Judges.*

TORNQUIST, *Administrative Patent Judge.*


FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

_____

[1] Petitioner represents that Samsung Telecommunications America, LLC, an
originally-named Petitioner in this case, was merged into Samsung
Electronics America, Inc. on January 1, 2015.  Paper 33, 1.
[2] As noted below, IPR2014-00408 was joined and consolidated with
IPR2014-00407.

IPR2014-00407
Patent 8,359,007 B2

## I. BACKGROUND

Samsung Electronics Co., Ltd., Samsung Electronics America, Inc.,

Samsung Telecommunications America, LLC, LG Electronics, Inc., LG

Electronics U.S.A., Inc., LG Electronics Mobilecomm USA, Inc., HTC

Corp., and HTC America, Inc.[3] (collectively, "Petitioner") filed Petitions in

IPR2014-00407 (Paper 8, "Pet.") and IPR2014-00408 (Paper 7,

"-00408 Pet.")[4] requesting *inter partes* review of claims 1, 2, 5–8, and 10 of

U.S. Patent No. 8,359,007 B2 ("the '007 patent").  The owner of the '007

patent, Affinity Labs of Texas, LLC ("Patent Owner"), filed Preliminary

Responses to the Petitions.  Paper 12; -00408 Paper 11.

Pursuant to 35 U.S.C. § 314, the Board instituted trial as to claims 1,

2, 5–8, and 10 of the '007 patent on the following grounds:

> 1.  Whether claims 1, 2, 5–8, and 10 are unpatentable under
> 35 U.S.C. § 103(a) as having been obvious over Treyz[5] and
> Fuller;[6] and

---

[3] On July 9, 2014, we granted a request for adverse judgment submitted by
LG Electronics, Inc., LG Electronics U.S.A., Inc., and LG Electronics
Mobilecomm USA, Inc.  Paper 14.  Accordingly, the LG petitioners are no
longer participating in these proceedings.
[4] Documents filed in IPR2014-00407 are identified by paper number.
Unless otherwise noted, documents filed in IPR2014-00408 are identified by
the additional prefix "-00408".  Exhibits filed by Petitioner in IPR2014-
00407 are identified by the prefix "11XX" and exhibits filed in IPR2014-
00408 are identified by the prefix "10XX".
[5] Ex. 1004, U.S. Patent No. 6,678,215 B1 (Jan. 13, 2004).
[6] Ex. 1006, U.S. Patent No. 6,711,622 B1 (Mar. 23, 2004).

2

**A2**

IPR2014-00407
Patent 8,359,007 B2

> 2.  Whether claims 1, 2, 5–8, and 10 are unpatentable under
> 35 U.S.C § 103(a) as having been obvious over Hitson[7] and
> Fuller.

Paper 15 ("Dec. on Pet."); -00408 Paper 14 ("-00408 Dec. on Pet.").

Following institution, we joined and consolidated IPR2014-00407 and

IPR2014-00408 and terminated the proceedings in IPR2014-00408.

Paper 27, 3.  During trial, Patent Owner filed a consolidated Patent Owner

Response (Paper 32, "PO Resp."), and Petitioner filed a consolidated Reply

(Paper 34, "Reply").

Petitioner filed a Motion to Exclude portions of the Declaration of

Dr. Lin Zhong (Ex. 2103), as well as certain exhibits relied upon by

Dr. Zhong.  Paper 38 ("Pet. Mot. to Exc.").  Patent Owner filed an

Opposition to the Motion to Exclude (Paper 42, "PO Opp. to Mot. to Exc."),

and Petitioner filed a Reply (Paper 45, "Reply to PO Opp. to Mot. to Exc.").

Patent Owner filed a Motion to Exclude all exhibits submitted with

Petitioner's Reply.  Paper 35 ("PO Mot. to Exc.").  Petitioner filed an

Opposition to the Motion to Exclude (Paper 43, "Pet. Opp. to Mot. to Exc."),

and Patent Owner filed a Reply (Paper 44, "Reply to Pet. Opp. to Mot. to

Exc." ).

An oral hearing was held on April 1, 2015 (Paper 47, "Tr.").

We have jurisdiction under 35 U.S.C. § 6(c).  This Final Written

Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons that follow, we determine that Petitioner has shown by

a preponderance of the evidence that claims 1, 2, 5–8, and 10 of the '007

patent are *unpatentable*.

---

[7] Ex. 1104, U.S. Patent Application 2002/0010759 A1 (Jan. 24, 2002).

3

**A3**

A.  *Related Proceeding*

The parties indicate that the '007 patent is being asserted in *Affinity Labs of Texas, LLC v. Samsung Electronics Co.*, No. 1:12-cv-557 (E.D. Tex.).  Paper 11; Pet. 5.

B.  *The '007 Patent*

The '007 patent is directed to a system for content delivery in which "a user may interact with the Internet to select information, such as audio information, and wirelessly communicate the selected information to an electronic device."  Ex. 1101, 1:21–23, 2:55–58.  Selectable audio information may include "songs, on-line radio stations, on-line broadcasts, streaming audio, or other selectable information."  *Id.* at 2:63–64.

A broad array of electronic devices are contemplated for use in the '007 system, including: "a network radio, a modular device, an audio system, a personal digital assistant (PDA), a cellular phone, or other electronic devices operable to receive information wirelessly."  *Id.* at 4:33–38.  In one embodiment, using a display and web browser incorporated in the electronic device, a user may review content available on an Internet website.  *Id.* at 7:26–28, 8:17–20, 9:16–21.  By selecting displayed links for the available content, a user may cause desired songs or videos to be downloaded to the user's device.  *Id.* at 7:26–35.

In one embodiment of the '007 patent, different portions of the selected content are delivered at different communication rates:

> For example, the selected audio information may first be transmitted to the electronic device via high-speed communication until enough information has been wirelessly communicated and buffered into a memory device operably associated with the electronic device.  Upon communication of a certain percentage of the selected audio information, slower

4

IPR2014-00407
Patent 8,359,007 B2

communication speeds may then be used to communicate additional selected audio information.

*Id.* at 6:6–13.

## C.  *Illustrative Claim*

Of the challenged claims, claims 1 and 7 are independent.  Claim 1 is illustrative of the claims at issue and is reproduced below:

1. A system comprising:

a cellular telephone comprising a display, a non-volatile memory, and a processing device operable to execute instructions stored in the non-volatile memory;

a browser saved locally at the cellular telephone and configured to facilitate accessing of a web page; and

a collection of instructions stored in the non-volatile memory and operable to direct the cellular telephone to request a list of network addresses for a plurality of portions of an available media, to request delivery of a first portion of the available media such that the first portion is delivered at a first communication rate, and to request delivery of a second portion of the available media such that the second portion is delivered at a second communication rate that is different than the first communication rate.

Ex. 1101, 18:21–36.

## II. ANALYSIS

### A. *Claim Construction*

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC*, No. 2014-1301, 2015 WL 4097949, at *5–7 (Fed. Cir. July 8, 2015) (confirming that the broadest reasonable

5

**A5**

IPR2014-00407
Patent 8,359,007 B2

construction standard was properly adopted by PTO regulation). In determining the broadest reasonable construction, we presume that claim terms carry their ordinary and customary meaning. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). This presumption may be rebutted when a patentee, acting as a lexicographer, sets forth an alternate definition of a term in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

In both Decisions to Institute, we construed the term "portions of an available media" as "parts of the content accessible from a source of audio, video, and/or textual information, such as songs or stations in a playlist or parts of an Internet radio broadcast." Dec. on Pet. 6; -00408 Dec. on Pet. 6. In IPR2014-00408, we also construed the term "cellular phone"[8] as a "telephone with access to a cellular radio system so it can be used over a wide area, without a physical connection to a network." -00408 Dec. on Pet. 7. Neither party challenges these constructions or proposes constructions for any remaining claim terms. PO Resp. 9 ("The Board adopted the plain and ordinary meaning of the term 'cellular phone' in its Order instituting *inter partes* review."); Reply 2. Accordingly, based on the complete record now before us, we maintain our previous constructions of the terms "cellular phone" and "portions of an available media," and will give all other claim terms their broadest reasonable construction in light of the specification. *See* 37 C.F.R. § 42.100(b).

---

[8] Throughout the Decision, we use the terms "celluar phone" and "cellular telephone" interchangeably.

6

IPR2014-00407
Patent 8,359,007 B2

### B. Patentability of Claims 1, 2, 5–8, and 10
#### Over Treyz and Fuller

Petitioner contends that claims 1, 2, 5–8, and 10 are unpatentable under 35 U.S.C. § 103 as obvious over Treyz and Fuller.  We have reviewed the Petition, the Patent Owner Response, and Petitioner's Reply, as well as the relevant evidence cited by each party, and are persuaded, by a preponderance of the evidence, that claims 1, 2, 5–8, and 10 would have been obvious over Treyz and Fuller.

#### 1. Treyz

Treyz is directed to devices that receive and process audio signals "other than traditional radio broadcasts." Ex. 1004, 1:25–28, 8:28–40. Treyz primarily describes the invention in terms of a clock radio, but instructs that the invention "may also be applied to audio devices other than clock radios such as stereos, portable digital audio players, automobile personal computers, web appliances, personal computers with audio cards and speakers, etc." *Id.* at 1:61–64, 8:36–40.

The Treyz device contains a display, non-volatile memory, and a processor. *Id.* at 1:48–51, 12:46–55, Fig. 10a; Ex. 1017 ¶¶ 33, 34, 37.  The device also has "built-in telephone functions" permitting the device to place and receive calls using "cellular telephone transmissions." *Id.* at 1:65–2:2, 2:22–35, 3:13–14, 16:52–60.  If an incoming call is not answered, the Treyz device may store "messages like an answering machine." *Id.* at 3:14–16. The device may also communicate over wired means, such as "universal serial bus" or "IEEE 1394 (FireWire)" cable connections. *Id.* at 1:65–2:2, 2:22–35, 2:41, 7:62–64, 13:36–41, Fig. 10a.

A web browser, incorporated into the alarm clock, may interact with the Internet to review and select available Internet radio stations. *Id.* at

7

**A7**

IPR2014-00407
Patent 8,359,007 B2

6:14–15, 18:12–16, Fig. 9b.  A user selects these Internet radio stations "by clicking on links for stations that the user is interested in or by otherwise selecting the proper Internet addresses for the desired stations." *Id.* at 5:32– 38.  The selected radio stations then may be streamed to the user's device in real time and buffered using local memory to improve audio quality. *Id.* at 1:56–60.

Treyz discloses that it is "relatively easy" to move the wireless device, which "may be located in the home or in any other suitable location." *Id.* at 7:10–11, 11:11–12.  The device may also be "implemented using a mobile platform such as a car radio, automobile personal computer, etc." that communicates using, *inter alia*, "bidirectional cellular links." *Id.* at 24:22– 29.

### 2. *Fuller*

Fuller is directed to a system for providing streaming audio and video data to multiple users. Ex. 1006, 1:15–17.  In Fuller, a web browser is used to review and select links for available content on a network, such as an audio jukebox or a collection of available internet radio stations. *Id.* at 4:46– 49, 8:30–36, Figs. 1–3.  When a desired link is selected, the user is asked to identify the transmission speed of the connection and the desired video frame rate. *Id.* at Figs. 4, 5.  Based on the information provided, the server then selects an appropriate rate of transmission for the selected audio or video content. *Id.* at 10:56–11:6.

In Fuller, the server transmits one or more Java applets to the client. *Id.* at 8:37–41.  These applets serve both to decode audio data and to monitor the rate at which the client receives and processes information from the server. *Id.* at 8:37–41, 10:11–17.  If the audio or video data are not being

8

**A8**

IPR2014-00407
Patent 8,359,007 B2

received or processed at a sufficient rate, the client may instruct the server to reduce the rate of transmission to "more appropriately match the bandwidth availability of the client." *Id.* at 10:11–17.

### 3. Analysis

Petitioner identifies where every limitation of claims 1, 2, 5–8, and 10 is disclosed in the combination of Treyz and Fuller. -00408 Pet. 19–32. With respect to the rationale for the proposed combination, Petitioner contends that one of ordinary skill in the art would have incorporated Fuller's method of switching transmission rates into Treyz in order to prevent the input buffer from running out of data, which would result in "substantial and perceivable" degradation of audio quality. *Id.* at 17–19 (citing Ex. 1017 ¶¶ 41–43).

Patent Owner responds that the challenged claims would not have been obvious over Treyz and Fuller, because the device of Treyz is not a "cellular telephone" and the proposed combination of Treyz and Fuller would have been "impossible." PO Resp. 7–24. We address these arguments in turn.

### a. Whether Treyz Discloses a Cellular Telephone

Patent Owner contends that the device of Treyz is not a cellular telephone because it requires a "land-line" connection to operate as a telephone. PO Resp. 11. Patent Owner's argument relies on the following passage of Treyz:

> The audio device may receive digital audio using any suitable communications technology. As one example, a clock radio device may receive digital audio over telephone lines using modem circuitry. A clock radio of this type may include telephone capabilities if desired.

Ex. 1004, 1:66–2:2; PO Resp. 11.

9

**A9**

IPR2014-00407
Patent 8,359,007 B2

This passage, however, describes but "one example" of a device that may incorporate telephone capabilities, and does not clearly and unambiguously limit all telephone embodiments in Treyz to the use of a land-line connection.  Reply 7–8.  Moreover, other portions of Treyz state without limitation that the "audio device may have built-in telephone functions" and may communicate via "cellular telephone transmissions." Ex. 1004, 2:32, 3:13–14.  Indeed, Figure 4 of Treyz discloses clock radio 12 with a telephone handset and access to long-range wireless communications circuitry 76, which may include a "cellular modem" or any other transmitter/receiver for facilitating "communications with a cellular telephone system."  *Id.* at 13:42–50, Fig 4.

Patent Owner also argues the Treyz device is not a "cellular telephone" because "[n]owhere does Treyz suggest that the alarm clock audio device contemplated is capable of placing telephone calls to other devices through cellular transmissions in which the user of the audio device can conduct a conversation with the user of another telephone."  PO. Resp. 11 (citing Ex. 2121 ¶ 56).  We are not persuaded by this argument because Treyz discloses a device with a telephone handset that communicates using "cellular telephone transmissions" and saves "voice mail messages" when "the telephone is not answered."  Ex. 1004, 2:32–41, 3:13–22, Figs. 4, 10.  One of ordinary skill in the art would understand that such a device could be used to conduct a conversation with another telephone user.  *See* Ex. 1123 ¶ 49 (Dr. Quackenbush testifying that a person of ordinary skill in the art would have understood that a user of the Treyz device could communicate with another telephone user over the cellular telephone network).

IPR2014-00407
Patent 8,359,007 B2

Patent Owner also contends that the device of Treyz "does not fall within" the Board's definition of "cellular phone" because it is not portable, such that it could be "used over a wide area" *while* being "moved around." PO Resp. 9–10 (citing Ex. 2121 ¶¶ 55–57). In support of this argument, Patent Owner's declarant, Dr. Zhong, testifies that the device of Treyz would not be considered a cellular telephone because it lacks a rechargeable battery that would allow the device to be used over a "wide range," for example, "while riding a bike or walking on [the] street." Ex. 2121 ¶¶ 55–56.

Although the most familiar embodiments of a modern cellular telephone undoubtedly may be used while moving about, for example when walking or riding a bike, the ordinary meaning of "cellular telephone" encompasses a broader range of devices than these common embodiments, and we are directed to no express limitation or words of exclusion in the '007 patent that would limit the claimed "cellular telephone" to devices that may be used *while* moving over a wide area. Ex. 2121 ¶ 55; *see Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) (noting that claim terms carry their ordinary meaning unless the patentee demonstrates an intent to deviate from this meaning through "words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope"). We find, therefore, that the clock radio of Treyz, which communicates over a cellular telephone network without a physical connection to the network, and which can be moved about and placed in any "suitable location," such as various hotel rooms while travelling on vacation, is a cellular telephone, even if the device requires

11

**A11**

IPR2014-00407
Patent 8,359,007 B2

connection to a power source, as asserted by Patent Owner.[9]  Ex. 1004,

7:10–15, 24:22–30.

### b.  Whether the Combination of Treyz and Fuller is Impossible

Claim 1 requires that instructions stored in the cellular telephone are

operable to request delivery of:

> a first portion of the available media such that the first portion
> is delivered at a first communication rate, and to request
> delivery of a second portion of the available media such that
> the second portion is delivered at a second communication
> rate that is different than the first communication rate.

Ex. 1101, 18:27–36.

At a high level, Fuller discloses the benefit of using two different

transmission rates to deliver streaming media.  Ex. 1006, 10:11–17;

Ex. 1017 ¶¶ 41–42.  After analyzing the disclosures of Treyz and Fuller,

including Treyz's use of a buffer to improve audio quality, Dr. Quackenbush

concludes that it "would have been routine for a person of ordinary skill in

the art to use Fuller's teaching of streaming multimedia content at two

different communication rates" in Treyz and "it would be clear . . . that such

a use would work and provide the expected functionality."  Ex. 1017 ¶¶ 28–

30, 40–43.

In response, Patent Owner does not argue that the general idea of

transmission rate switching disclosed in Fuller would be difficult to

---

[9] Even if a "cellular telephone" were limited to devices that can
communicate while they are moving over a wide area, Petitioner presents
evidence that the disclosed embodiments of Treyz meet this requirement.
Ex. 1004, 7:10–15, 8:35–40, 24:22–30 (noting that Treyz discloses that the
device may take the form of a car radio that communicates using "cellular
modem technology").  Moreover, the device of Treyz could be used in any
mobile platform with electrical outlets, such as a mobile home, bus, or train.

IPR2014-00407
Patent 8,359,007 B2

implement in Treyz. Patent Owner argues, instead, that because Fuller only describes switching transmission rates using a Java applet, one of ordinary skill in the art would understand the scope of Fuller's disclosure to be limited to this specific switching mechanism, which Patent Owner contends would have been impossible to implement in Treyz. PO Resp. 13–21.

Patent Owner and Dr. Zhong identify no disclosure in Fuller to suggest that transmission rate switching cannot, or should not, be implemented by means other than Java applets. *See* PO Resp. 14 (citing Ex. 2103 ¶¶ 39–42; Ex. 2121 ¶¶ 39–42). Absent such a restriction, we are not persuaded that Fuller's teaching of the benefits of transmission rate switching would be understood by one of ordinary skill in the art as limited to the use of Java applets. *See In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012) (declining to limit the teachings of a prior art reference to the specific optical implementation disclosed therein); *Syntex LLC v. Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005) ("What a reference teaches a person of ordinary skill in the art is not . . . limited to what a reference specifically 'talks about' or what is specifically 'mentioned' or 'written' in the reference."); *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference," but "what the combined teachings of the references would have suggested to those having ordinary skill in the art").[10]

_____

[10] As noted by Patent Owner, Petitioner cites in its claim charts to Fuller's implementation of transmission rate switching using Java applets. PO Resp. 13–14. We understand this to be a citation to where the idea of transmission rate switching is disclosed in Fuller, and not a concession by Petitioner that

13

IPR2014-00407
Patent 8,359,007 B2

Patent Owner also argues that Dr. Quackenbush "unequivocally confirmed" that Fuller requires installation of a Java applet to operate. PO Resp. 14–15. Patent Owner concludes, therefore, that "Petitioner's proposed combination rests solely on whether the Java applet described in Fuller could be executed on . . . the alarm clock audio device disclosed in Treyz." *Id.* As noted by Petitioner, however, Patent Owner's deposition questioning of Dr. Quackenbush was directed to only Fuller's use of Java applets, and not the general idea of transmission rate switching discussed in the Petition. Reply 11 (citing Ex. 2106, 47:2–6 ("if we accept your assumption, the portable device cannot execute Java, then the Java applet would not be able to operate as in Fuller")); *see also* Ex. 2106, 47:21–48:7 ("Q. If the portable device could not execute the Java applet, then the method disclosed in Fuller would not work, correct?"). Thus, we understand Dr. Quackenbush's testimony as simply confirming that a device that relies on Java applets to perform transmission rate switching would need Java applet capability to operate, and not as an admission that the combination of Treyz and Fuller set forth in the Petition is limited to the use of Java applets. *See also* Ex. 1123 ¶ 15 (Dr. Quackenbush asserting that his analysis is not limited to the use of Java applets). Moreover, Dr. Quackenbush's testimony was provided in a different, earlier proceeding involving a different patent, different claims, and a different combination of prior art references (Hitson, Bork, and Fuller), and Patent Owner has not explained why this testimony would necessarily apply to Dr. Quackenbush's analysis with respect to the combination of Treyz and Fuller set forth in this proceeding. Ex. 2106

---

transmission rate switching is only to be implemented using Java applets. *See* -00408 Pet. 25.

14

**A14**

IPR2014-00407
Patent 8,359,007 B2

(relating to IPR2014-00212 and U.S. Patent No. 7,953,390); IPR2014-00212, Paper 1, 8–9.

Finally, Patent Owner argues that, even if Petitioner's combination were not limited to the use of Java applets, Dr. Quackenbush's testimony does not support a finding that the proposed combination would have been operable, because it is conclusory in nature and fails to disclose what the method of transmission rate switching would look like, how it would be implemented, or how it would work in Treyz. Tr. 27:6–28:11. In his declaration, however, Dr. Quackenbush analyzed the scope of the claims (Ex. 1017 ¶ 26) and the disclosures of Treyz and Fuller (*id.* ¶¶ 29–30, 40–42), including Treyz's disclosure that a buffer can be used to improve the quality of streaming audio (*id.* ¶ 42), and concluded that switching of communication rates in Treyz "would work and provide the expected functionality." *Id.* ¶ 43. This testimony, as a whole, is not so conclusory as to be unreliable or of no probative value.[11]

Accordingly, we credit Dr. Quackenbush's testimony that one of ordinary skill in the art would have sought to use, and would have had a reasonable expectation of success in implementing, Fuller's idea of transmission rate switching in Treyz. Ex. 1017 ¶¶ 41–43; Ex. 1123 ¶¶ 15, 17. We conclude, therefore, that Petitioner has demonstrated, by a

---

[11] We note that Patent Owner would require far more detail from Dr. Quackenbush regarding the method of implementing transmission rate switching than is set forth in the '007 patent. For example, the '007 patent does not disclose or describe a particular method of switching transmission rates, leaving it to one of ordinary skill in the art to choose how to successfully implement the claimed process. *See* Ex. 1101, 6:3–13; *see also* IPR2014-00209, Paper 51, 50:14–51:24 (Patent Owner's counsel noting during oral argument that there are numerous ways to perform transmission rate switching).

15

**A15**

IPR2014-00407
Patent 8,359,007 B2

preponderance of evidence, that claims 1, 2, 5–8, and 10 are unpatentable under 35 U.S.C. § 103 as obvious over Treyz and Fuller.

Moreover, even if the proposed combination was in fact limited to the use of Java applets, as suggested by Patent Owner, we are not persuaded that such a combination would have been impossible.

Patent Owner argues it would have been impossible to combine Treyz and Fuller because Java applet support was not available on portable devices, as opposed to desktop computers, "until well after the March 28, 2000 priority date of the '007 patent." PO Resp. 16. In support of its argument, Patent Owner relies upon the testimony of Dr. Zhong, who testifies that, to the best of his knowledge, "Java applets have never been supported by a browser on a publically available mobile device." Ex. 2103 ¶ 46. To support this argument, Dr. Zhong directs our attention to a 2001 paper that discusses the limited availability of Java and Javascript on mobile devices:

> Consider for example accessing the Web from a PDA such as the Palm Pilot, using a wireless data service such as Omnisky [20]. Omnisky runs over CDPD and has effective throughput rates that vary from 5-6 kbps up to 12-13 kbps. Combining that with a screen size of 160x160 pixels on a 6x6cm surface, it can be very hard to browse through large pages with rich graphics. Given that these devices have significantly less memory and processing power than desktops, the available browsers only have a small subset of the features of the widely used browsers (*e.g.*, they do not support Java, Javascript, and are not able to display GIF or JPEG images.)

Ex. 2102, 576; Ex. 2103 ¶ 48; PO Resp. 17–18.

In response, Petitioner cites to a 1999 book, titled "Java 2 Platform Unleashed," that describes the features of several Java application

16

**A16**

IPR2014-00407
Patent 8,359,007 B2

environments, including Personal Java. Ex. 1129, 1047.[12]  In discussing the
features of Personal Java, this reference discloses that Personal Java: (1) was
designed "for use in consumer electronic devices and mobile computing
devices," including "handled PCs, set-top Internet boxes, Web phones, and
game controllers"; (2) can run most Java applet packages; (3) is "upward-
compatible with the Java Platform" yet "still capable of executing in
memory-constrained devices"; and (4) may be tailored to specific
application environments by adding additional APIs.  *Id.* at 1048; *see also*
Ex. 1133, 1–2 (disclosing in 1999 "the availability of a Personal Java
reference implementation for Windows CE" that allowed development of
applets "running on multiple consumer device platforms").

Although Patent Owner's evidence does suggest that support for Java
and Javascript was not widespread, even in 2001, given the availability of
the Personal Java application environment in 1999, we are not persuaded by
Patent Owner's argument that it would have been impossible to execute
Fuller's Java applets in the device of Treyz.  *See* Ex. 1017 ¶¶ 41–43;
Ex. 1123 ¶¶ 15, 24–41; Ex. 1129, 1047–48; *see also In re O'Farrell*, 853
F.2d 894, 903–904 (Fed. Cir. 1988) (noting that for obviousness under
§ 103, "all that is required is a reasonable expectation of success"); Ex.
1004, 1:47–51 (noting that additional memory, in the form of solid-state
memory circuits, hard drives, or any other suitable storage arrangement, may
be added to the device of Treyz as needed).  We conclude, therefore, that
Petitioner has demonstrated by a preponderance of the evidence that claims
1, 2, 5–8, and 10 of the '007 patent are unpatentable under 35 U.S.C. § 103

---

[12] Jamie Jaworski, JAVA 2 PLATFORM UNLEASHED 1046–1051 (1999).

IPR2014-00407
Patent 8,359,007 B2

as obvious over Treyz and Fuller, even if the combination of Treyz and Fuller requires the use of Java applets as argued by Patent Owner.

### C. Claims 1, 2, 5–8, and 10 as Obvious Over Hitson and Fuller

Petitioner contends that claims 1, 2, 5–8, and 10 are unpatentable under 35 U.S.C. § 103 as obvious over Hitson and Fuller.

### 1. Hitson

Hitson relates to "the composition and distribution of multimedia files." Ex. 1104 ¶ 2. "In particular, [Hitson] provides a system and method for composing and delivering music and other audio content via the Internet." *Id.* Hitson also discloses a "modified client/server approach to content delivery," wherein a client device may request content from a server, or may function as a server "providing content to other clients." *Id.* ¶¶ 38– 39.

A broad range of client devices are contemplated for use in the Hitson system, including portable media players, PCs (including a "cellular" telephone), "or other wireless or wired device[s]." *Id.* ¶¶ 3, 12. Hitson also discloses several commercially available personal media devices, such as the Cassiopeia E-105, manufactured by Casio Computer Co., and the Palm VII Connected Organizer, manufactured by 3Com, Inc. *Id.* ¶ 5. Petitioners present evidence that these devices contain a display, a processor, and non-volatile memory. *See* Pet. 24–26 (citing Ex. 1107A, 15, 42; Ex. 1120 ¶¶ 36– 41).

In a preferred embodiment, a client accesses the Internet using a locally stored World Wide Web browser. Ex. 1104 ¶ 40. Using this web browser, a user may, *inter alia*, conduct a video conference, review e-mail, and explore available multimedia content for streaming. *Id.* ¶¶ 75–76. The

IPR2014-00407
Patent 8,359,007 B2

Hitson system also may create a playlist for a user based on the user's genre preferences. *Id.* ¶ 90. When the playlist is requested, the media server extracts playlist song ids, translates them into audio file locations, and downloads the playlist to the client device. *Id.* ¶ 90, Fig. 15. A user may then review the playlist and select desired content for delivery. *Id.* ¶ 90.

In Hitson, the client device may communicate through wired or wireless means, "including . . . Universal Serial Bus ('USB') cable connections" or a "digital cellular telephone." *Id.* ¶ 39. A transmission rate "appropriate for a given user session" is determined "through software, hardware, or by asking a user." *Id.* ¶ 70. For example, a user may indicate whether a "broadband" or "narrowband" connection is available. *Id.* ¶ 70, Fig. 3. Once a desired transmission rate is determined, this information may be saved for later use. *Id.* ¶ 70.

### 2. Analysis

Petitioner contends that the combination of Hitson and Fuller discloses each limitation of claims 1, 2, 5–8, and 10. Petitioner further contends that one of ordinary skill would have sought to incorporate Fuller's disclosure of varying the transmission rate between first and second portions of an available media in the device of Hitson in order to avoid having the input buffer run out of data, resulting in a "substantial and perceivable quality degradation." Pet. 21 (citing Ex. 1120 ¶¶ 48, 55–56). In support of this argument, Petitioner relies upon the declaration testimony of Dr. Quackenbush. *Id.* (citing Ex. 1120 ¶¶ 55–56).

In contrast to his supporting testimony for the combination of Treyz and Fuller, Dr. Quackenbush provides no evidence or citation to establish that Hitson actually utilizes an input buffer, nor does Dr. Quackenbush

IPR2014-00407
Patent 8,359,007 B2

explain why a person of ordinary skill in the art would have understood that Hitson necessarily contains such a buffer.  Ex. 1120 ¶¶ 55–56; Ex. 1123 ¶ 17.  The Petition also fails to point to any such input buffer in Hitson. Pet. 17–18, 20–22, 29–30.

Absent evidence of an input buffer in Hitson, it is not evident from the Petition why one of ordinary skill in the art would have sought to modify Hitson to incorporate Fuller's method of transmission rate switching. Accordingly, we are not persuaded that claims 1, 2, 5–8, and 10 would have been obvious under 35 U.S.C. § 103 over Hitson and Fuller.[13]

### III.  MOTIONS TO EXCLUDE

#### A.  Patent Owner's Motion to Exclude

Patent Owner moves to exclude twenty-seven exhibits relied upon in Petitioner's Reply.  PO Mot. to Exc. 1.  According to Patent Owner, Petitioner presents in its Reply new evidence that is being used improperly to support its case-in-chief.  *Id.* at 2 (citing 37 C.F.R. § 42.104).  Patent Owner contends that the belatedly submitted evidence must be excluded because "Patent Owner has been completely deprived of the opportunity to substantively respond to the new evidence and arguments."  *Id.* at 3.

In response, Petitioner asserts Patent Owner "fails to identify even a *single* new argument or piece of evidence that constitutes 'improper reply evidence.'"  Pet. Opp. to Mot. to Exc. 3.  Petitioner, nevertheless, asserts that

---

[13] Patent Owner also argues that the present *inter partes* review proceeding deprives it of its right to a jury trial under the Seventh Amendment.  PO Resp. 24–28.  Patent Owner does not ask the Board to decide this issue, as it "does not believe that the Board has the authority to determine whether the *inter partes* process is constitutional," but raises the issue in an effort to preserve its arguments on appeal.  *Id.* at 24.  Accordingly, we do not address Patent Owner's argument in this Decision.

IPR2014-00407
Patent 8,359,007 B2

each piece of evidence submitted in its Reply is appropriate to rebut Patent Owner's arguments, as well as the testimony of Dr. Zhong. With respect to Patent Owner's argument that it was deprived of an opportunity to substantively respond to Petitioner's rebuttal evidence, Petitioner notes that Patent Owner in fact had an opportunity to respond to this evidence via a motion for observation on cross-examination, but simply chose not to avail itself of the opportunity. *Id.* at 3, 7.

Patent Owner replies that Petitioner had nearly a year to search and identify evidence, and its decision to spring twenty-seven additional exhibits and a forty-six page rebuttal exhibit from its expert is a "thinly-veiled effort to sandbag" Patent Owner and deprive it of an opportunity to respond to the new arguments and references. Reply to Pet. Opp. to Mot. to Exc. 1, 4.

A motion to exclude "must explain why the evidence is not admissible (e.g., relevance or hearsay) but may not be used to challenge the sufficiency of the evidence to prove a particular fact." Office Patent Trial Practice Guide, 77 Fed. Reg. 48756, 48767 (Aug. 14, 2012). Here, Patent Owner does not assert that any of the evidence relied upon in the Reply is inadmissible, for example, because it is irrelevant, unauthenticated, or hearsay. Accordingly, we deny the Motion to Exclude.

Nevertheless, a reply may "only respond to arguments raised in the corresponding opposition" and may not add new evidence necessary to make out its case-in-chief of unpatentability of a claim. *Id.* Thus, to the extent that Petitioner's Reply evidence does not respond to specific arguments or evidence presented in the Patent Owner Response, or seeks to establish an element necessary to make out its case-in-chief, it has not been considered.

IPR2014-00407
Patent 8,359,007 B2

### B. Petitioner's Motion to Exclude

Petitioner contends the Dr. Zhong's opinions lack sufficient basis under Federal Rule of Evidence 702. Specifically, Petitioner contends that Dr. Zhong's opinions regarding Java applets "fail to provide sufficient underlying facts or data upon which such opinions could legitimately be based" and Dr. Zhong's opinions regarding the disclosure of Treyz fail to consider the express disclosures of Treyz. Pet. Mot. to Exc. 7–8, 11–12. Petitioner submits, however, "that it is, as a general matter, better for the Board to have before it a complete record of the evidence submitted by the parties than to exclude particular pieces of it and thereby risk improper exclusion." *Id.* at 4. Petitioner further submits that "the Board, sitting as a non-jury tribunal with administrative expertise, is well-positioned to determine and assign the appropriate weight to be accorded to the evidence . . . without the need for formal exclusion." *Id.* at 3.

We agree that the Board, sitting as a non-jury tribunal, is well-positioned to assign appropriate weight to the evidence without the need for formal exclusion. Moreover, we need not reach the merits of Petitioner's Motion to Exclude because, having considered Dr. Zhong's testimony, we have decided the issue in Petitioner's favor. Petitioner's Motion to Exclude, therefore, is *dismissed as moot.*

### IV. ORDER

It is,

ORDERED that claims 1, 2, 5–8, and 10 of the '007 patent are held *unpatentable*;

FURTHER ORDERED that Petitioner's Motion to Exclude is *dismissed as moot*;

IPR2014-00407
Patent 8,359,007 B2

FURTHER ORDERED that Patent Owner's Motion to Exclude is *denied*; and

FURTHER ORDERED that this is a Final Written Decision, and, therefore, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2014-00407
Patent 8,359,007 B2

For PETITIONERS:

J. Steven Baughman
Gabrielle E. Higgins
ROPES & GRAY LLP
steven.baughman@ropesgray.com
gabrielle.higgins@ropesgray.com

B. Todd Patterson
Jerry R. Selinger
PATTERSON & SHERIDAN, LLP
tpatterson@pattersonsheridan.com
jselinger@pattersonsheridan.com

For PATENT OWNER:

Timothy G. Newman
LARSON NEWMAN
tnewman@larsonnewman.com

Ryan M. Schultz
Thomas R. DeSimone
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
rmschultz@rkmc.com
TRDesimone@rkmc.com

24

**A24**

US008359007B2

(12) **United States Patent**
White et al.

(10) Patent No.: **US 8,359,007 B2**
(45) Date of Patent: *Jan. 22, 2013

(54) **SYSTEM AND METHOD FOR COMMUNICATING MEDIA CENTER**

(75) Inventors: **Russell W. White**, Austin, TX (US); **Kevin R. Imes**, Austin, TX (US)

(73) Assignee: **Affinity Labs of Texas, LLC**, Austin, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/052,559**

(22) Filed: **Mar. 21, 2011**

(65) **Prior Publication Data**

US 2011/0312386 A1     Dec. 22, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 12/495,190, filed on Jun. 30, 2009, now Pat. No. 7,953,390, which is a continuation of application No. 12/015,320, filed on Jan. 16, 2008, now Pat. No. 7,778,595, which is a continuation of application No. 10/947,755, filed on Sep. 23, 2004, now Pat. No. 7,324,833, which is a continuation of application No. 09/537,812, filed on Mar. 28, 2000, now Pat. No. 7,187,947.

(51) **Int. Cl.**
*H04M 3/16*     (2006.01)
*H04H 40/00*     (2008.01)

(52) **U.S. Cl.** ........................ **455/410**; 455/3.06; 455/418

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,582,926 | A | 6/1971 | Hassan |
| 4,291,749 | A | 9/1981 | Ootsuka et al. |
| 4,314,232 | A | 2/1982 | Tsunoda |
| 4,337,821 | A | 7/1982 | Saito |
| 4,401,848 | A | 8/1983 | Tsunoda |
| 4,407,564 | A | 10/1983 | Ellis |
| 4,419,730 | A | 12/1983 | Ito et al. |
| 4,441,405 | A | 4/1984 | Takeuchi |
| 4,481,584 | A | 11/1984 | Holland |
| 4,536,739 | A | 8/1985 | Nobuta |
| 4,570,217 | A | 2/1986 | Allen et al. |
| 4,582,389 | A | 4/1986 | Wood et al. |
| 4,636,782 | A | 1/1987 | Nakamura et al. |
| 4,716,458 | A | 12/1987 | Heitzman et al. |
| 4,731,769 | A | 3/1988 | Schaefer |
| 4,740,779 | A | 4/1988 | Cleary et al. |
| 4,740,780 | A | 4/1988 | Brown et al. |
| 4,752,824 | A | 6/1988 | Moore |
| 4,795,223 | A | 1/1989 | Moss |
| 4,802,492 | A | 2/1989 | Grunstein |
| 4,807,292 | A | 2/1989 | Sorscher ........................ 381/86 |
| 4,809,177 | A | 2/1989 | Windle et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2225910 | 12/1997 |
| CN | 1218256 A | 6/1999 |

(Continued)

OTHER PUBLICATIONS

Multi Technology Equipment, "Neo Car Jukebox, Installation and Instruction Manual," Prior to Mar. 28, 2000, 29 pages.

(Continued)

*Primary Examiner* — Erika A Washington

(57) **ABSTRACT**

A method for communicating media content is disclosed. The method includes receiving in a server a request for a listing of network addresses associated with a playlist for available content, and sending a message having network addresses for different portions of the content. The network addresses allow a requesting device to use one transmission rate for a first part of the content and a different transmission rate for a second part of the content.

**20 Claims, 9 Drawing Sheets**



**US 8,359,007 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,812,843 | A | 3/1989 | Champion, III et al. |
| 4,817,203 | A | 3/1989 | Tsurumoto et al. |
| 4,818,048 | A | 4/1989 | Moss |
| 4,827,520 | A | 5/1989 | Zeinstra |
| 4,837,551 | A | 6/1989 | Iino |
| 4,876,594 | A | 10/1989 | Schiffman |
| 4,905,272 | A | 2/1990 | Van de Mortel et al. |
| 4,914,705 | A | 4/1990 | Nigawara |
| 4,977,509 | A | 12/1990 | Pitchford et al. |
| 4,988,976 | A | 1/1991 | Lu |
| 4,995,258 | A | 2/1991 | Frank |
| 4,996,959 | A | 3/1991 | Akimoto |
| 4,999,622 | A | 3/1991 | Amano et al. |
| 5,006,829 | A | 4/1991 | Miyamoto et al. |
| 5,051,735 | A | 9/1991 | Furukawa |
| 5,070,323 | A | 12/1991 | Iino et al. |
| 5,124,915 | A | 6/1992 | Krenzel |
| 5,164,904 | A | 11/1992 | Sumner |
| 5,179,385 | A | 1/1993 | O'Loughlin et al. |
| 5,198,797 | A | 3/1993 | Daidoji |
| 5,203,499 | A | 4/1993 | Knittel |
| 5,214,413 | A | 5/1993 | Okabayashi et al. |
| 5,214,707 | A | 5/1993 | Fujimoto et al. |
| 5,214,793 | A | 5/1993 | Conway et al. |
| 5,239,700 | A | 8/1993 | Guenther et al. |
| 5,257,190 | A | 10/1993 | Crane |
| 5,270,689 | A | 12/1993 | Hermann |
| 5,274,560 | A | 12/1993 | LaRue |
| 5,278,532 | A | 1/1994 | Hegg et al. |
| 5,293,115 | A | 3/1994 | Swanson |
| 5,299,132 | A | 3/1994 | Wortham |
| 5,307,326 | A | 4/1994 | Osawa |
| 5,327,558 | A | 7/1994 | Burke et al. |
| 5,335,743 | A | 8/1994 | Gillbrand et al. |
| 5,341,350 | A | 8/1994 | Frank |
| 5,345,817 | A | 9/1994 | Grenn et al. |
| 5,351,041 | A | 9/1994 | Ikata et al. |
| 5,361,165 | A | 11/1994 | Stringfellow et al. |
| 5,363,355 | A | 11/1994 | Takagi |
| 5,371,510 | A | 12/1994 | Miyauchi et al. |
| 5,388,248 | A | 2/1995 | Robinson et al. |
| 5,400,045 | A | 3/1995 | Aoki |
| 5,400,246 | A | 3/1995 | Wilson et al. |
| 5,404,443 | A | 4/1995 | Hirata |
| 5,408,686 | A | 4/1995 | Mankovitz |
| 5,410,326 | A | 4/1995 | Goldstein |
| 5,414,439 | A | 5/1995 | Groves et al. |
| 5,416,318 | A | 5/1995 | Hegyi |
| 5,418,962 | A | 5/1995 | Bodin et al. |
| 5,420,573 | A | 5/1995 | Tanaka et al. |
| 5,422,565 | A | 6/1995 | Swanson |
| 5,432,904 | A | 7/1995 | Wong |
| 5,440,428 | A | 8/1995 | Hegg et al. |
| 5,442,553 | A | 8/1995 | Parrillo |
| 5,442,557 | A | 8/1995 | Kaneko |
| 5,450,321 | A | 9/1995 | Crane |
| 5,450,471 | A | 9/1995 | Hanawa et al. |
| 5,450,613 | A | 9/1995 | Takahara et al. |
| 5,475,399 | A | 12/1995 | Borsuk |
| 5,475,835 | A | 12/1995 | Hickey |
| 5,479,157 | A | 12/1995 | Suman et al. |
| 5,483,632 | A | 1/1996 | Kuwamoto et al. |
| 5,486,840 | A | 1/1996 | Borrego et al. |
| 5,488,357 | A | 1/1996 | Sato et al. |
| 5,493,658 | A | 2/1996 | Chiang et al. |
| 5,497,271 | A | 3/1996 | Mulvanny et al. |
| 5,504,482 | A | 4/1996 | Schreder |
| 5,504,622 | A | 4/1996 | Oikawa et al. |
| 5,506,595 | A | 4/1996 | Fukano et al. |
| 5,511,724 | A | 4/1996 | Freiberger et al. |
| 5,519,410 | A | 5/1996 | Smalanskas et al. |
| 5,523,559 | A | 6/1996 | Swanson |
| 5,524,051 | A | 6/1996 | Ryan |
| 5,525,977 | A | 6/1996 | Suman |
| 5,528,248 | A | 6/1996 | Steiner et al. |
| 5,528,496 | A | 6/1996 | Brauer et al. |
| 5,532,684 | A | 7/1996 | Katsu |
| 5,534,888 | A | 7/1996 | Lebby et al. |
| 5,539,645 | A | 7/1996 | Mandhyan et al. |
| 5,539,658 | A | 7/1996 | McCullough |
| 5,539,869 | A | 7/1996 | Spoto et al. |
| 5,543,789 | A | 8/1996 | Behr et al. |
| 5,547,125 | A | 8/1996 | Hennessee et al. |
| 5,553,661 | A | 9/1996 | Beyerlein et al. |
| 5,555,172 | A | 9/1996 | Potter |
| 5,555,286 | A | 9/1996 | Tendler |
| 5,555,502 | A | 9/1996 | Opel |
| 5,557,541 | A | 9/1996 | Schulhof et al. |
| 5,568,390 | A | 10/1996 | Hirota et al. |
| 5,572,442 | A | 11/1996 | Schulhof |
| 5,576,724 | A | 11/1996 | Fukatsu et al. |
| 5,586,090 | A | 12/1996 | Otte |
| 5,587,560 | A | 12/1996 | Crooks et al. |
| 5,589,090 | A | 12/1996 | Song |
| 5,594,709 | A | 1/1997 | Nagano et al. |
| 5,594,779 | A | 1/1997 | Goodman .................. 455/3.04 |
| 5,596,319 | A | 1/1997 | Spry |
| 5,604,676 | A | 2/1997 | Penzias |
| 5,614,895 | A | 3/1997 | Ohomori et al. |
| 5,616,876 | A | 4/1997 | Cluts |
| 5,619,412 | A | 4/1997 | Hapka |
| 5,621,252 | A | 4/1997 | Bucknam |
| 5,625,608 | A | 4/1997 | Grewe et al. |
| 5,625,668 | A | 4/1997 | Loomis et al. |
| 5,627,547 | A | 5/1997 | Ramaswamy et al. |
| 5,638,305 | A | 6/1997 | Kobayashi et al. |
| 5,639,305 | A | 6/1997 | Brown et al. |
| 5,646,608 | A | 7/1997 | Shintani |
| 5,650,929 | A | 7/1997 | Potter et al. |
| 5,653,386 | A | 8/1997 | Hennessee et al. |
| 5,654,715 | A | 8/1997 | Hayashikura et al. |
| 5,657,221 | A | 8/1997 | Warman et al. |
| 5,661,652 | A | 8/1997 | Sprague et al. |
| 5,664,228 | A | 9/1997 | Mital |
| 5,666,102 | A | 9/1997 | Lahiff |
| 5,670,953 | A | 9/1997 | Satoh et al. |
| 5,677,837 | A | 10/1997 | Reynolds |
| 5,682,525 | A | 10/1997 | Bouve et al. |
| 5,684,490 | A | 11/1997 | Young et al. |
| 5,691,695 | A | 11/1997 | Lahiff |
| 5,694,120 | A | 12/1997 | Indekeu et al. .............. 340/7.23 |
| 5,699,056 | A | 12/1997 | Yoshida |
| 5,699,255 | A | 12/1997 | Ellis et al. |
| 5,702,165 | A | 12/1997 | Koibuchi |
| 5,712,640 | A | 1/1998 | Andou et al. |
| 5,715,474 | A | 2/1998 | Burke et al. |
| 5,721,827 | A | 2/1998 | Logan et al. |
| 5,724,407 | A | 3/1998 | Bruno et al. |
| 5,732,216 | A | 3/1998 | Logan et al. |
| 5,734,973 | A | 3/1998 | Honda |
| 5,737,706 | A | 4/1998 | Seazholtz |
| 5,742,226 | A | 4/1998 | Szabo et al. |
| 5,742,893 | A | 4/1998 | Frank |
| 5,752,754 | A | 5/1998 | Amitani et al. |
| 5,754,774 | A | 5/1998 | Bittinger et al. |
| 5,754,775 | A | 5/1998 | Adamson et al. |
| 5,757,359 | A | 5/1998 | Morimoto et al. |
| 5,758,311 | A | 5/1998 | Tsuji et al. |
| 5,760,742 | A | 6/1998 | Branch et al. |
| 5,772,534 | A | 6/1998 | Dudley |
| 5,774,070 | A | 6/1998 | Rendon |
| 5,774,793 | A | 6/1998 | Cooper et al. |
| 5,774,827 | A | 6/1998 | Smith, Jr. et al. |
| 5,777,394 | A | 7/1998 | Arold |
| 5,790,973 | A | 8/1998 | Blaker et al. |
| 5,790,974 | A | 8/1998 | Tognazzini |
| 5,794,164 | A | 8/1998 | Beckert et al. |
| 5,797,089 | A | 8/1998 | Nguyen et al. |
| 5,798,759 | A | 8/1998 | Dahl |
| 5,806,018 | A | 9/1998 | Smith et al. |
| 5,808,566 | A | 9/1998 | Behr et al. |
| 5,812,870 | A | 9/1998 | Kikinis et al. |
| 5,819,160 | A | 10/1998 | Foladare et al. |
| 5,822,098 | A | 10/1998 | Morgaine |
| 5,835,732 | A | 11/1998 | Kikinis et al. |
| 5,839,108 | A | 11/1998 | Daberko et al. |
| 5,852,775 | A | 12/1998 | Hidary |

**US 8,359,007 B2**

Page 3

| | | | |
|---|---|---|---|
| 5,864,305 | A | 1/1999 | Rosenquist |
| 5,867,494 | A | 2/1999 | Krishnaswamy et al. |
| 5,870,680 | A | 2/1999 | Guerlin et al. |
| 5,875,412 | A | 2/1999 | Sulich et al. |
| 5,878,282 | A | 3/1999 | Mital |
| 5,889,852 | A | 3/1999 | Rosecrans et al. |
| 5,900,564 | A | 5/1999 | Kurakake .................... 84/477 R |
| 5,908,464 | A | 6/1999 | Kishigami et al. |
| 5,914,941 | A | 6/1999 | Janky |
| 5,917,405 | A | 6/1999 | Joao |
| 5,918,013 | A | 6/1999 | Mighdoll et al. |
| 5,919,239 | A | 7/1999 | Fraker et al. |
| 5,919,246 | A | 7/1999 | Waizmann et al. |
| 5,926,624 | A | 7/1999 | Katz et al. |
| 5,940,767 | A | 8/1999 | Bourgeois et al. |
| 5,953,005 | A | 9/1999 | Liu ........................... 715/500.1 |
| 5,953,506 | A | 9/1999 | Kalra et al. |
| 5,953,657 | A | 9/1999 | Ghisler |
| 5,956,029 | A | 9/1999 | Okada et al. |
| 5,956,651 | A | 9/1999 | Willkie |
| 5,963,916 | A | 10/1999 | Kaplan |
| 5,966,714 | A | 10/1999 | Huang et al. |
| 5,969,283 | A | 10/1999 | Looney et al. |
| 5,969,826 | A | 10/1999 | Dash et al. |
| 5,974,333 | A | 10/1999 | Chen |
| 5,978,567 | A | 11/1999 | Rebane et al. |
| 5,978,689 | A | 11/1999 | Tuoriniemi et al. |
| 5,982,298 | A | 11/1999 | Lappenbusch et al. |
| 5,987,381 | A | 11/1999 | Oshizawa |
| 5,987,394 | A | 11/1999 | Takakura et al. |
| 5,990,803 | A | 11/1999 | Park |
| 5,991,640 | A | 11/1999 | Lilja et al. |
| 5,999,525 | A | 12/1999 | Krishnaswamy et al. |
| 5,999,877 | A | 12/1999 | Takahashi et al. |
| 6,006,115 | A | 12/1999 | Wingate |
| 6,006,161 | A | 12/1999 | Katou |
| 6,007,228 | A | 12/1999 | Agarwal et al. |
| 6,009,355 | A | 12/1999 | Obradovich et al. |
| 6,009,363 | A | 12/1999 | Beckert |
| 6,012,100 | A | 1/2000 | Frailong et al. |
| 6,014,569 | A | 1/2000 | Bottum ........................ 370/913 |
| 6,014,689 | A | 1/2000 | Budge et al. |
| 6,018,571 | A | 1/2000 | Langlois et al. |
| 6,023,232 | A | 2/2000 | Eitzenberger |
| 6,023,241 | A | 2/2000 | Clapper |
| 6,029,064 | A | 2/2000 | Farris et al. ................ 455/412 |
| 6,032,089 | A | 2/2000 | Buckley |
| 6,035,339 | A | 3/2000 | Agraharam et al. |
| 6,041,023 | A | 3/2000 | Lakhansingh |
| 6,047,234 | A | 4/2000 | Cherveny et al. |
| 6,047,327 | A | 4/2000 | Tso et al. |
| 6,055,478 | A | 4/2000 | Heron |
| 6,061,306 | A | 5/2000 | Buchheim ........................ 369/2 |
| 6,072,598 | A | 6/2000 | Tso |
| 6,073,168 | A | 6/2000 | Mighdoll et al. |
| 6,084,584 | A | 7/2000 | Nahi et al. |
| 6,088,730 | A | 7/2000 | Kato et al. .................... 455/556 |
| 6,100,884 | A | 8/2000 | Tomita et al. |
| 6,104,334 | A | 8/2000 | Allport |
| 6,114,970 | A | 9/2000 | Kirson et al. |
| 6,115,669 | A | 9/2000 | Watanabe et al. |
| 6,121,282 | A | 9/2000 | Dominianni et al. |
| 6,122,403 | A | 9/2000 | Rhoads |
| 6,128,559 | A | 10/2000 | Saitou et al. |
| 6,131,060 | A | 10/2000 | Obradovich et al. |
| 6,133,853 | A | 10/2000 | Obradovich et al. |
| 6,144,358 | A | 11/2000 | Narayanaswamy et al. |
| 6,144,848 | A | 11/2000 | Walsh et al. .................... 235/379 |
| 6,147,938 | A | 11/2000 | Ogawa et al. |
| 6,148,261 | A | 11/2000 | Obradovich et al. |
| 6,150,925 | A | 11/2000 | Casazza |
| 6,151,634 | A | 11/2000 | Glaser |
| 6,157,619 | A | 12/2000 | Ozluturk |
| 6,157,725 | A | 12/2000 | Becker |
| 6,160,551 | A | 12/2000 | Naughton |
| 6,161,071 | A | 12/2000 | Shuman et al. |
| 6,163,079 | A | 12/2000 | Miyazaki et al. |
| 6,163,711 | A | 12/2000 | Juntunen et al. |
| 6,167,253 | A | 12/2000 | Farris et al. .................... 455/412 |
| 6,169,515 | B1 | 1/2001 | Mannings et al. |
| 6,175,782 | B1 | 1/2001 | Obradovich et al. |
| 6,175,789 | B1 | 1/2001 | Beckert et al. |
| 6,177,950 | B1 | 1/2001 | Robb |
| 6,178,403 | B1 | 1/2001 | Detlef |
| 6,178,514 | B1 | 1/2001 | Wood |
| 6,182,006 | B1 | 1/2001 | Meek |
| 6,185,491 | B1 | 2/2001 | Gray et al. |
| 6,185,625 | B1 | 2/2001 | Tso et al. |
| 6,189,057 | B1 | 2/2001 | Schwanz et al. |
| 6,192,340 | B1 | 2/2001 | Abecassis |
| 6,196,846 | B1 | 3/2001 | Berger et al. |
| 6,199,076 | B1 | 3/2001 | Logan et al. |
| 6,201,540 | B1 | 3/2001 | Gallup et al. |
| 6,202,008 | B1 | 3/2001 | Beckert et al. |
| 6,225,984 | B1 | 5/2001 | Crawford |
| 6,230,322 | B1 | 5/2001 | Saib et al. ...................... 725/40 |
| 6,232,539 | B1 | 5/2001 | Looney et al. .................. 84/609 |
| 6,233,430 | B1 | 5/2001 | Helferich |
| 6,236,832 | B1 | 5/2001 | Ito ................................ 455/3.06 |
| 6,236,918 | B1 | 5/2001 | Sonoda et al. |
| 6,240,297 | B1 | 5/2001 | Jadoul |
| 6,240,347 | B1 | 5/2001 | Everhart et al. |
| 6,243,725 | B1 | 6/2001 | Hempleman et al. |
| 6,246,935 | B1 | 6/2001 | Buckley |
| 6,247,130 | B1 | 6/2001 | Fritsch ........................ 713/171 |
| 6,248,946 | B1 | 6/2001 | Dwek |
| 6,253,061 | B1 | 6/2001 | Helferich |
| 6,255,961 | B1 | 7/2001 | Van Ryzin et al. |
| 6,259,892 | B1 | 7/2001 | Helferich |
| 6,262,724 | B1 | 7/2001 | Crow et al. |
| 6,262,978 | B1 | 7/2001 | Bruno et al. |
| 6,275,231 | B1 | 8/2001 | Obradovich |
| 6,278,531 | B1 | 8/2001 | Tesavis |
| 6,278,676 | B1 | 8/2001 | Anderson et al. |
| 6,278,884 | B1 | 8/2001 | Kim |
| 6,282,464 | B1 | 8/2001 | Obradovich |
| 6,289,382 | B1 | 9/2001 | Bowman-Amuah |
| 6,292,440 | B1 | 9/2001 | Lee .................................. 369/7 |
| 6,292,743 | B1 | 9/2001 | Pu et al. |
| 6,292,834 | B1 | 9/2001 | Ravi et al. |
| 6,301,116 | B1 | 10/2001 | Tamura |
| 6,311,215 | B1 | 10/2001 | Bakshi et al. |
| 6,314,094 | B1 | 11/2001 | Boys .............................. 370/352 |
| 6,314,326 | B1 | 11/2001 | Fuchu |
| 6,330,247 | B1 | 12/2001 | Chang |
| 6,332,163 | B1 | 12/2001 | Bowman-Amuah |
| 6,335,927 | B1 | 1/2002 | Elliott et al. |
| 6,338,044 | B1 | 1/2002 | Cook et al. |
| 6,339,706 | B1 | 1/2002 | Tillgren et al. ............... 455/419 |
| 6,339,832 | B1 | 1/2002 | Bowman-Amuah |
| 6,344,861 | B1 | 2/2002 | Naughton et al. |
| 6,349,223 | B1 | 2/2002 | Chen |
| 6,349,352 | B1 | 2/2002 | Lea |
| 6,353,637 | B1 | 3/2002 | Mansour et al. |
| 6,363,240 | B2 | 3/2002 | Ito |
| 6,377,825 | B1 | 4/2002 | Kennedy et al. |
| 6,396,164 | B1 | 5/2002 | Barnea et al. |
| 6,396,769 | B1 | 5/2002 | Polany |
| 6,401,085 | B1 | 6/2002 | Gershman et al. .............. 707/4 |
| 6,405,236 | B1 | 6/2002 | Lin et al. |
| 6,407,750 | B1 | 6/2002 | Gioscia et al. ................ 345/716 |
| 6,418,138 | B1 | 7/2002 | Cerf et al. ...................... 370/352 |
| 6,418,330 | B1 | 7/2002 | Lee |
| 6,418,421 | B1 | 7/2002 | Hurtado et al. |
| 6,420,975 | B1 | 7/2002 | DeLine et al. ............. 340/815.4 |
| 6,421,305 | B1 | 7/2002 | Gioscia et al. |
| 6,422,941 | B1 | 7/2002 | Thorner et al. |
| 6,425,018 | B1 | 7/2002 | Kaganas et al. |
| 6,434,459 | B2 | 8/2002 | Wong et al. |
| 6,434,568 | B1 | 8/2002 | Bowman-Amuah |
| 6,434,628 | B1 | 8/2002 | Bowman-Amuah |
| 6,438,594 | B1 | 8/2002 | Bowman-Amuah |
| 6,442,748 | B1 | 8/2002 | Bowman-Amuah |
| 6,446,080 | B1 | 9/2002 | Van Ryzin et al. |
| 6,449,541 | B1 | 9/2002 | Goldberg et al. |
| 6,453,281 | B1 | 9/2002 | Walters |
| 6,456,892 | B1 | 9/2002 | Dara-Abrams et al. |
| 6,476,825 | B1 | 11/2002 | Croy |

**A27**

**US 8,359,007 B2**

Page 4

| Patent | Kind | Date | Inventor / Class |
|---|---|---|---|
| 6,477,580 | B1 | 11/2002 | Bowman-Amuah |
| 6,477,665 | B1 | 11/2002 | Bowman-Amuah |
| 6,484,212 | B1 | 11/2002 | Markowitz et al. |
| 6,487,663 | B1 | 11/2002 | Jaisimha |
| 6,493,429 | B1 | 12/2002 | Cannon et al. |
| 6,493,546 | B2 | 12/2002 | Patsiokas |
| 6,496,205 | B1 | 12/2002 | White et al. ............. 345/824 |
| 6,496,692 | B1 | 12/2002 | Shanahan ................. 455/418 |
| 6,496,850 | B1 | 12/2002 | Bowman-Amuah |
| 6,501,832 | B1 | 12/2002 | Saylor et al. |
| 6,502,213 | B1 | 12/2002 | Bowman-Amuah |
| 6,507,762 | B1 | 1/2003 | Amro et al. |
| 6,509,716 | B2 | 1/2003 | Yi ........................ 320/115 |
| 6,510,210 | B1 | 1/2003 | Baughan ................. 379/90.01 |
| 6,510,325 | B1 | 1/2003 | Mack, II et al. |
| 6,516,466 | B1 | 2/2003 | Jackson ................ 455/3.01 |
| 6,526,335 | B1 | 2/2003 | Treyz |
| 6,529,909 | B1 | 3/2003 | Bowman-Amuah |
| 6,529,948 | B1 | 3/2003 | Bowman-Amuah |
| 6,539,396 | B1 | 3/2003 | Bowman-Amuah |
| 6,549,942 | B1 | 4/2003 | Janky et al. |
| 6,549,949 | B1 | 4/2003 | Bowman-Amuah |
| 6,550,057 | B1 | 4/2003 | Bowman-Amuah |
| 6,559,773 | B1 | 5/2003 | Berry |
| 6,571,282 | B1 | 5/2003 | Bowman-Amuah |
| 6,578,068 | B1 | 6/2003 | Bowman-Amuah |
| 6,584,403 | B2 | 6/2003 | Bunn |
| 6,587,127 | B1 | 7/2003 | Leeke et al. |
| 6,587,835 | B1 | 7/2003 | Treyz et al. ..................... 705/14 |
| 6,591,085 | B1 | 7/2003 | Grady ............................. 455/42 |
| 6,594,723 | B1 | 7/2003 | Chapman et al. |
| 6,594,740 | B1 | 7/2003 | Fukuda |
| 6,594,774 | B1 | 7/2003 | Chapman et al. |
| 6,601,192 | B1 | 7/2003 | Bowman-Amuah |
| 6,601,234 | B1 | 7/2003 | Bowman-Amuah |
| 6,606,082 | B1 | 8/2003 | Zuberec et al. |
| 6,606,660 | B1 | 8/2003 | Bowman-Amuah |
| 6,606,744 | B1 | 8/2003 | Mikurak |
| 6,609,105 | B2 | 8/2003 | Van Zoest |
| 6,615,199 | B1 | 9/2003 | Bowman-Amuah |
| 6,615,253 | B1 | 9/2003 | Bowman-Amuah |
| 6,618,039 | B1 | 9/2003 | Grant et al. |
| 6,622,083 | B1 | 9/2003 | Knockeart et al. |
| 6,629,000 | B1 | 9/2003 | Moon et al. |
| 6,629,197 | B1 | 9/2003 | Bhogal et al. |
| 6,633,932 | B1 | 10/2003 | Bork et al. |
| 6,636,242 | B2 | 10/2003 | Bowman-Amuah |
| 6,639,584 | B1 | 10/2003 | Li |
| 6,640,238 | B1 | 10/2003 | Bowman-Amuah |
| 6,640,244 | B1 | 10/2003 | Bowman-Amuah |
| 6,640,249 | B1 | 10/2003 | Bowman-Amuah |
| 6,640,306 | B1 | 10/2003 | Tone et al. |
| 6,647,257 | B2 | 11/2003 | Owensby |
| 6,658,247 | B1 | 12/2003 | Saito |
| 6,671,567 | B1 | 12/2003 | Dwyer et al. |
| 6,671,715 | B1 | 12/2003 | Langseth et al. |
| 6,671,745 | B1 | 12/2003 | Mathur et al. |
| 6,671,818 | B1 | 12/2003 | Mikurak |
| 6,675,233 | B1 | 1/2004 | Du |
| 6,678,215 | B1 | 1/2004 | Treyz |
| 6,681,120 | B1 | 1/2004 | Kim |
| 6,694,200 | B1 | 2/2004 | Naim .............................. 700/94 |
| 6,697,470 | B2 | 2/2004 | McDonough |
| 6,697,824 | B1 | 2/2004 | Bowman-Amuah |
| 6,697,944 | B1 | 2/2004 | Jones et al. |
| 6,704,394 | B1 | 3/2004 | Kambhatla et al. |
| 6,707,889 | B1 | 3/2004 | Saylor et al. |
| 6,708,086 | B2 | 3/2004 | Richard |
| 6,715,145 | B1 | 3/2004 | Bowman-Amuah |
| 6,721,489 | B1 | 4/2004 | Benyamin et al. |
| 6,721,710 | B1 | 4/2004 | Lueck et al. ............... 369/59.21 |
| 6,725,022 | B1 | 4/2004 | Clayton et al. |
| 6,728,531 | B1 | 4/2004 | Lee |
| 6,731,625 | B1 | 5/2004 | Eastep et al. |
| 6,741,980 | B1 | 5/2004 | Langseth et al. |
| 6,742,015 | B1 | 5/2004 | Bowman-Amuah |
| 6,754,181 | B1 | 6/2004 | Elliott et al. |
| 6,760,916 | B2 | 7/2004 | Holtz et al. |
| 6,772,212 | B1 | 8/2004 | Lau et al. ..................... 709/228 |
| 6,788,528 | B2 | 9/2004 | Enners et al. .................. 361/683 |
| 6,791,907 | B2 | 9/2004 | Berhan |
| 6,792,086 | B1 | 9/2004 | Saylor et al. |
| 6,792,263 | B1 | 9/2004 | Kite ............................ 455/412.1 |
| 6,792,615 | B1 | 9/2004 | Rowe et al. |
| 6,804,825 | B1 | 10/2004 | White et al. |
| 6,823,255 | B2 | 11/2004 | Ahrens et al. |
| 6,832,316 | B1 | 12/2004 | Sibert |
| 6,842,906 | B1 | 1/2005 | Bowman-Amuah |
| 6,845,398 | B1 | 1/2005 | Galensky et al. |
| 6,862,357 | B1 | 3/2005 | Albus et al. |
| 6,888,927 | B1 | 5/2005 | Cruickshank et al. |
| 6,888,929 | B1 | 5/2005 | Saylor et al. |
| 6,892,067 | B1 | 5/2005 | Sharma et al. |
| 6,892,226 | B1 | 5/2005 | Tso et al. |
| 6,901,067 | B1 | 5/2005 | Kalavade |
| 6,904,449 | B1 | 6/2005 | Quinones |
| 6,907,112 | B1 | 6/2005 | Guedalia et al. ..... 379/88.17 |
| 6,909,708 | B1 | 6/2005 | Krishnaswamy et al. |
| 6,915,272 | B1 | 7/2005 | Zilliacus et al. .............. 705/26 |
| 6,917,923 | B1 | 7/2005 | Dimenstein |
| 6,956,833 | B1 | 10/2005 | Yukie et al. .................... 370/352 |
| 6,957,260 | B1 | 10/2005 | Mighdoll et al. |
| 6,963,783 | B1 | 11/2005 | Bi et al. |
| 6,963,784 | B1 | 11/2005 | Gibbs |
| 6,975,835 | B1 | 12/2005 | Lake et al. |
| 6,978,127 | B1 | 12/2005 | Bulthuis et al. |
| 6,990,208 | B1 | 1/2006 | Lau et al. |
| 6,990,334 | B1 | 1/2006 | Ito |
| 7,013,251 | B1 | 3/2006 | Nace et al. |
| 7,020,704 | B1 | 3/2006 | Lipscomb et al. |
| 7,058,376 | B2 | 6/2006 | Logan et al. |
| 7,065,342 | B1 | 6/2006 | Rolf ........................... 455/412.1 |
| 7,085,710 | B1 | 8/2006 | Beckert et al. |
| 7,120,462 | B2 | 10/2006 | Kumar |
| 7,123,936 | B1 | 10/2006 | Rydbeck et al. |
| 7,124,101 | B1 | 10/2006 | Mikurak |
| 7,130,807 | B1 | 10/2006 | Mikurak |
| 7,139,626 | B2 | 11/2006 | Kataoka et al. |
| 7,145,898 | B1 | 12/2006 | Elliott |
| 7,149,543 | B2 | 12/2006 | Kumar, II |
| 7,149,772 | B1 | 12/2006 | Kalavade |
| 7,200,357 | B2 | 4/2007 | Janik et al. |
| 7,209,943 | B2 | 4/2007 | Ching et al. |
| 7,219,123 | B1 | 5/2007 | Fiechter et al. |
| 7,321,783 | B2 | 1/2008 | Kim |
| 7,321,923 | B1 | 1/2008 | Rosenberg et al. |
| 7,324,833 | B2 | 1/2008 | White et al. |
| 7,339,993 | B1 | 3/2008 | Brooks |
| 7,343,414 | B2 | 3/2008 | Lipscomb et al. |
| 7,346,687 | B2 | 3/2008 | Lipscomb et al. |
| 7,376,586 | B1 | 5/2008 | Partovi et al. |
| 7,379,541 | B2 | 5/2008 | Iggulden et al. |
| 7,437,485 | B1 | 10/2008 | Kruglikov et al. |
| 7,440,772 | B2 | 10/2008 | White et al. |
| 7,444,353 | B1 | 10/2008 | Chen |
| 7,549,007 | B1 | 6/2009 | Smith et al. |
| 7,562,392 | B1 | 7/2009 | Rhoads et al. |
| 7,610,597 | B1 | 10/2009 | Johnson et al. |
| 7,711,838 | B1 | 5/2010 | Boulter |
| 7,778,595 | B2 | 8/2010 | White et al. |
| 7,945,284 | B1 | 5/2011 | Cao et al. |
| 7,953,390 | B2* | 5/2011 | White et al. .................. 455/410 |
| 2001/0042107 | A1 | 11/2001 | Palm |
| 2002/0010759 | A1 | 1/2002 | Hitson |
| 2002/0023028 | A1 | 2/2002 | Quarendon et al. ............ 705/26 |
| 2002/0026442 | A1 | 2/2002 | Lipscomb et al. |
| 2002/0046084 | A1 | 4/2002 | Steele et al. .................... 705/14 |
| 2002/0058475 | A1 | 5/2002 | Patsiokas |
| 2002/0060701 | A1 | 5/2002 | Naughton et al. |
| 2002/0072818 | A1 | 6/2002 | Moon et al. |
| 2002/0112078 | A1 | 8/2002 | Yach |
| 2002/0144271 | A1 | 10/2002 | Behagen et al. |
| 2002/0164973 | A1 | 11/2002 | Janik |
| 2002/0174013 | A1 | 11/2002 | Freeman et al. |
| 2003/0008646 | A1 | 1/2003 | Shanahan ............. 455/418 |
| 2003/0105718 | A1 | 6/2003 | Hurtado et al. |
| 2003/0126335 | A1 | 7/2003 | Silvester |
| 2003/0163486 | A1 | 8/2003 | Van Der Meulen |

Samsung-LG-HTC Ex. 1001 p. 4

**US 8,359,007 B2**

Page 5

| | | | |
|---|---|---|---|
| 2003/0215102 A1 | 11/2003 | Marlowe | |
| 2004/0078274 A1 | 4/2004 | Aarnio | 705/26 |
| 2004/0151327 A1 | 8/2004 | Marlow | |
| 2004/0203608 A1 | 10/2004 | Osann, Jr. | |
| 2004/0210765 A1 | 10/2004 | Erickson | |
| 2005/0010633 A1 | 1/2005 | Shanahan | 709/200 |
| 2005/0049002 A1 | 3/2005 | White et al. | 455/556.1 |
| 2005/0054379 A1 | 3/2005 | Cao et al. | 455/556.1 |
| 2005/0096018 A1 | 5/2005 | White et al. | 455/414.1 |
| 2005/0143047 A1 | 6/2005 | Kwon et al. | |
| 2005/0282600 A1 | 12/2005 | Paradice | |
| 2006/0039263 A1 | 2/2006 | Trotabas | |
| 2006/0080741 A1 | 4/2006 | Nair | |
| 2006/0094349 A1 | 5/2006 | Slesak et al. | |
| 2006/0105804 A1 | 5/2006 | Kumar | |
| 2006/0206493 A1 | 9/2006 | Lipscomb et al. | |
| 2007/0150963 A1 | 6/2007 | Lee et al. | |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 1218258 A | 6/1999 | |
| DE | 4431070 | 3/1996 | |
| DE | 19 651 308 A1 | 10/1996 | |
| DE | 101 01 702 A1 | 1/2001 | |
| DE | 102 05 641 A1 | 2/2002 | |
| DE | 44 31 070 B4 | 7/2004 | |
| DE | 20 2004 013 65 | 12/2004 | |
| EP | 333330 A1 | 2/1989 | |
| EP | 0 569 343 A1 | 10/1993 | |
| EP | 0569243 | 11/1993 | |
| EP | 0 661 676 A1 | 12/1994 | |
| EP | 0 675 341 A1 | 4/1995 | |
| EP | 0675341 | 10/1995 | |
| EP | 0744839 | 11/1996 | |
| EP | 0 771 686 A2 | 7/1997 | |
| EP | 0 898 378 | 2/1999 | |
| EP | 0 920 016 A2 | 2/1999 | |
| EP | 0 918 408 A2 | 5/1999 | |
| EP | 0 982 732 A1 | 1/2000 | |
| EP | 0982732 A1 | 1/2000 | |
| EP | 984584 | 8/2000 | |
| EP | 1 148 674 A2 | 10/2001 | |
| FR | 10-149162 | 6/1998 | |
| FR | 3056721 | 12/1998 | |
| JP | 59085599 | 5/1984 | |
| JP | 63-136828 | 6/1988 | |
| JP | 63136828 | 6/1988 | |
| JP | 1018712 | 1/1989 | |
| JP | 2-301330 | 12/1990 | |
| JP | H4-261576 | 9/1992 | |
| JP | 5077679 | 3/1993 | |
| JP | 5-294250 | 11/1993 | |
| JP | 6-187597 | 7/1994 | |
| JP | 6289118 | 10/1994 | |
| JP | 6294659 | 10/1994 | |
| JP | 7036362 | 2/1995 | |
| JP | 07-129695 | 5/1995 | |
| JP | 7-146155 | 6/1995 | |
| JP | 7-262493 | 10/1995 | |
| JP | 7270171 | 10/1995 | |
| JP | H08-6875 | 1/1996 | |
| JP | 8-79814 | 3/1996 | |
| JP | H06-79614 | 3/1996 | |
| JP | 8-110231 | 4/1996 | |
| JP | 9-50282 | 2/1997 | |
| JP | 9-61514 | 3/1997 | |
| JP | 9-74580 | 3/1997 | |
| JP | 10-103966 | 4/1998 | |
| JP | H08-252976 | 4/1998 | |
| JP | 10-143349 | 5/1998 | |
| JP | 10-173737 | 6/1998 | |
| JP | 1998-052033 | 9/1998 | |
| JP | 3056721 | 12/1998 | |
| JP | 11-68685 | 3/1999 | |
| JP | 11-73192 | 3/1999 | |
| JP | 1168685 | 3/1999 | |
| JP | 2901445 | 3/1999 | |
| JP | 11-96735 | 4/1999 | |
| JP | 11-143791 | 5/1999 | |
| JP | 1999-0033393 | 5/1999 | |

| | | |
|---|---|---|
| JP | 1999-0042565 | 6/1999 |
| JP | H11-164058 | 6/1999 |
| JP | 11-219580 | 8/1999 |
| JP | 11-068685 | 9/1999 |
| JP | 11-242686 | 9/1999 |
| JP | H11-242686 | 9/1999 |
| JP | 11219580 A | 10/1999 |
| JP | H11-286558 | 10/1999 |
| JP | 11-317061 | 11/1999 |
| JP | H11-317061 | 11/1999 |
| JP | 2000-0001465 | 1/2000 |
| JP | 2000-66974 | 3/2000 |
| JP | 2001-0009302 | 2/2001 |
| JP | 2001-0028354 | 4/2001 |
| JP | 2001-128280 | 5/2001 |
| JP | 10-356742 | 10/2002 |
| JP | 3890692 | 12/2006 |
| JP | 2007-207257 | 8/2007 |
| KR | 10-1997-0016743 | 4/1997 |
| KR | 20-1997-0012254 | 5/1997 |
| KR | 0142256 | 3/1998 |
| KR | 1999-024210 | 3/1999 |
| KR | 1999-0033726 | 6/1999 |
| KR | 201999002030 U | 6/1999 |
| KR | 1999-0048723 | 7/1999 |
| KR | 1999-0055970 | 7/1999 |
| KR | 1999-0073234 | 10/1999 |
| KR | 100242563 B1 | 10/1999 |
| KR | 2000-0001465 | 1/2000 |
| KR | 20000036680 | 7/2000 |
| KR | 10-0356742 | 10/2002 |
| WO | WO 94/18753 | 8/1994 |
| WO | WO 96/04724 | 2/1996 |
| WO | WO 96/07110 | 3/1996 |
| WO | WO 97/13657 | 4/1997 |
| WO | 98/19480 | 5/1998 |
| WO | WO 98/21672 | 5/1998 |
| WO | WO 98/19480 | 7/1998 |
| WO | WO 98/33102 | 7/1998 |
| WO | WO 98/47252 | 10/1998 |
| WO | WO 99/06910 | 2/1999 |
| WO | WO 99/18518 | 4/1999 |
| WO | WO 99/23856 | 5/1999 |
| WO | WO 99/35009 | 7/1999 |
| WO | WO 99 38266 | 7/1999 |
| WO | 99/43136 | 8/1999 |
| WO | WO 99/28897 | 8/1999 |
| WO | WO 99/43135 | 8/1999 |
| WO | 11-317061 | 11/1999 |
| WO | WO 99/12152 | 11/1999 |
| WO | WO 00/07849 | 2/2000 |
| WO | 00/38340 | 6/2000 |
| WO | WO 00/38340 | 6/2000 |
| WO | WO 00/38340 | 8/2000 |
| WO | WO 00/54187 | 9/2000 |
| WO | WO 00/54462 | 9/2000 |
| WO | WO 00/60450 | 10/2000 |
| WO | WO 0060450 | 10/2000 |
| WO | WO 00/70523 | 11/2000 |
| WO | WO 00/79372 A1 | 12/2000 |

### OTHER PUBLICATIONS

Sony Corporation, "FM/AM Compact Disc Player Operating Instructions," 1998, 132 pages.

United States Patent and Trademark Office, Office Action mailed on Oct. 20, 2011 in U.S. Appl. No. 13/117,507.

Request for Inter Partes Reexamination of U.S. Patent No. 7,187,947, filed on Nov. 13, 2009, with accompanying Claim Charts.

Request for Inter Partes Reexamination of U.S. Patent No. 7,440,772, filed on Nov. 13, 2009, with accompanying Claim Charts.

Request for Inter Partes Reexamination of U.S. Patent No. 7,324,833, filed on Nov. 13, 2009, with accompanying Claim Charts.

Request for Inter Partes Reexamination of U.S. Patent No. 7,486,926, filed on Nov. 13, 2009, with accompanying Claim Charts.

Request for Inter Partes Reexamination of U.S. Patent No. 7,634,228, filed on Feb. 3, 2010, with accompanying Claim Charts.

"Universal Serial Bus Specification," Revision 1.1, Sep. 23, 1998, pp. ii-106.

Reply to Office Action Mailed Aug. 5, 2009 in Reexamination Control No. 90/010,333 of U.S. Patent No. 7,324,833 (along with a Supplemental Reply and a Second Supplemental Reply).

Response to Notice of Failure to Comply with Inter Partes Reexamination Request Filing Requirements (37 CFR 1.915(d)) filed on Sep. 22, 2009. Requestor: Volkswagen Group of America, inc. with Replacement Request for Inter Partes Reexamination of U.S. Patent No. 7,324,833 adn Claim Charts A-JJ.

The United States Patent And Trademark Office, Office Action Mailed Nov. 9, 2007 in related U.S. Appl. No. 10/947,755.

Cai, Jian, et al., "General Packet Radio Service in OSM," IEEE Communications Magazine, Oct. 1997.

RealNetworks, "RealPlayer Plus G2 Manual," Copyright 1998-1999.

Rathbone, Andy, "MP3 for Dummies," IDG Books Worldwide, Copyright 1999.

Affinity Labs of Texas, LLC v. BMW North America, LLC, et al., C.A. No. 908CV164 and Affinity Labs of Texas, LLC v. Alpine Electronics of America, Inc., et al., C.A. No. 9:08CV171, Eastern District of Texas, Order Construing Claim Terms of United States Pates No. 7,324,833, Dec. 18, 2009, pp. 1-31.

Exhibit B to Third Party Requester's Comments to Patent Owner's Supplemental Reply of Jul. 26, 2010 filed Aug. 25, 2010 in Reexamination No. 95/001,262 (Declaration of Dr. Bruce Maggs dated Aug. 25, 2010).

Exhibit A to Third Party Requester's Comments to Patent Owner's Reply of Sep. 9, 2010 filed Oct. 12, 2010 in Reexamination No. 95/001,263 (Declaration of Dr. Bruce Maggs dated Oct. 12, 2010).

Nokia, "Quick Guide—Accessories Guide." Copyright 1999.

Reply to Office Action Mailed Aug. 5, 2009 in Reexamination Control No. 90/010,333 of U.S. Patent No. 7,324,833 (along with a Supplemental Reply and Second Supplemental Reply).

Response to Notice of Failure to Comply with Inter Partes Reexamination Request Filing Requirements (37 CFR 1.915(d)) filed on Sep. 22, 2009. Requestor: Volkswager Group of America, Inc. with Replacement Request for Inter Partes Reexamination of U.S. Patent No. 7,324,833 and Claim Charts A-HH.

The United States Patent and Trademark Office, Office Action Mailed Nov. 12, 2009 in related U.S. Appl. No. 12/015,320.

The United States Patent and Trademark Office. Office Action Mailed Aug. 5, 2009, in a related application.

"Request for Inter Partes Reexamination of U.S. Patent No. 7,324,833 Pursuant to 37 CFR 1.915," Requestor: Volkswagen Group of America, Inc., Filed on Aug. 21, 2009, pp. 1-61 with Certificate of Mailing, and Claim Charts A-HH.

Yamaha Corporation, "Yamaha Music Sequencer, QY70, Owner's Manual," Chapters 1-11, 1997.

Multi Technology Equipment, "Neo Car Jukebox, Installation and Instruction Manual," pp. 1-30.

IEEE Standard 802.11a, 1999 Edition (Wireless LAN Medium Access Control and Physical Layer Specifications: High-Spend Physical Layer in the 5GHz Bend), 1999, 91 pages.

Rod Underhill & Nat Geriter, "The Complete Idiot's Guide to MP3: Music on the Internet," 1999, 44 pages.

Bill Mann, "I Want My MP3! How to Download, Rip, & Play Digital Music," McGraw-Hill 2000, 175 pages.

IEEE Standard 802.11, 1997 Edition (Wireless LAN Medium Access Control and Physical Layer Specifications), 1997, pp. 1-145.

Rio 800 User Guide, Mar. 2001, pp. 1-38.

IBM Wireless Modem for Cellular/CDPD—Quick Reference, Oct. 1995, pp. 1-20.

Creative Sound Blaster Live! Platinum product, documentation, and software: Creative Technology Ltd., Creative Sound Blaster Live! Platinum Getting Started, Sep. 1999, 93 pages.

psa[play Getting Started Guide, (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.c. 102 (a). (b), (f) end (g)). pp. 1-18.

psa[play Getting Started Guide, 2000, pp. 1-16.

Rio 800 User Guide, 2001, pp. 1-38.

Rio 800 Digital Audio Player—Getting Started, 2000, pp. 1-19.

Rio 600 Getting Started Guide, 2001, pp. 1-169.

Affinity Labs of Texas, LLC v. BMW North America, LLC, et al., Civil Action No. 9:08CV164, Order Denying Defendant's Motion for Summary Judgment of Non-Infringement of the '833 Patent, filed Oct. 7, 2010, pp. 1-5.

Affinity Labs of Texas, LLC, v. Hyundai Motor America, Inc.; Hyundai Motor Manufacturing Alabama LLC.; Volkswagen Group of America, Inc.; and Kia Motors America, Inc., Civil Action No. 9:08CV164 Jury Verdict Form, filed Oct. 28, 2010, pp. 1-16.

Affinity Labs of Texas, LLC, vs.BMW North America, LLC, et al., Docket 9:08CV164, Oct. 27, 2010, vol. 8 of_. pp. 2100 through 2633, Reporter's Transcript of Jury Trial, pp. 1-88.

Affinity Labs of Texas, LLC, vs. BMW North America, LLC, et al., Docket 9.08CV164, Oct. 28, 2010, vol. 9 of 9, pp. 2634 Through 2824, Reporter's Transcript of Jury Trial, pp. 1-19.

Affinity Labs of Texas, LLC, Plaintiff and Counter-Claim Defendant, vs. Apple Inc., Defendant and Counter-Claim Plaintiff.. Case No. 09-4436-CW, Apple Inc.'s First Invalidity Contentions Pursuant to Patent Local Rule 3-3, filed Jan. 5, 2011, pp. 1-25, with accompanying Appendixes A-G.

U.S. Patent and Trademark Office, Office Action mailed May 24, 2010 with Reply filed on Jul. 23, 2010 and supplemental reply filed on Jul. 26, 2010 for U.S. patent reexamination No. 95/001,262.

Third Party Requester's Comments to Patent Owner's Supplemental Reply of Jul. 26, 2010 Pursuant to 37 C.F.R 1.947, filed on Aug. 25, 2010 for U.S. patent reexamination No. 95/001,262.

U.S. Patent and Trademark Office, Office Action mailed Aug. 2, 2010 with Reply filed on Oct. 1, 2010 for U.S. patent reexamination No. 95/001,266.

U.S. Patent and Trademark Office, Office Action mailed Jul. 7, 2010 with Reply filed on Sep. 9, 2009 for U.S. patent reexamination No. 95/001,263.

Third Party Requester's Comments to Patent Owner's Supplemental Reply of Sep. 9, 2010 Pursuant to 37 C.F.R. 1.947, filed on Oct. 12, 2010 for U.S. patent reexamination No. 95/001,263.

U.S. Patent and Trademark Office, Office Action mailed Sep. 2, 2010 with Reply filed on Nov. 2, 2010 for U.S. patent reexamination No. 95/001,281.

Third Party Requester's Comments to Patent Owner's Reply of Oct. 1, 2010 Pursuant to 37 C.F.R 1.947, filed on Nov. 1, 2010 for U.S. patent reexamination No. 95/001,266.

U.S. Patent and Trademark Office, Office Action in Inter Partes Reexamination of Patent No. 7440772, Reexamination Control No. 95001266, Office Action issued on Aug. 2, 2010, 14 pages.

U.S. Patent and Trademark Office, Office Action in Inter Partes Reexamination of Patent No. 7486926, Control No. 95/001,263, Office Action issued Jul. 9, 2010, 20 pgs.

U.S. Patent and Trademark Office, Office Action in Inter Partes Reexamination dated Jun. 14, 2010 in U.S. Appl. No. 96/001,223.

U.S. Patent and Trademark Office, Ex Parte Reexamination Communication Transmittal Form dated Jun. 14, 2010 providing "Decision, Sua Sponte, to Merge Reexamination Proceedings," An U.S. Appl. No. 95/001,223.

U.S. Patent and Trademark Office, Office Action in Inter Partes Reexamination mailed on May 24, 2010, in U.S. application reexamination serial No. 95/001,262.

Affinity Labs of Texas, LLC, Plaintiff v. BMW North America, LLC, et al., Civil Action No. 9:08CV164, Affinity Labs of Texas, LLC, Plaintiff, v., Alpine Electronics of America, Inc., et al., Civil Action No. 9:08CV171, Order Construing Claim Terms of United States Patent No. 7,634,228, Filed on May 10, 2010, pp. 1-27.

O. Peters, et al., "Car Multimedia—Mobile Multimedia for the 21st Century," Oct. 5-6, 2000, pp. 1-56.

Stephan Hartwig, et al., "Mobile Multimedia—Challenges and Opportunities Invited Paper," Jun. 19, 2000, pp. 1-12.

John Hanan, "Car Audio Has Come Far since the 8-Track," Knight Ridder/Tribune Business News, Dec. 17, 1999, pp. 1-2.

Business Wire. "Lobjects Announces New Digital Audio Player Technology for the Next-Generation Auto PC," Aug. 4, 1999, pp. 1-2.

Jason Meserve, "Windows Media Player now avaiable for WinCe, (from Microsoft) (Product Announcement)," Network World, Mar. 6, 2000, pp. 1-2.

Samsung-LG-HTC Ex. 1001 p. 6

Business Wire. ""HUM" MP3 Software Turns Windows CE Handheld Computers into Portable Music Players," May 24, 1999, pp. 1-2.

Chris De Herrera, "Windows CE 2.0 Auto PC Pictures," Chris De Herrera's Windows CE Website, Revised Jan. 11, 1999. pp. 1-3.

John Murray, "Inside Microsoft Windows CE," Microsoft Press, 1998, pp. 1-20.

Compaq, Intel, Microsoft, NEC. "Universal Serial Bus Device Class Definition for Audio Devices." Release 1.0, Mar. 18, 1998, pp. 1-130.
Compaq, Intel, Microsoft, NEC, "Universal Serial Bus Specification," Revision 1.1, Sep. 23, 1998, pp. 1-327.

VESA, Video Electronics Standards Association, "VESA Plug and Display (P&D) Standard," Version 1, Revision 0, Jun. 11, 1907, pp. 1-109.

*Affinity Labs of Texas, LLC,* Plaintiff, v., *BMW North America, LLC, et al.,* Defendants, Case No. 9:08-cv-00184-RC, First Amended Answer and Counterclaim of Defendant Volkswagen Croup of America, Inc. To Third Amended Complaint, Filed on Apr. 9, 2010, pp. 1-57.

*Affinity Labs of Texas, LLC,* Plaintiff. v., *BMW North America, LLC, et al.,* Defendants, Case No. 9:08-cv-00164-RC, Amended Answer And Counterclaim of Defendants Hyundai Motor America, Hyundai Motor Manufacturing Alabama, LLC, and KIA Motors America. Inc. To Plaintiff Afenity Labs of Texas, LLC's Third Amended Complaint, Filed on Apr. 9, 2010, pp. 1-22.

*Affinity Labs of Texas, LLC,* Plaintiff. v., *BMW North America, LLC, et al.,* Defendants, Case No. 9:08-cv-00164-RC, Plaintiffs Reply to Amended Answer and Counterclaim of Defendants Hyundai Motor America, Hyundai Motor Manufacturing Alabama, LLC and KIA Motors America, Inc. To Plaintiff Affinity Labs of Texas, LLC's Third Amended Complaint, Filed on Apr. 279, 2010, pp. 1-7.

*Affinity Labs of Texas, LLC,* Plaintiff. v., *BMW North America, LLC, et al.,* Defendants, Case No. 9:08-cv-00164-RC, Plaintiffs Reply to First Amended Answer and Counterclaim of Defendant Volkswagen Group of America, Inc. to Third Amended Complaint, Filed on Apr. 27, 2010, pp. 1-7.

Panasonic, "Portable DVD/Video CD/CD Player, Operating Instructions, DVC-L10D," 1998, pp. 1-84.

Clarion Car Audio end Beyond, "1996 Car Audio & Security Product Catalog." 1998, pp. 1-24.

Clarion Car Audio and Beyond, "1999 Car Audio & Security Product," 1999, pp. 1-50.

Jamie Anderson. "Driving our way soon: the e-car," The Times, Nov. 9, 2000, pp. 1-4.

Clarion Auto PC, "Clarion Auto PC Owner's Manual," 1998, pp. 1-177.

DELPHI Automotive Systems. "The Personal Productivity Vehicle," 1996, pp. 1-2.

DELPHI Delco Electronics Systems. "On-Board Architecture," 1997, pp. 1-2.

Janet Braunstein, "Diversified Software Industries: Enabling digital instrument panels," Jan. 10, 2001, pp. 1-2.

Microsoft PressPass, "Microsoft Previews New Devices Using Windows CE for Automotive 2.0," Jan. 2000, pp. 1-2.

John Townley, "Countdown to Clarion," Automedia, pp. 1-4.

Gina Hertel, "A Voice-Activated Co-Pilot: ICES," Odds & Ends, Jan. 2000, vol. 8, Issue 1, pp. 1-5.

Kami Buchholz, "Diversified Software launches IVIS," Automotive Engineering Online, 2009, one page.

EMPEG Car webpage, http:/web.archive.org/web/1999043003316/www.empeg.com/main.html, Apr. 30, 1999, one page.

Clarion AutoPC, "Frequently Asked Questions," 1998, pp. 1-3.
Clarion AutoPC, "Frequently Asked Questions," 1999, pp. 1-9.

Stereophile, "Clarion Debuts World's First Automobile PC/Stereo," Dec. 5, 1998, pp. 1-3.

Steve Whalley, "Peripherals To Go: USB in AutoPC," pp. 1-2.

Gregory L. White, "After AutoPC's Hard Ride, Detroit Tries Rebooting In-Car Computers," The Wall Street Journal, pp. 1-3.

*Affinity Labs of Texas, LLC,* Plaintiff, v., *BMW North America, LLC, et al.,* Defendants, Civil Action No. 9-08-CV-164, Order Denying Defendant's Motion to Dismiss, Filed on Sep. 2, 2009, pp. 1-7.

*Affinity Labs of Texas, LLC* (Plaintiff) v. *BMW North America, LLC, et al.* (Defendants), Case No. 9:08-cv-00164-RC, Answer and Coun-

terclaim of Defendant Volkswagen Group of America, Inc., to Third Amended Complaint, pp. 1-58, filed on Jan. 15, 2010.

*Affinity Labs of Texas, LLC* (Plaintiff) v. *Alpine Electronics of America, Inc., et al.* (Defendants), Civil Action No. 9:08-cv-171, Order Denying Without Prejudice Defendants' Motion for Summary Judgment, one page, filed on Feb. 25, 2010.

Transperfect/Translations, "True and accurate translation of the 1995 BMW Manual, from German into English," Aug. 16, 2005, pp. 1-80.

Heinz Sodeikat, "Euro-Scout is facing the German 1994 Market," 1994, pp. 551-556.

Pictures of car navigation systems in a car dashboard, pp. 1-11.

BMW, "The BMW On-Board Navigation System—Technology Takes a Remarkable Turn," 2005, pp. 1-9.

Oldsmobile, "1991 Toronado/Trofeo Users Guide," 1991, pp. 1-41.

Yepp. "Digital Sounds—yepp—YP-E32/E64102-291," Oct. 23, 1999, pp. 1-46.

U.S. Appl. No. 60/167,179, entitled "System, Method, and Device for Playing Recorded Music on a Wireless Communications Device," by Devon A. Rolf, filed Nov. 23, 1999, pp. 1-48.

Microsoft, "Getting Started, Microsoft Windows 98, for distribution with a new PC only," 1998, pp. 1-145.

PR Newswire, "Alpine Announces Fall Release of Interface Adapter That Enables iPod Control and Playback from In-Vehicle Sound Systems," Jul. 7, 2004, pp. 1-2.

Ha-Young Park, The Customer Times, "Portable Computer Music, MP3 File and MP3 Player rise as the Next Generation Audio Format," May 1999, pp. 1-2.

"MP3 Players Introduced in the Korean IT Magazines," 1998-1999, pp. 1-15.

MPMan, "MP-F20, User's Guide, Portable MP3 player using the flash memory and a Memory card," pp. 1-16.

PR Newswire Association, Inc., "Delphi's Communiport(R) Technology for Tomorrow, Today Demonstrated at Frankfurt Auto Show," Sep. 15, 1999, pp. 1-8.

Crain Communiations, Inc., "Products," Agilent Technologies Press Release, Feb. 21, 2000, pp. 1-6.

The Washington Times, LLC, John Henan, Dallas Morning News, "Cars add computer, audiovisual gear," Jan. 14, 2000, pp. 1-3.

*Affinity Labs of Texas, LLC,* Plaintiff, v. *BMW North America, LLC, et al,* Defendants, Case No. 9:08-cv-00104-RC, Defendant Volkswagen Group of America, Inc's Invalidity Contentions, pp. 1-346.

*Affinity Labs of Texas, LLC,* Plaintiff, v. *Dice Electronics, LLC.,* Defendants, Case No. 9:08-cv-00163-RC; *Affinity Labs of Texas, LLC,* Plaintiff, v. *Hyundai Motor of America, et al.,* Defendants, Case No. 9:08-cv-00164-RC; *Affinity Labs of Texas, LLC,* Plaintiff, v. *JVC Americas Corp., Kenwood USA Corporation,* Defendants, Case No. 9:08-cv-00171-RC, Defendant's Joint Invalidity Contentions and Production of Documents Pursuant to Patent Rules 3-3 and 3-4(b), pp. 1-23 and Exhibits A, B1-B34, C and D.

U.S. Patent and Trademark Office, Issue Notification in U.S. Appl. No. 10/947,754, 1 page.

R. Lind, et al. "The Network Vehicle—A Glimpse Into the Future of Mobile Multi-Media," Sep. 1999, pp. 27-32.

U.S. Patent and Trademark Office, Order Granting/Denying Request for Ex Parte Reexamination dated Dec. 19, 2008 for U.S. Patent No. 7,324,833 (request granted), pp. 1-13.

*Affinity Labs of Texas, LLC,* Plaintiff, v.*BMW North America, LLC, et al.,* Defendants, Civil Action No. 9:08-cv-164, Order Denying Defendants' Motion to Stay, Filed Feb. 20, 2009, pp. 1-9.

Yamaha Corporation, "QY Data Filer—Owner's Manual," pp. 1-250, 1997.

GSM 03.64 version 6.0.1 Release 1997, TS 101 350 V8.01. 42 pages. Aug. 1998.

Novak, Druce and Quigg, LLP, Third Party Requester's Comments to Patent Owner's Reply of Sep. 14, 2010 Pursuant to 37 C.F.R. 1.947 with Exhibits A-E, mailed Dec. 20, 2010, in U.S. Patent Reexamination No. 90/010,333.

Declaration of Scott Andrews Under 37 C.F.R. 1.132 with Exhibits A-P, submitted with Comments of Requester. Volkswagen Group of America, Inc., Pursuant to 37 CFR 1.947, mailed Feb. 11, 2011, in U.S. Patent Reexamination No. 95/001,281.

Declaration of Dr. DeWayne Perry Under 37 C.F.R. 1.132 with Exhibits A-P, submitted with Comments of Requester. Volkswagen

Group of America, Inc., Pursuant to 37 CFR 1.947, mailed Feb. 11, 2011, in U.S. Patent Reexamination No. 95/001,281.

"Handbook for the Workpad c3 PD Companion" 3Com Corporation, 1998, 240 pages.

"IEEE 100 The Authoritative Dictionary of IEEE Standards Terms, Seventh Edition" Published by Standards Information Network, IEEE Press, 2000, pp. 357 and 994.

Kenyon & Kenyon LLP, Comments of Requester, Volkswagen Group of America, inc., Pursuant to 37 CFR 1.947, mailed Feb. 11, 2011, with Claims Charts (pp. 1-46) and Exhibits 1-11 in U.S. Patent Reexamination No. 95/001,281.

Kenyon & Kenyon LLP, Comments of Requester, Volkswagen Group of America, Inc., Pursuant to 37 C.F.R. 1.947 mailed Dec. 20, 2010 in U.S. Patent Reexamination No. 95/001,233 (merged with 90/010,333 and 95/001,284), with Claims Charts (pp. 1-60) and Exhibits 1-11.

Declaration of Scott Andrews Under 37 C.F.R. 1.132 with Exhibits A-C, submitted with Comments of Requester. Volkswagen Group of America, Inc., Pursuant to 37 CFR 1.947, mailed Dec. 20, 2010. In U.S. Patent Reexamination No. 95/001,233.

The Rio 500 Getting Started Guide, 1999, pp. 1-2.

"Vistaon's Mobile Office Solutions Give Busy Commuters More of What They Need—Time," Canada Newswire, Sep. 15, 1999, 3 pages.

Hiatt, "RIAA Sues Napster, Claiming 'Music Piracy'," MTV News, Dec. 8, 1999, 3 pages.

Sony VAIO Notebook Computer User Guide PCG-731PCG-735, 1998, pp. 1-131.

Sony VAIO Notebook Computer User Guide PCG-812, 1998, pp. 1-144.

Sony VAIO Notebook Computer User Guide PCG-838, 1999, pp. 1-121.

Sony Service Manual PCG-731/735/737, 1997, pp. 1-22.

Sony Service Manual PCG-723/729, 1998, pp. 1-22.

Boehlart, "Artists to Napster: Drop Dead" Salon.com, Mar. 24, 2000. 3 pages.

Sony Service Manual PCG-812/818, 1998, pp. 1-22.

Sony Service Manual PCG-838, 1999, pp. 1-22.

"Digital Download Provider Musicmaker.com Partners With Download Directory Listen.com; Offers Nearly 100,000 Downloadable Tracks Via the Online Directory," PR Newswire, Sep. 15, 1999, pp. 1-3.

MP3.com prospectus, Jul. 21, 1999, pp. 1-81.

Ana Orubeondo, "Trim AnCard 300 Eases Power Demands," InfoWorld, vol. 21, Issue 48. Nov. 29, 1999. p. 46 & 50.

"Net Music Firms to Tap Public Market," Billboard, Jul. 17, 1999, pp. 1-2.

"Cellular for Notebook PCs," CIO Vo. 13, No. 1, Oct. 1, 1999, p.90.

"Briefs," Network World. vol. 16, No. 24. Aug. 23, 1999, p. 27.

The MusicMatch.com website (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 36 U.S.C. 102 (a), (b), (f) and (g)) 32 pages.

The MusicMaker.com website (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)), 10 pages.

Qualcomm QCP 1960 User Manual. Apr. 1999, pp. 1-76.

Samsung SCH-3500 User Manual. 1999, pp. 1-108.

Motorola Digital StarTAC User Guide. Mar. 1999, pp. 1-118.

Nokia 9110 Quick Guide/Accessories Guide. 1999, pp. 1-31.

"MP3.com and i-drive.com Join Forces to Store and Manage MP3 Files," Business Wire, Oct. 7, 1999, pp. 1-3.

Nomad User Guide, Jun. 1999, pp. 1-34.

Nomad II Getting Started Manual. Jan. 2000, pp. 1-38.

GSM 03.64 version 6.2.0 Ralesee 1997, European Telecommunications Standards Institute, 1999, pp. 1-42.

The I-Drive.com website (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)) 6 pages.

GSM 03.64 version 7.0.0 Release 1997, European Telecommunications Standards institute. 1999, pp. 1-42.

Riocar.org. "rio car dot org Geek Guide," empeg car Mk.1, Jul. 16, 2010, 4 pages.

The MP3.com website (date unknown, contended by Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g))

Screenshots from MP3.com website (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)), 8 pages.

MP3.com and I-drive.com Join Forces to Store and Manage MP3 Files, Business Wire, Oct, 7, 1999, pp. 1-3.

The EMusic.com website (formerly www.goodnoise.com) (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)) 2 pages.

EMusic.com prospectus, Sep. 24, 1999, pp. 1-61, F1-F41.

"Logging on, Selling Sound Free From the CD," The Washington Post, Mar. 3, 2000, pp. 1-3.

"Music Factory: Retailers Struggle to Expand Listening Options Online," Contra Costa Times Mar. 19, 2000, pp. 1-2.

The MyPlay.com website (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)) 1 page.

Myplay.com Launches Today, PR Newswire. Oct. 13, 1999, pp. 1-2.

Myplay, Inc. Launches Consumer Online Music Service, PR Newswire, Oct. 13, 1999, pp. 1-3.

Empeg.com, "Does Your Car Stereo Run Linux," (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)), 2 pages.

TIA/EIA Interim Standard, Cellular Digital Packet Data, System Specification—Part 403, Mobile Data Link Protocol, Telecommunications Industry Association, Dec. 1997, 83 pages.

"The Listen Up Player from Audio HIghway" 1996. 1 page.

Audio Highway Announces the Listen Up Player, Audio Highway Press Release, Sep. 23, 1996, 2 pages.

MPMan F-10 and F-20 digital audio players and review article "MP3 Player Saehan MPMan F20 Review", X-bit labs, Jul. 14, 1999, 6 pages.

Menta, "RIAA Sues Music Startup Napster for $20 Billion" Newswire, Jan. 11, 2000, 4 pages.

Sony Corporation, Sony Portable MiniDisc Recorder MZ-R90/MZ-R91 Operating Instructions, Doc. No. 3-867-571-22(1), 1999, pp. 1-55.

Empeg Car User Guide, 1999, pp. 1-19.

Empeg Car User Guide (2000) pp. 1-28.

Crowe, Mike. Empeg Car Beta 10a, Mar. 25, 2000, 3 pages.

Emplode Help, (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a) (b), (f) and (g)) 25 pages.

"MP3 Portable Player Goes Elite" The Mac Observer, Nov. 17, 1999, 3 pages.

"MP3 in Your Car Has Arrived" (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)) 1 page.

Photos from Comdex Fall 1999, Nov. 1999, 9 pages.

Photos from LinuxWorld Expo, Winter 1999, Mar. 1-4, 1999, 22 pages.

Craig Knudsen, "MP3 Linux Players," Linux Journal, Jul. 1, 1999, pp. 1-3.

riocar.org—Empeg Car History, (date unknown, contended by defendant Apple Corp. to be prior art under one or more of 35 U.S.C. 102 (a), (b), (f) and (g)), 4 pages.

"Vistaon: For Your Listening Pleasure—Any Music, Any Time, Anywhere," Presswire, Jan. 5, 2000, 1 page.

Photographs in email to Hugo Fiennes, Sep. 22, 1999, 4 pages.

HP Jomada 420 User's Manual. 1999, pp. 1-142.

IEEE Standard 802.11b, 1999 Edition (Wireless LAN Medium Access Control and Physical Layer Specifications: Higher-Speed Physical Layer Extension in the 2.4 GHz Band) Sep. 16, 1999, 96 pages.

RealPlayer Plus G2 Manual, 1999, pp. 1-81.

U.S. Patent and Trademark Office, Reexamination Control No. 90/010,333, "Decision Granting Petition" (on the 95/001,264 third party requester (Apple, Inc.)) mailed on Apr. 18, 2011, 6 pages.

U.S. Patent and Trademark Office, Reexamination Control No. 90/010,333, "Decision Granting-In-Part Petition and Expunging Improper Paper" (on the 95/001,223 third party requester Volkswagen Group of America, Inc.)) mailed on Apr. 18, 2011, 10 pages.

US 8,359,007 B2

Page 9

U.S. Patent and Trademark Office, Reexamination Control No. 95/001,281, "Decision Dismissing Petition" mailed on May 5, 2011, 2 pages.

Volkswagen Group of America, Inc., Reexamination Control No. 95/001,223 (merged with 90/010,333 and 95/001,264), "Petition Under 37 C.F.R. 1.181 for Reconsideration," filed on May 3, 2011, 23 pages.

Volkswagen Group of America, Inc., Reexamination Control No. 95/001,223 (merged with 90/010,333 and 951001,264), "Transmittal of Replacement Comments of Requester, Volkswagen Group of America, Inc., Pursuant to 37 C.F.R. 1.947," filed on May 3, 2011, with Exhibits 1-9, and Declaration of Scott Andrews Under 37 C.F.R. 1.132, 271 pages.

Affinity Labs of Texas, LLC, Plaintiff, v. BMW North America, LLC, et al., Defendants, C.A. No. 9:08-cv-00164-RC, Affinity's Infringement Contentions, with Infringement Chart Exhibits A-G.

Affinity Labs of Texas, LLC, Plaintiff. v. Alpine Electronics of America, Inc., et al., Defendants, C.A. No. 9:08-cv-00171-RC, Affinity's Infringement Contentions. with Infringement Chart Exhibits A-1 to G.

Affinity Labs of Texas, LLC, Plaintiff, v. Dice Electronics, LLC, et al., Defendants, C.A. No. 9:08-cv-00171-RC, Affinity's Infringement Contentions, with Infringement Chart Exhibits A-C.

Affinity Labs of Texas, LLC, Plaintiff, v. Dice Electronics, LLC; et al., Defendants, C.A. No. 9:08-cv-00163 (Eastern District of Texas), Defendants' Motion to Stay Litigation Pending Reexamination, Filed Jan. 12, 2009, pp. 1-15.

Declaration of John M. Jackson in Support of Defendants' Motion to Stay Litigation Pending Reexamination, Filed on Jan. 12, 2009, pp. 1-2.

Exhibit B to Defendants' Motion to Stay Litigation Pending Reexamination (Ex Parte Reexamination Communication Transmittal Form and Order Granting Request for Ex Parte Reexamination. Issued by the U.S. Patent and Trademark Office on Dec. 12, 2008, pp. 1-16).

Exhibit C to Defendants' Motion to Stay Litigation Pending Reexamination (Affinity Labs of Texas website, http://www.afflabstx.com/, printed on Dec. 29, 2008, Filed on Jan. 12, 4 pages total).

Exhibit D to Defendants' Motion to Stay Litigation Pending Reexamination (United States Patent and Trademark Office, Ex Parte Reexamination Filing Data, Sep. 30.200B, pp. 1-2).

Affinity Labs of Texas, LLC, Plaintiff, v. BMW North America, LLC, et al., Civil Action No. 9:08-cv-00164 RC (Defendants' Joint Motion to Stay litigation Pending Reexamination, Filed on Jan. 13, 2009. pp. 1-8).

Proposed Order on Defendants' Motion to Stay litigation Pending Reexamination, Filed on Jan. 13, 2009, 1 page total.

J. Braunstein, "Airbag Technology Takes Off," Automotive & Transportation Interiors, Aug. 1996, p. 16.

I. Adcock, "No Longer Square," Automotive &Transportation Interiors, Aug. 1996, pp. 38-40.

M. Krebs, "Cars That Tell You Where to Go," The New York Times, Dec. 15, 1996, section 11, p. 1.

L. Kraar, "Knowledge Engineering," Fortune, Oct. 26, 1996, pp. 163-164.

S. Heuchert, "Eyes Forward: An ergonomic solution to driver information overload," Society of Automobile Engineering, Sep. 1996, pp. 27-31.

"OnStar" brochure by General Motors Corp., 1997.

Sun Microsystems, Inc., "Why Jini Now?", Aug. 1, 1998, pp. 1-14.

Sun Microsystems, Inc "What is Jini?", —Summary.

Clohessy, Kim, Object Technology, Inc., Virtual Machine Technology: Managing Complexity and Providing Portability for Embedded Systems, 2001. pp. 58-60.

Mobile Gt, "The Architecture for Driver Information Systems."

Request for Ex Parte Reexamination Under 35 U.S.C. §302 for U.S. Patent No. 7,324,833, Filed on Nov. 7, 2008 (pp. 1-21).

Richard Menta, "1200 Song MP3 Portable Is a Milestone Player," Jan. 11, 2000, pp. 1-3.

U.S. Appl. No. 10/947,755, filed Sep. 23, 2004.

U.S. Appl. No. 60/167,179, filed Nov. 23, 1999.

U.S. Appl. No. 09/234,259, filed Jan. 20, 1999.

"Phillips PSA [128 MAX," PC Authority Reviews, May 1, 2003, 1 pg.

"Sony Network Walkman NW-MS70D," PC Authority Reviews, Oct. 8, 2003, 1 pg.

"Targa TMU-401," PC Authority Reviews, Oct. 8, 2003, 1 pg.

"Targa TMU-604," PCT Authority Revews, Oct. 8, 2003, 1 pg.

Affinity Labs of Texas, LLC, Plaintiff, v. Apple, Inc., Defendant, C.A. No. 9:09-cv-00047-RC (Eastern District of Texas), Complaint (pp. 1-7), with Exhibits A, B and C, Filed Mar. 24, 2009. 76 pages in total.

Daniel Kumin, Stereo Review, "Jukebox Heaven," Jan. 1999, pp. 64-71.

Audio "Anthem Five-Channel Amp," Jul./Aug. 1999, p. 15.

Sony webpages in Japanese, "Portable Mini Disc Player MD Recorder," Jul. 21, 1996, pp. 1-5.

Sony, "MD Walkman Operating Instructions—MZ-R4ST," 1996, pp. 1-64.

Sony, "MD Walkman Operating Instructions—MZ-R5ST," 1997, pp. 1-79.

Stereo Review. "New Products," Jun. 1998, 1 page.

Factiva, Hardware Review, "Lost in the Supermarket," 2009, pp. 1-3.

Sony webpages in Japanese, "Portable Mini Disc Player MD Recorder," Oct. 21, 1999, pp. 1-63.

Jamie Sorcher, Stereo Review, "New for the Road," May 1998, 2 pages.

Sony. "MD Walkman Operating Instructions—MZ-R55," 1998, pp. 1-42.

John Whitters, The Advertiser, "Is the cassette doomed?" Jul. 16, 1998, pp. 1-2.

George Cole, Financial Times, "Listen with your eyes: A new music CD fomat supplies textual information," Oct. 23, 1997, pp. 1-2.

Dana J. Parker, Standard Deviations, "CD-TEXTral Read all about it", Oct. 1996. pp. 1-2.

Mobile Electronics, "Down the Road," Jul. 2004, pp. 1-2.

Alpine, "Interface Adapter for Pod KCA-420i—Owner's Manual," 44 pages total.

PR Newswire, "Alpine Announces Fall Release of interface Adapter That Enables iPod Control and Playback From in-Vehicle Sound Systems," Jul. 7, 2004, 2 pages total.

Amy Gilboy, Mobile Electronics, "Apple's iPod Seen Transforming Car Audio Business," 1 page.

Greg Borrowman, The Sydney Morning Herald, "Philips Releases Its Latest DVD," 1999, 2 pages total.

JVC, "Audio/Video Control Receiver, RX-668VBK, Instructions," pp. 1-43.

Sony webpages in Japanese. "Portable MD Recorder," Oct. 1997, 5 pages total.

Sony. "Walkman MZ-R50 Recorder," Oct. 1997 7 pages total.

Sony, "MD Walkman MZ-R55." Oct. 10, 1998, 6 pages total.

Von Herbert Pauler, Funkschau, "Kopierschulz fur MP3-Audio," 1999. 9 pages total.

English Summary, "A device for remotely controlling a car device for playing mp3 files is disclosed . . . ", 1 page total.

Franklin N. Tessler, MacWorld, "Mobile MAC, Highway Fidelity," Jun. 2004, pp. 1-3.

Barry Collins, The Sunday Times, "High-class high-tech—Buyer's guide," 2001, 2 pages total.

Peter Familari, Herald-Sun, "Clever Deck—CD and mini-disc combination," 1996, 1 page.

JVC, "MD-CD Combination Deck, XU-301BK, Instructions," pp. 1-59.

Amy Gilroy, Mobile Electronics, "OEM Integrators Embrace iPod's Success," 1 page.

JVC, "Portable Minidisc Recorder, XM-R700SL, Instructions," pp. 1-24.

Rio Car, "Car Toy Sole Retailer for Rio Car," May 28, 2001, 1 page.

Amy Gilroy, Twice, "Panasonic Ships First D MP3," Dec. 4, 2000. 1 page.

Twice, "PhatNoisie Readies MP3," Nov. 5, 2001, 1 page.

Kevin Savetz, The Washington Post, "Putting Your MP3 Collection in Drive (Final Edition)," Aug. 10. 2001, pp. 1-3.

Twice, "Study Sees Retail Opportunities for Mobile Multimedia," vol. 14, Issue 15, Jun. 28, 1999, pp. 1-2.

Japanese Weepage, www.kcalgo.kr/jsp/main.jsp, 1 page.

US 8,359,007 B2

Page 10

Japanese Webpage, www.kca.go.kr—Brochure Free—Microsoft Internet Explorer, 1 page.

Japanese Webpage, www.kca.go.kr—Brochure Free—Microsoft Internet Explorer, 1 page.

Stephen Kempainen, EDN Access for Design, by Design "in-car Computing gets personal," Aug. 17, 1996, pp. 1-7.

Japanese Website, MM MPMANIA.com, http:/mpmania, x-y.net/bbs/zboard.php?id=products&keyword=1996. 1 page.

Japanese document regarding MP3, May 1999, 1 page.

MPMan, "The portable MP3 player using the Flash Memory and Memory card—MP-F20," in Japanese, pp. 1-34.

Japanese Website, MM MPMANIA.com, http:/mpmania.xy.net/bbs/view/php?id=products&page=1&sn1=&divpage, 1 page.

www.mpman.com, "MP-F30, Users Guide," pp. 2-47.

Mark Moeller, Computing Unplugged Magazine, "Software Review, New software products for the Auto PC," 1999-2009, Zatz Publishing, pp. 1-4.

Mark Moeller, Computing Unplugged Magazine, "Auto PC Power, A survey of resources for Auto PC owners," 1999-2009, Zatz Publishing, pp. 1-5.

Mark Moeller, Computing Unplugged Magazine, "Auto PC Power. A look at the first year of the Auto PC with Microsoft," 1999-2009, Zatz Publishing, pp. 1-5.

Mark Moeller, Computing Unplugged Magazine "Auto PC Power, Next generation AutoPCs make a big debut at CES," 1999-2009, Zatz Publishing, pp. 1-6.

Mark Moeller, Computing Unplugged Magazine, "Programming Power, Getting started developing software for the Auto PC," 1999-2009, Zatz Publishing, pp. 1-5.

Mark Moeller, Computing Unplugged Magazine "Behind the Scenes, The AutoPC ; Vision vs. Reality," 1999-2009, Zatz Publishing, pp. 1-7.

Mark Moeller, Computing Unplugged Magazine, "Product Preview, A Survey of Auto PC 2.0 for software developers," 1999-2009, Zatz Publishing, pp. 1-7.

Mark Moeller, Computing Unplugged Magazine, "AutoRC Update, Auto PC/Windows CE for Automotive news bites," 1999-2009, Zatz Publishing, pp. 1-4.

Claim Chart for KR19990033393, Claim 17 of U.S. Patent No. 7,324,833, pp. 1-3.

RIO500, Getting Started Guide for Windows 98 and Macintosh OS 8.6, pp. 1-2.

Norbert A. Streitz, et al., "DOLPHIN: Integrated Meeting Support Across Local and Remote Desktop Environments and LiveBoards," Integrated Publication and Information Systems Institute, 1994, pp. 345-358.

Leo Degen, et al., "Working with Audio: Integrating Personal Tape Recorders and Desktop Computers," May 3-7, 1992, pp. 413-418.

H.S. Jun Gibee, "A Virtual Information Desk on the Internet," University of Ulsan, Sep. 1999, pp. 265-266.

Steve Whittaker, et al., "TeleNotes: Managing Lightweight Interactions in the Desktop," Lotus Development Corporation, Jun. 1997, pp. 137-168.

R.M. Crowder, et al., "Integration of Manufacturing Information Using Open Hypermedia," Computer in Industry, 1999, pp. 31-42.

Tomas Bostrom, et al., "Mobile Audio Distribution," Royal Institute of Technology, 1999, pp. 166-172.

Alex Poon, et al., Xerox Disclosure Journal, vol. 19, No. 2, "Gestural User Interface Technique for Controlling the Playback of Sequential Media," Mar./Apr. 1994, pp. 187-190.

Deb Kumar Roy, "NewsComm: A Hand-Held Device for Interactive Access to Structured Audio." Massachusetts Institute of Technology, Jun. 1995, pp. 1-12.

Victoria Bellotti, et al., "Walking Away from the Desktop Computer Distributed Collaboration and Mobility in a Product Design Team," 1996. pp. 209-218.

Upul Obeyisekere, et al., "The Visual Interactive Desktop Laboratory," Jan.-Mar. 1997, pp. 63-71.

Asim Smailagic, et al., "MoCCA: A Mobile Communication and Computing Architecture." Institute for Complex Engineered Systems, pp. 1-8.

Sui-Meng Poon, et al., "Integration of Value-Added Audio Playback Capacity Into Computer Network," Nanyang Technological University, 1995, pp. 632-636.

Erdal Paksoy, et al., "A variable-rate celp coder for fast remote voicemail retrieval using a notebook computer," DSPS R&D Center, Texas Instruments, 1997, pp. 119-124.

Jeffrey A. Davis, "Use of Personal Computers in Satellite Command and Control Systems," Raytheon Systems Company, Oct. 24, 1998, pp. 283-291.

Niki Davis, "Remote Teaching Via ISDN2 and Desktop Conferencing,"Exeter University School of Education, pp. 1-3.

A Chan, et al., "The PEP-II Project-Wide Database," Stanford University, 1998, pp. 840-842.

Krishna Bharat, et al., "Migratory Applications," Springer Berlin, vol. 1222, 1997, pp. 1-21.

EMPEG Car, "MP3 in your dash," Digital Audio Player User Guide, pp. 1-50.

Microsoft, "Getting Started Microsoft Windows. 98" Second Edition, 1998, pp. 1-136.

Saul Greenberg, "PDAs and Shared Public Displays: Making Personal information Public, and Public Information Personal," University of Calgary, Mar. 1999, pp. 1-11.

Naohiko Kohtake, et al., "InfoStick: an interaction device for Inter-Appliance Computing," Keio University, pp. 1-15.

Hewlett Packard, User's Guide, HP Jomada 420, Patin-Size PC, pp. 1-75.

Microsoft, "Introducing Microsoft Windows 95—Certificate of Authenticity," 1995, pp. 1-117.

Sony, "New Technical Theory for Servicing, MZ-R5ST Operation Manual," pp. 1-44.

Richard C. Davis, et al., "A Framework for Sharing Handwritten Notes," 1998, pp. 119-120.

Krishna A. Bharat, et al., "Migratory Applications," UIST '95, Nov. 14-17, 1995, pp. 133-142.

Brad A. Myers, "Collaboration Using Multiple PDAs Connected to a PC," Carnegie Mellon University, 1998, pp. 385-294.

Richard C. Davis, et al., "NotePals: Lightweight Note Sharing by the Group, for the Group." May 15-20, 1999, pp. 338-345.

Jun Rekimoto, et al., "Augmented Surfaces: A Spatially Continuous Work Space for Hybrid Computing Erivirontrienta," May 15-20, 1999. pp. 378-385.

Dan R. Olsen, Jr., "Interacting with Chaos," Sep. and Oct. 1999, pp. 42-54.

Scott Robertson, et al., "Dual Device User Interface Design: PDAs and Interactive Television," Apr. 13-18, 1996, pp. 79-86.

Symantec Corporation, "pcANYWHERE32 User's Guide," 1993-1997, pp. 1-216.

Krishna Bharat, et al., Migratory Applications, "Mobile Object Systems Towards the Programmable Internet," Springer Berlin/Heidelberg, vol. 1222/11997, 1997, pp. 1-134.

Diamond Multimedia Systems, Inc., "Rio PMP300, Users Guide," 1998. pp. 1-27.

Sony, "Portable MiniDisc Recorder, Operating Instructions. MZ-R55," 1998, pp. 1-42.

Norbert A. Streitz, et al., "i-Land: An Interactive Landscape for Creativity and Innovation," Proceedings of the ACM Conference on Human Factors in Computing Systems, May 15-20, 1999, pp. 120-127.

Norbert A. Streitz, et al., "Roomware for Cooperative Buildings: Integrated Design of Architectural Spaces and Infonnatien Spaces," pp. 1-20.

Direct Cable Connection screen shot, "B1U6U4," 10 pages total.

Direct Cable Connection screen shot, 10 pages total.

IBM, "WordPad z50 Cradle Option—User's Guide," 1990, pp. 1-18.

IBM Mobile Systems, "WorkPad z50 Mobile Companion (2608-1Ax), Hardware Maintenance Manual," Mar. 1999, pp. 1-77.

Kevin Jost, Automotive Engineering International, "The car as a mobile-media platform," May 1998, pp. 49-53.

Microsoft Corporation, "Windows CE 2.1 Technical Articles, Developing Applications for an Auto PC," Jun. 1999, pp. 1-13.

Infogation Corporation, "InfoGation Corp. Introduces Software Applications for Next-Generation Smart Car Systems," Jan. 8, 1998, pp. 1-2.

Business Wire, "ORA Electronics Announces USB-Compatible TelCar Mark VII Begins Shipping First Quarter of 1999," Jan. 6, 1999, pp. 1-2.

ORA USA, "ORA Electronics Patents Telear Cellular Telephone Interface," Jul. 6, 1998, pp. 1-2.

Hewlett Packard, "HP Jomade 430/430se Palm-Size PC, Users Guide," Edition 1, 1999, pp. 1-151.

NEC, "NEC MobilePro 750C, Users Guide," 1998, pp. 1-83.

Microsoft, "Palm PC Users Guide," Microsoft Windows CE, pp. 1-39.

Palm PC User's Guide, "Chapter 6, Information Backup and Exchange," pp. 69-148.

MPMan, "User's Guide, The Portable MP 3player using the flash memory and SmartMedia card," 1997, pp. 1-35.

Cover Sheet, www.mpman.com. 1 page.

Smart Media Card Slot Diagram, 1 page.

MP Man F20 Logo, 1 page.

MPMan, "Users Guide, The portable MP3 player using the flash memory with variety features including the voice recording, phone/memo browsing, etc.," 1997, pp. 1-47.

Smart Media card diagram and install instructions, pp. 1-4.

Anand Lal Shimpi, Empeg, Ltd., "MP3 meets Car Audio: Empeg Mark II in-dash Car MP3 Player," Sep. 18, 2000, pp. 1-17.

Peter Clarke, EE Times, "Engineers drive craze for MP3 audio players." Feb. 5, 1999, pp. 1-4.

Rio Car Dot Org Geek Guide, "empeg car Mk. 1," Feb. 21, pp. 1-4.

Hugo Fiennes, Rio Car Dot Org Geek Guide, "MP3 Mobile," Feb. 21, pp. 1-4.

Rio Car Dot Org, "Frequently Asked Questions," pp. 1-16.

Diamond Multimedia Systems, Inc., "Rio PMP300 Users Guide," 1998, pp. 1-27.

Stephen J. Buckley, et al., "The Car as a Peripheral, Adapting a Portable Computer to a Vehicle Intranet," SAE Technical Paper Series. 98C030, Oct. 19-21, 1998, pp. 1-14.

"The MP3 Mobile," Apr. 8,1998, pp. 1-13.

12-Volt Business & Technology Solutions, AutoMedla, "How the Intelligent Data Bus will impact the way you do business." Nov. 1998, pp. 1-2.

Press Release, "Creative Labs Launches Nomad Portable MP3 Players," Apr. 15, 1999, pp. 1-5.

BMW, "Betriebsanleitung Bordmonitor mit Navigation und TV," 1995, pp. 1-82.

BMW, "Owners Manual, On-board monitor with navigation system," 1996, pp. 1-51.

*Affinity Labs of Texas, LLC* (Plaintiff) v. *BMW North America, LLC. et al.*, (Defendants), Civil Action No. 9:06CV154 and *Affinity Labs of Texas, LLC* (Plaintiff) v. *Alpine Electronics of America, Inc., et al.*, Civil Action No. 9:06CV171, Order Construing Claim Terms of United States Patent No. 7,324,833, issued on Dec. 16, 2009, pp. 1-31.

Real Networks, Inc., RealJukebox Plus Manual, 1999, pp. 1-80.

Nokia 9110 Communicator User Manual, Copyright 1999.

Sony, "Sony Notebook Computer User Guide PCG-717/719," User Guide, 1997.

AirCard, "Sierra Wireless Announces First Cellular Network Interface Card for Notebook PCs," Jun. 21, 1999.

MusicMatch Internet Music System, "MusicMatch Jukebox Reviews," Mar. 4, 2000, May 8, 1999, Aug. 29, 1999, May 8, 1999, Feb. 4, 1997, Aug. 12, 1999, Jan. 24, 2000, Jan. 25, 2000, Feb. 22, 2000, pp. 1-32.

Bluetooth, "Specification of the Bluetooth System, Profiles," Dec. 1, 1999.

J. Schneidawind, "Big Blue Unveiling," USA Today, Nov. 23, 1992, p. 2B.

Nokia Suomi, "Range of suspension GSM products unveiled: Nokia's innovations offer a new dimension to mobile communication," Mar. 13, 1998, 1 page.

Nokia 9000i User's Manual, Copyright 1995-1997.

FCC Website, "Broadband PCS," available at http://wireless.fcc.gov/services/index.htm?job=service_home&id=broadband_pcs (accessed Nov. 9, 2009).

RealNetworks, "RealPlayer plus, RealPlayer 7 Plus User Manual," Copyright 2000, Mar. 6, 2000.

David Pogue, "SoundJam MP Digital Audio System Manual," 1999.

iTunes Wikipedia Page, http://en.wikipedia.org/wiki/iTunes, accessed Jul. 31, 2009.

K. Jost, "The Car as a Mobile-Media Platform," Automotive Engineering International, May 1998, pp. 49-53.

S.K. Kirschner, "Wired Wheels," Popular Science, Mar. 1998, pp. 54-55.

R. Lind, et al., "The Network Vehicle—A Glimpse into the Future of Mobile Multi-Media," 17th AIAA/IEEE/SAE Digital Avionics Sys. Conference Proceedings, Oct. 31 to Nov. 7, 1998, at 121-1 to 121-6.

Nokia Mobile Phones, "Application Guide," 1999-2000, 76 pages.

Van Zoest, Alexander, et al., "System and Method for Enabling Global Access and Instantaneous Listening to Digital Audio," U.S. Appl. No. 60/175,159, filed Jan. 7, 2000, 54 pages.

Diamond Multimedia Systems, Ltd., "Rio 500 Getting Started Guide for Windows 98 and Macintosh OS 8.6," 1999, 2 pages.

Creative Technology, Ltd., "Creative NOMAD II, Getting Started," 1999, 2000, 38 pages.

Rolf, Devon A., "System, Method, and Device for Playing Recorded Music on a Wireless Communications Device," U.S. Appl. No. 60/167,179, filed Nov. 23, 1999, 50 pages.

Musicmatch—Jukebox Software, "MusicMatch Jukebox 4.2," Sep. 28, 1999, 1 page.

Musicmatch—Jukebox Software, "Company History, A Few Words About MusicMatch," Sep. 28, 1999, 1 page.

Musicmatch—Jukebox Software, "About MusicMatch Jukebox, Record, Organize and Play Digital Music," Sep. 28, 1999, 2 pages.

Musicmatch, "Selected Topics From the MusicMatch Jukebox Help Included Within the Software," 1999, 14 pages.

Sprint Spectrum L.P., "Digital StarTAC Wireless Telephone User Guide," 1999, 118 pages.

"Order Construing Claim Terms of United States Patent No. 7,324,833," in the case of *Affinity Labs of Texas, LLC* v. *BMW North America, LLC, et al.*, Case No. 9:08-cv-00164 (E.D. Tex. Dec. 18, 2009).

Realnetworks Inc., "RealNetworks—The Home of Streaming Media," Oct. 18, 1999, 2 pages.

Third Party Requester's Comments to Patent Owner's Reply of Jul. 26, 2011, in Reexamination Control No. 95/001,266, filed Aug. 25, 2011, 21 pages.

Applicant's Response to Action Closing Prosecution mailed Jun. 27, 2011, in Reexamination Control No. 95/001,266, filed Jul. 26, 2011, 23 pages.

U.S. Patent and Trademark Office, Action Closing Prosecution, in Reexamination Control No. 95/001,266, Mailed on Jun. 27, 2011, 28 pages.

U.S. Patent and Trademark Office,Action Closing Prosecution, in Reexamination Control No. 95/001,263, Mailed on Aug. 17, 2011, 46 pages.

U.S. Patent and Trademark Office, Action Closing Prosecution, in Reexamination Control No. 95/001,281, Mailed on Aug. 18, 2011, 38 pages.

3COM Corporation, "Handbook for the WorkPad c3 PC Companion," 1998.

Simona, "Audi Reports Best Sep. Sales Ever," Topspeed.com, Oct. 7, 2008, 3 pages.

Press Release, "Audi Market Share Continues to Grow Through September 2009," PRNewswire.com, Dec. 20, 2010, 2 pages.

Johnson, Drew, "VW Reports May Sales Gain," www.leftlanenews.com, Dec. 20, 2010, 2 pages.

Press Release, "Volkswagen of America Announces 16 Percent Increase for Jul. Sales and a 13th Consecutive Month of Growth," Media.vw.com, Aug. 3, 2010, 2 pages.

Quattroholic, "Audi Sets April U.S. Sales Record—A3 TDI Exceeds Expectations, Record Q5 Sales," Quattroholic.com, May 3, 2010, 3 pages.

Halliday, Jean, "Thinking Big Takes Audi From Obscure to Awesome," Adage.com, Feb. 2, 2009, 5 pages.

The Deposition of Patrick Mueller, *Affinity Labs of Texas, LLP*, Plantiffs, vs. *BMW North America, LLC, et al.*, Defendants, Feb. 25, 2010, pp. 1-2, and 46-48.

**A35**    Samsung-LG-HTC Ex. 1001 p. 11

"IEEE 100 The Authoritative Dictionary of IEEE Terms, Seventh Edition," Published by the Institute of Electrical and Electronics Engineering, Inc. 2000, pp. 357 and 994.

The Deposition of Lori Markatos, *Affinity Labs of Texas, LLP*, Plantiffs, vs. *BMW North America, LLC, et al.*, Defendants, Apr. 24, 2010, pp. 1-3, 5 and 23-24.

The Deposition of James Minarik, *Affinity Labs of Texas, LLP*, Plantiffs, vs. *BMW North America, LLC, et al.*, Defendants, May 18, 2010, pp. 1-3, 10-13 and 19.

The Deposition of Hugo Fiennes, *Affinity Labs of Texas, LLP*, Plantiffs, vs. *BMW North America, LLC, et al.*, Defendants, May 20, 2010, pp. 1-3 and 35-41.

The Deposition of Marc Merlin, *Affinity Labs of Texas, LLP*, Plantiffs, vs. *BMW North America, LLC, et al.*, Defendants, Mar. 17, 2010, pp. 1-2, 14, 29 and 36.

Exhibit 4 in Request for Inter Partes Reexamination of U.S. Patent No. 7,634,228 filed Oct. 26, 2011 (Declaration of Dr. Dewayne Perry (12 pages) with exhibits A-P, dated Feb. 11, 2011).

Exhibit 5 in Request for Inter Partes Reexamination of U.S. Patent No. 7,634,228 filed Oct. 26, 2011 (Declaration of Scott Andrews (8 pages) with exhibits A-C dated Feb. 11, 2011).

"Alpine Debuts Worlds First Audio Head Units That Allow True Integration with iPod," Press Release, Alpine Electronics of America, Inc., Jan. 8, 2004, 1 page.

"iPhone User's Guide," Apple Computers,Inc., date unknown, 124 pages.

"Owner's Manual for iPod Interface," BMW of North America, LLC., 2004, 22 pages.

"Infotainment/MMI Operating Instructions," Audi AG, 2006, 195 pages.

"VRX755VD, Owner's Manual & Installation Manual," Clarion Corp., date unknown, 74 pages.

"iPod User's Guide," Apple Computer, Inc., date unknown, 64 pages.

Declaration of Hugo Fiennes in Support of Apple's Opposition to Affinity Labs of Texas, LLC's Motion for Summary Judgment and Apple's Cross Motion for Summery Judgment, in *Affinity Labs of Texas, LLC.* v. *Apple Inc.*, case No. CV 09-4436-CW, on Jun. 23, 2011, 62 Pages.

"The Free iPod Book 2.2 from iLounge.com," The Media LLC. 2005-2006, 202 pages.

U.S. Patent and Trademark Office, Final Office Action mailed May 27, 2011 in U.S. Appl. No. 13/117,507.

United States Patent and Trademark Office, Office Action mailed on Jun. 18, 2012 with Reply to Office Action filed Aug. 16, 2012 in United States reexamination No. 95/001,262.

United States Patent and Trademark Office, Office Action mailed on Aug. 17, 2011 with Reply to Office Action filed Sep. 16, 2011 in United States reexamination No. 95/001,263.

United States Patent and Trademark Office, Office Action mailed on Dec. 16, 2011 with Reply to Office Action filed Feb. 16, 2012 in United States reexamination No. 95/001,782.

United States Patent and Trademark Office, Office Action mailed on Jun. 5, 2012 with Reply to Office Action filed Aug. 2, 2012 in United States reexamination No. 90/011,982.

United States Patent and Trademark Office, Action Closing Prosecution mailed on Aug. 18, 2011 with Notice of Appeal filed by Patent Owner Nov. 11, 2011, Appeal Brief filed by patent owner Jan. 20, 2012 and Respondent Brief filed by Patent Owner Feb. 21, 2012 in United States reexamination No. 95/001,281.

United States Patent and Trademark Office, Request for Continued Examination filed Sep. 17, 2012 in U.S. Appl. No. 13/117,507.

Federal Circuit docket sheet for Jun. 5, 2012, dismissing appeal of *Affinity Labs of Texas, LLC* v. *BMW North America, LLC, et al.*, Civil Action No. 9:08-cv-164-RC (E.D. Tex.), 1 page.

U.S. District Court for the Eastern District of Texas Lufkin Division, Jury Verdict Form in Civil Action No. 9:08-cv-164-RC (E.D. Tex.), filed Oct. 28, 2010, 16 pages.

U.S. District Court for the Eastern District of Texas Lufkin Division, Final Judgment in Civil Action No. 9:08-cv-164-RC (E.D. Tex.), filed Apr. 12, 2011, 4 pages.

Comments of Requester, Volkswagen Group of America, Pursuant to 37 CFR 1.947 filed on Mar. 19, 2012 in United States reexamination No. 95/001,782.

Requester filed Petition under 37 CFR 1.181 to Invoke the Supervisory Authority of the Director and for Reconsideration, filed on Nov. 21, 2011, along with Requesters Appellant's Brief under 37 CFR 41.67 filed on Jan. 23, 2012, and Requesters Respondent Brief under 37 CFR 41.68 filed on Feb. 21, 2012 in United States reexamination No. 95/001,281.

U.S. Patent and Trademark Office, Right of Appeal mailed Oct. 1, 2012, with Notice of Appeal filed Oct. 31, 2012 in Reexamination application No. 95/001,266.

U.S. Patent and Trademark Office, Action Closing Prosecution mailed Oct. 1, 2012, with Reply to Action Closing Prosecution filed Nov. 1, 2012 in Reexamination application No. 95/001,782.

U.S. Patent and Trademark Office, Action Closing Prosecution mailed Oct. 5, 2012, with Reply to Action Closing Prosecution filed Nov. 5, 2012 (with 1.132 Declaration) in Reexamination application No. 90/010,333.

U.S. Patent and Trademark Office, Patent Board Decision on Appeal mailed Nov. 1, 2012 in Reexamination application No. 95/001,263.

Patent Owner, Affinity Labs of Texas, LLC, "Patent Owner's Petition to Terminate Inter Partes Reexamination Proceeding Under 35 USC 317(b) & 37 CFR 1.182 (with Exhibits A-F)," filed in the U.S. Patent and Trademark Office on Nov. 9, 2012 in Reexamination application No. 95/001,281.

* cited by examiner



*FIG. 1*

Case: 16-1208    Document: 16    Page: 104    Filed: 01/15/2016



*FIG. 2*

**A38**    **Samsung-LG-HTC Ex. 1001 p. 14**

300



301  Communication Module | Processor Module  302

Storage Medium

303

*FIG. 3*

A39        Samsung-LG-HTC Ex. 1001 p. 15

FIG. 4





FIG. 5A

FIG.5B



*FIG. 6*



*FIG. 7*



*FIG. 8*



FIG 9

US 8,359,007 B2

1

# SYSTEM AND METHOD FOR COMMUNICATING MEDIA CENTER

This application is a continuation of U.S. patent application Ser. No. 12/495,190, filed Jun. 30, 2009, which is now U.S. Pat. No. 7,953,390, which issued on May 31, 2011 entitled "Method for Content Delivery," which is a continuation of U.S. patent application Ser. No. 12/015,320, filed Jan. 16, 2008, which is now U.S. Pat. No. 7,778,595, which issued on Aug. 17, 2010, which is a continuation of U.S. patent application Ser. No. 10/947,755, filed on Sep. 23, 2004, which is now U.S. Pat. No. 7,324,833, which issued on Jan. 29, 2008, which is a continuation of U.S. patent application Ser. No. 09/537,812, filed on Mar. 28, 2000, which is now U.S. Pat. No. 7,187,947, which issued on Mar. 6, 2007, the disclosures of which are all hereby incorporated herein by reference in their entirety for all purposes.

## FIELD OF THE DISCLOSURE

The present disclosure relates to digitally stored content and, more specifically, to a content delivery system and method.

## BACKGROUND

The first commercial radio stations in the United States began operation around 1920. Today, there may be as many as 12,000 radio stations in the United States programming in several distinct formats. When broadcasting their respective signals, these radio stations often use an analog signal, which may be modulated based on frequency or amplitude. Frequency modulated (FM) radio appears to be the dominant entertainment medium while amplitude modulated (AM) radio seems to be a popular outlet for news and information.

Unfortunately, analog radio may be unable to provide the sound quality and consistency that radio listeners desire. As such, several broadcasting related companies have begun to consider a movement to digital radio. Unlike analog radio reception, digital radio reception may be able to provide compact disk (CD) quality sound while remaining virtually immune to interference. Being immune to interference may result in reducing static growls or "multipath" echoes, echoes caused by signal reflections off buildings or topographical features.

Some countries, like Canada and many European countries, may choose to have digital radio operate in a single digital radio band such as the L-band between 1452-1492 megahertz (MHz). This band would allow the reception of both terrestrially and satellite-originated signals. By comparison, FM radio typically operates between 88 and 108 MHz while AM radio typically operates between 0.525 and 1.705 MHz. Neither of these bands allows for easy transmission via satellite.

Canada proposed using the L-Band for digital radio as early as 1992. Several countries throughout the world have since agreed to use the L-Band for digital radio with one notable exception. It appears the United States has chosen not to operate its digital radio within the L-Band. In the United States, the L-Band may already be committed for military uses. Apparently, the United States plans to adopt a system called in-band on-channel, or IBOC, which fits within the AM and FM frequencies.

IBOC technology may offer some advantages over L-Band transmissions. For example, there may be no need for new spectrum allocations. There may be backward and forward compatibility with existing AM and FM systems on both the

2

transmitter and receiver sides, and there may be a low-investment upgrade to digital systems. Unfortunately, a workable IBOC solution is yet to be seen though technology may someday make IBOC digital radio commercially possible.

Even if an IBOC solution becomes commercially available in the United States, IBOC digital radio may suffer from several shortcomings. For example, there may global standardization problems. Though the United States favors IBOC, the European and Canadian communities seem to favor L-Band making the establishment of a global standard difficult.

## BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the present embodiments and advantages thereof may be acquired by referring to the following description taken in conjunction with the accompanying drawings, in which like reference numbers indicate like features, and wherein:

FIG. 1 depicts a general system for wirelessly communicating selective information to an electronic device in accordance with one aspect of the present invention;

FIG. 2 illustrates a block diagram of a method of wirelessly communicating selected information to an electronic device;

FIG. 3 illustrates an electronic device operable to receive selected audio information in accordance with the teachings of the present invention;

FIG. 4 illustrates a graphical user interface (GUI) for displaying selectable audio information according to one aspect of the present invention;

FIG. 5A illustrates a portable radio system having a mount for an electronic device according to one embodiment of the present invention;

FIG. 5B illustrates an automobile console having a mount for coupling an electronic device according to one aspect of the present invention;

FIG. 6 illustrates a block diagram of a system for communicating voice mail messages using email according to one embodiment of the present invention;

FIG. 7 illustrates a flow chart for providing voice email messages according to one embodiment of the present invention;

FIG. 8 illustrates a flow diagram of a method for providing selected audio information to an electronic device according to one embodiment of the present invention; and

FIG. 9 illustrates an automobile console having a mount for an electronic device according to one embodiment of the present invention.

## DETAILED DESCRIPTION

The conceptual groundwork for the present invention includes wirelessly communicating selective information to an electronic device. According to one aspect, a user may interact with the Internet to select information, such as audio information, and wirelessly communicate the selected information to an electronic device. The electronic device receives the information via a wireless communications network and processes the information accordingly. In a particularized form, a user may select information from an Internet website operable to allow selectivity of audio information such as songs, on-line radio stations, on-line broadcasts, streaming audio, or other selectable information. Upon selecting the audio information, information or data associated with the selected audio information is wirelessly communicated to an electronic device. The electronic device may then be used to

Samsung-LG-HTC Ex. 1001 p. 22

US 8,359,007 B2

3

process the selected audio information. In this manner, a user may receive selective audio information via a wireless electronic device.

In one form, the electronic device may be operable to communicate with an individual's automobile audio system. A user may select audio information utilizing a personal computer with access to a website operable to display selectable audio information. The selected audio information may then be wirelessly communicated to the electronic device associated with an automobile's audio system. Therefore, upon receiving the selected audio information, a user may access and play the received audio information utilizing the electronic device in association with the automobile's audio system.

The present invention is not limited to communicating only audio information. One skilled in the art can appreciate that other types of information, such as video, textual, etc. may be communicated utilizing the systems and methods disclosed herein without departing from the spirit and scope of the present invention. Additionally, it will be understood that information may be formatted in a plurality of ways at different phases of communication without loosing the underlying content of the selected information. For example, an audio file may be formatted, segmented, compressed, modified, etc. for the purpose of providing or communicating the audio information. Therefore, the term "audio information" or "information" is used in a general sense to relate to audio information in all phases of communication.

FIG. **1** depicts a general system for wirelessly communicating selective information to an electronic device in accordance with one aspect of the present invention. The system, illustrated generally at **100**, includes a digital engine **101** coupled to a communications engine **102**. Communications engine **102** is remotely coupled to an electronic device **103**. Digital engine **101** may be directly or indirectly coupled to storage device **105** operable to store information. Digital engine **101** maintains information or data associated with selected information in a digital format. The information may be stored within storage device **105** or other storage devices operable to maintain data or information associated with the selected information.

Communications engine **102** is communicatively coupled to digital engine **101** and operable to wirelessly communicate the selected information to electronic device **103**. During operation, audio information may be selected by a user utilizing a personal computer or other devices operable to communicate with an information network. Digital engine **101** is operable to maintain information associated with the selected audio information. For example, the information could be several songs or titles configured as an audio file and formatted in a digital format such as an MP3 file, wave file, etc. The maintained information may also be a reference to a network location where an audio file may be stored, a network location where a network broadcast of audio information may be located, etc. or other network locations having information associated with the selected audio information. Therefore, digital engine **101** may maintain a plurality of different types of information or data associated with the selected audio information.

System **100**, utilizing communication engine **102**, may wirelessly communicate data or information associated with the selected audio information to electronic device **103** thereby providing wireless communication of selected information to an electronic device operable to receive wireless communications. In one embodiment, digital engine **101** may be used in association with an Internet website configured to provide access to selectable information. The Internet web-

4

site operably associated with digital engine **101** allows a user to select information to be wirelessly communicated to electronic device **101** utilizing a network environment. The Internet website may include several different types of information related to audio information.

FIG. **4**, described in greater detail below, illustrates one embodiment of providing an Internet website for displaying selectable audio information. For example, the Internet website may include music and/or artist search engines, playlists, top **10** charts, artists by genre, and other information associated with audio information. A user may select information associated with the audio information and digital engine **101** can maintain the information or data associated with the selected information in a digital format. Communications engine **102** coupled to digital engine **101** may wirelessly communicate data associated with the selected audio information to electronic device **103**. Therefore, a user may access and select audio information via an Internet website and wirelessly communicate the data to an electronic device. As such, system **100** advantageously allows for wireless communication of selected audio information to electronic devices that may be remotely located from a conventional terrestrial communication network.

Electronic device **105** may be configured in a plurality of ways for receiving wireless communication of selected audio information. In one embodiment, electronic device **105** may be operable as a component configured to receive a cellular signal comprising the selected information communicated by the communication engine. For example, a device having a cellular modem may be operable to receive the information at specified intervals. Upon receiving the information the electronic device may process the received information. Electronic devices are described in more detail below and may include a network radio, a modular device, an audio system, a personal digital assistant (PDA), a cellular phone, or other electronic devices operable to receive information wirelessly communicated by communication engine **102**.

Communications engine **102** may be operable to wirelessly communicate selected information to electronic device **103** in a plurality of ways. The present invention advantageously allows for several different embodiments of wirelessly communicating selected audio information to electronic device **103** and is not limited to any specific configuration described below. Several different types or combinations of wireless communication may be realized by the present invention. Communications engine **102** may be operable to wirelessly communicate the selected information from an information network, such as the Internet, to an electronic device operable to receive wireless communications. In one embodiment, communications engine **102** may comprise a conduit to interface information with a wireless communication network. The conduit may configure the information located within the information network into a format operable to be transmitted via wireless communication.

For example, a wireless device may be operable to receive packets of information having a specific size and in a specific format. In such an embodiment, communications engine **102** could format the information into a desirable format for wirelessly communicating the information to electronic device **103**. Several types of wireless communication may be used by communications engine **102** to communicate the selected information to an electronic device. Communications networks such as GSM, Digital Satellite communication, SB, Radio bands, DRC, SuperDRC or other systems or types of transmission such as TDMA, CDMA, spread spectrum, etc. or frequencies such as between about 1.7 GHz and 2.0 GHz

Samsung-LG-HTC Ex. 1001 p. 23

US 8,359,007 B2

5                                                          6

may be realized by the present invention for communicating information or data representing the selected audio information to electronic device **103**.

In one embodiment, the selective information may be communicated using a digital broadcast signal. Digital broadcast includes providing information via a signal such as AM, FM, and the like. Digital information may be included or encoded as a sub-carrier within the broadcast signal and received by electronic device **103**. A digital sub-carrier may include a selective bandwidth of frequencies for a specific radio station (i.e., 6 MHz for FM). The selective information may be wirelessly communicated to electronic device **103** utilizing a communication engine **102** operable to communicate the selective information via a digital FM signal. In this manner, selective information may be communicated within digital FM sub-carriers to an electronic device operable to receive the information. For example, a user may subscribe to communicate the information via an FM sub-carrier and receive the selective data through wireless communication via a specified FM sub-carrier.

In one embodiment, the selected information may be formatted and transmitted to achieve a desirable transmission rate. For example, conventional systems may transmit information at a speed of 10 kilobits per second. Therefore, for 1 megabyte of information to be communicated to an electronic device, a transmission time of approximately 800 seconds may be required. The present invention may allow for a relative increase in transmission speed by removing the requirement that information be communicated asynchronously to an electronic device. For example, conventional wireless communication utilizes a specified frequency to communicate information in two directions (i.e., cellular phones). As such, information is communicated across a channel in an asynchronous manner to provide a continuous audio signal to the recipient.

The present invention advantageously allows for signals to be transmitted to an electronic device in a less than asynchronous manner. For example, if a user selected a song to be wirelessly communicated to an electronic device, system **100** could communicate the information in a less than asynchronous manner allowing the selected information to be transmitted efficiently thereby decreasing the overall download time for the selected audio information. In one embodiment, the selected information may be compressed and transmitted across the same frequency but at different phases thereby allowing plural signals having different phases to be wirelessly communicated to an electronic device. Therefore, the electronic device may be operable to receive multiple phased signals and process the selective information accordingly.

In one embodiment, the information may be wirelessly communicated at a relatively slow transmission rate. For example, a user may schedule when the selected audio information may be used by electronic device **103**. The user may select several different audio tracks or songs to be transmitted to an electronic device associated with the user's vehicle such that the user can listen to the user selected audio information during the drive home at the end of a workday. Therefore, it may be desirable to utilize a slower transfer speed due to the extended amount of time available prior to actual use of the selected audio information. In this manner, communications networks having less or slower transfer rates may be used to wirelessly communicate the selected audio information to the electronic device.

In another embodiment, high-speed wireless communication networks may be used to communicate the selected audio information. For example, a user may want to listen to an Internet broadcast of an Internet radio station. Therefore, high-speed communication may be required to wirelessly communicate or stream the selected audio information to an electronic device. In another embodiment, a hybrid of wireless communication rates may be deployed depending on the requirements of the selected audio information and/or the electronic device. For example, the selected audio information may first be transmitted to the electronic device via high-speed communication until enough information has been wirelessly communicated and buffered into a memory device operably associated with the electronic device. Upon communication of a certain percentage of the selected audio information, slower communication speeds may then be used to communicate additional selected audio information.

Therefore, system **100** may be configured in a plurality of ways to communicate selected information to electronic device **103**. Digital engine **101** may be used to maintain data or information associated with the selected information and communication engine **102**, communicatively coupled to digital engine **101**, may wirelessly communicate selected information to electronic device **103**.

FIG. **2** illustrates a block diagram of a method of wirelessly communicating selected information to an electronic device. The method may be used in association with the system illustrated in FIG. **1** or other systems operable to utilize the method of FIG. **2**.

The method begins generally at step **200**. At step **201**, selectable audio information may be accessed utilizing a network communications device. For example, selectable audio information may be displayed at an Internet website accessible by a personal computer. In another embodiment, the selectable information may be accessed utilizing a wireless communications device such as, a cellular phone, a PDA device, or other devices operable to provide access to the selectable audio information.

Upon accessing the selectable information, the method proceeds to step **202** where a user can identify or select audio information to be wirelessly communicated to an electronic device. For example, a user may select an entire album to be wirelessly communicated to a PDA device.

Upon the user selecting the audio information, the method proceeds to step **203** where the method maintains information associated with the selected information. In one embodiment, the information may be an audio file, such as a wave file, and MP3 file, etc. representative of the selected audio information. In another embodiment, a network location that comprises a file representing the selected information may be maintained. Another example may include a network location of a network broadcast of audio information. Therefore, the method at step **203** may maintain several different types of information associated with the selected audio information.

Upon maintaining information or data associated with the selected information, the method proceeds to step **204** where the method wirelessly communicates information associated with the selected information to an electronic device. For example, if an audio file associated with the selected audio information was maintained, the method would communicate the audio file to the electronic device. In another embodiment, a link or network address broadcasting the selected audio information may be accessed and, at step **204**, wirelessly communicated to an electronic device. In another embodiment, a combination of different types of audio information may be wirelessly communicated to an electronic device. Upon transmitting the selected audio information, the method proceeds to step **205** where the method ends.

Selected audio information may be communicated in a plurality of ways as described above including communicating via a cellular communications network to an electronic

**A48**                                    Samsung-LG-HTC Ex. 1001 p. 24

e

US 8,359,007 B2

7

device operable to receive cellularly-communicated signals. For example, the information may be selected from a website operable to display selectable information. Upon selecting the audio information, a data file representing the selected audio information may be wirelessly communicated to an electronic device thereby allowing a user to select audio information via the Internet and wirelessly communicate the information to an electronic device.

In some embodiments, the wireless communication to an electronic device may occur in an off-line environment. For example, a user may go "on-line" to access a website and select information and then go "off-line" or end the browsing session. The wireless communication may then occur while the user is off-line thereby removing the confines of using an active or on-line browsing environment (i.e. Internet radio broadcast, streaming audio, etc.) for accessing selected information. Therefore, the method of FIG. 2 allows for information, such as audio information, to be communicated from a network location such as a web site, to an electronic device "via" wireless communication. The present invention advantageously allows users to access and download information accessible by a network location to an electronic device operable to receive wireless communications thereby reducing the need for land lines, terrestrial communication networks, etc. for communicating selective information.

In one embodiment, the method of FIG. 2 may be deployed in association with an Internet website operable to display selectable links for downloading information. The information may include audio information such as MP3s, streaming audio, streaming, Internet broadcasts, etc. are selectable by a user and operable to be wirelessly communicated to an electronic device. By providing a user with a website of selectable audio information operable to be wireless communicated to an electronic device, a user may customize information communicated to an electronic device. In one embodiment, a user may communicate information to an electronic device that may not be owned by the user. For example the method of FIG. 2 could be modified to allow a user to wirelessly communicate audio information to a plurality of electronic devices that may or may not be owned by the user.

FIG. 3 illustrates an electronic device operable to receive selected audio information in accordance with the teachings of the present invention. Electronic device 300 includes a communication module 301 such as a transceiver coupled to storage medium 303 such as a high speed buffer, programmable memory, or other devices operable to store information. Electronic device 300 may also include processor 302 operably associated with communication module 301 and storage medium 303. Processor 302 may be operable to process wirelessly communicated selected information and in one embodiment may be integrated as part of communication module 301 of storage medium 303. In the same manner, as larger scale integration of electronic devices proliferate, communication module 301, processor 302, and storage medium 303 may be integrated into one communication component or device operable as electronic device 300.

Processor 302 may be operable using software that may be stored within storage medium 303. In one embodiment, software upgrades may be communicated to electronic device 300 via wireless communication allowing for efficient system upgrades for electronic device 300. Storage medium 303 may include one or several different types of storage devices. For example, storage medium 303 may include programmable gate arrays, ROM devices, RAM devices, EEPROMs, minidisks or other memory devices operable to store information.

During use, electronic device 300 receives wireless communications of selective information. The information may

8

be transmitted via a wireless communications network and received by electronic device 300 via transceiver 301. Transceiver 301 may be operable to convert the received wireless communication signal into a desirable format and store the received information within storage medium 303. The received information may then be processed by electronic device 300.

In one embodiment, electronic device 300 may be operable as an audio player configured to play digital representations of music. For example, electronic device 300 may also include an MP3 player operable to process the received information into an audio signal. Therefore, electronic device 300 may be used to receive wirelessly communicated MP3 audio files and play these files using an MP3 player when desired. In another embodiment, electronic device 300 may be configured as a PDA wherein the PDA includes a web browser operable to wirelessly communicate with the Internet. The PDA device may include a user interface allowing a user to select information to be wirelessly communicated to electronic device 300.

By providing a website of selectable information, the PDA devices may provide an efficient embodiment for electronic device 300 in that is allows a user to access and select information using a wireless communication network and receive the selected information using the same or different wireless communication network. In yet another embodiment, electronic device 300 may be configured as a component operable to receive selective information via wireless communication and communicate the information to a second electronic device such as an automobile sound system, home stereo, etc.

For example, electronic device 300 may utilize transceiver 301 to receive wirelessly communicated information. Electronic device 300 may then be coupled to an automobile sound system using an interface and communicate the received information to the automobile sound system. In this manner, electronic device 300 may be used to provide the automobile sound system with audio files received via wireless communication.

In another embodiment, electronic device 300 may be operable to communicate the received audio information to an audio system via a localized communications-signaling network. One such network may include utilizing "Bluetooth" communication standard, used to provide communication between electronic devices in a proximal setting. In one embodiment, electronic device 300 may be integrated into an audio component such as a radio receiver. Electronic device 300 integrated into an audio component may be configured to process digital audio files wirelessly communicated to an audio component. In another embodiment, electronic device 300 may be operable to communicate with an analog receiver at a predetermined frequency.

For example, a specific frequency may be selected (i.e., 93.7 MHz) for communicating the wireless received selected information from electronic device 300 to a localized audio system. Electronic device 300 communication of the wirelessly received information allows a conventional receiver to receive the selected audio information. In one embodiment, the conventional receiver may be configured to receive a digital sub-carrier, on-carrier, or other within a specified frequency. Therefore, electronic device 300 may be operable to locally transmit the signal at a specific frequency thereby allowing the conventional receiver to receive the information. In another embodiment, electronic device 300 may be operable to scan plural bandwidths to receive the selective information. For example, transceiver 301 may be operable to receive selective information across several frequencies and process the received information accordingly.

US 8,359,007 B2

9

10

In another embodiment, electronic device **300** may be operable to scan several frequencies to obtain the desirable information. For example, a user may select several Internet broadcasts comprised of streaming audio information. Therefore, the information may be transmitted across several wireless frequencies receivable by electronic device **300**. Electronic device **300** may then be operable to allow a user to scan wirelessly communicated Internet broadcast signals thereby providing a user selected virtual broadcast radio network. In another embodiment, electronic device **300** may include a user interface operable to communicate with an Internet website operable to display selectable audio information. The Internet website may be configured as a user-preferred environment displaying a users selected audio information. Internet broadcast selections, streaming audio selections, etc.

With a display device for displaying a Website having selectable information, electronic device **300** may allow a user to select audio information via a user interface and receive the selected information via wireless communication thereby providing a customizable WebRadio device for the user. In another embodiment, electronic device **300** may be a modular device configured to be coupled to, for example, a portion of a cars interior. For example, electronic device **300** may be mounted to a portion of a car's console thereby providing a removably coupled electronic device operable to wirelessly receive selected audio information. As a removable device, electronic device **300** may also be coupled to a home audio system, a portable radio system or other systems thereby providing a versatile electronic device operable to receive wirelessly communicated selected audio information.

In another embodiment, electronic device **300** may be operable as a PDA and/or a cellular phone that may be mounted to an automobile's console. Electronic device **300** may then integrate with a user's automobile to provide an all-encompassing communications device. For example, electronic device **300** configured as a PDA and cellular phone may allow for communication with a user's email account, voice mail account, the Internet, as well as allowing for the receipt of selected audio information via wireless communication. Electronic device **300** may be operable in a hands-free mode allowing a user to maintain safe driving fundamentals. During use, electronic device **300** may be processing selective audio information for communicating with an automobile audio system and may further be operating to receive incoming cellular calls.

Electronic device **300** may be set-up by the user to pause the music being played and allow the received cellular call to be communicated either via an independent speaker or utilizing the automobiles "audio system." Additionally, electronic device **300** may be operable to adjust the listening level of an automobile's audio system, it may play received voice mail messages, allow a user to view the Internet, etc. In one embodiment, electronic device **300** may be operable as a dual mode electronic device capable of receiving both digital and analog wireless communication signals. In this manner, electronic devices may efficiently utilize available bandwidth for receiving selected information from a communications engine. For example, transceiver **301** may be a wireless communications modem operable to receive digital or analog signals.

FIG. **4** illustrates a graphical user interface (GUI) for displaying selectable audio information according to one aspect of the present invention. The GUI may be operable with a computer system, cellular device, PDA, or other electronic devices or systems operable to display the GUI of FIG. **4**. The GUI, shown generally at **400**, may be displayed using a conventional web browser **402** such as Microsoft® Internet Explorer, a WAP browser, or other browsers operable to display the audio information. Browser **402** includes browser functions, shown collectively at **403**, for navigating a network such as the Internet or an intranet. Homepage **401** may be displayed using browser **402** and may include several functions, features, information, etc. related to audio information. Home page **401** may be developed using several different types of programming (i.e., HTML, XML, Java, etc.) used to developing a network location or website.

The present invention is not limited to any one specific type of software and may be realized in plurality of ways as can be appreciated by those skilled in the art. Homepage **401** may also include login region **410** allowing a user to log into homepage **401** and display a user-preferred environment. For example, a user may want Radio Dial **412** to appear when a user logs into homepage **401**. In another embodiment, a user may want to view a current playlist selected by the user or the status of wirelessly communicated playlist. A user may also provide demographic information allowing advertisers to access the demographic information and provide advertisements based upon the demographic information. For example, an advertiser may want to target Hispanic females in the 21-25 year old age group.

Through providing demographic information to advertisers, when a user logs into homepage **401** selective advertising can be "targeted" for a group of users. Homepage **401** may also include several tabs for efficiently navigating homepage **401**. Library tab **405** may be provided to allow a user to browse available audio information that may be presented by title, genre, artist, decade, culture, etc. Store tab **407** may also be provided for locating items available for purchase such as CDs, PDA devices, MP3 players, wireless communication hardware, interfaces, software or other types of products that may be purchased while on-line. Chat tab **408** may also be provided allowing a user to chat with other users of home page **401**. For example, a guest musical artist may be available to chat with visitors of home page **401** via a chat page associated with chat tab **408**. Home page **401** may also include contest tab **409** for displaying current contests, prizes, and/or winners.

Radio tab **406** may also be provided for displaying audio information. For example, radio tab **406** may display a collective menu **411** of selectable functions or features associated with audio information. Top ten lists may be provided to a user based on several different billboard polls or genres. A search engine may be provided allowing a user to search for a specific type of audio information such as an artist, song title, and genre. Internet radio station, etc. In one embodiment, a user may input the lyrics to a song within the search engine. As such, the search engine may locate several different songs having the desirable lyrics and allow a user to select the search results. A user may also use a select a device feature that allows a user to select a destination device for communicating selected audio information. For example, a user may want to communicate a playlist to several different devices such as a PDA, a home computer system, a work computer system, etc.

As such, a user can communicate selective information to several devices without having to download the information separately for each device. A send a friend link may also be provided allowing a user to send selective audio information to a friend's electronic device. A user may also join a group comprised of individuals that select a certain genre of music to be communicated to the user's electronic device. For example, a user may want to join a group that plays only 50s swing music. As such, the user could communicate the group's selected songs to the user's electronic device. A user

Samsung-LG-HTC Ex. 1001 p. 26

US 8,359,007 B2

11

may also utilize an email account provided by homepage **401** allowing a user to correspond with others via email. A user may also access a list of guest DJs that may provide playlists of songs chosen by the guest DJ and selectable by a user.

In one embodiment, a user's radio dial **412** may be provided when a registered user logs into homepage **401**. As such, radio dial **412** may include several functional buttons similar to conventional systems such as a volume control and a station control. However, radio dial **412** surpasses the limitations of conventional systems through providing a programmable radio dial of user customized audio information. Radio dial **412** includes several stations that may be programmed using program interface **413**. The preset stations may include several different types of user customized preset information such as user selected playlists, Internet broadcast stations, top lists, group playlists, artist-selected lists, on-line radio station, conventional radio stations. Internet phone, cellular phone, etc. and other functions, features, or information associated with audio information.

Radio dial **412** may also be displayed as a separate user interface and in some embodiments, does not require a "browsing" environment to view radio dial **412**. For example, an electronic device, such as a PDA, having a display may graphically present radio dial **412** to a user. One example may be using electronic device in association with an automobile audio system. Electronic device may display radio dial **412** and may allow a user to navigate, modify, select, adjust volume, access daytimer, access phone lists, etc. or perform other functions while the electronic device is used in association with an automobile sound system. Therefore, radio dial **412** may be operable as an application for use with several different types of electronic devices (i.e., computer systems, portable computing devices, cellular phones, etc.) operable to display radio dial **412** and in come embodiments may be wirelessly communicated to an electronic device.

In another embodiment, homepage **401** may allow a user to select when to download the information to an electronic device. For example, a user may want to listen to a certain genre of music at a specific time of day thereby allowing a user to select the information. As such, a user may select a different playlist for every day of the week thereby allowing a user to listen to different songs on different days of the week. The user can further identify when the selected playlist should be available for listening. For example, if a user wanted to listen to "playlist #1" on Monday morning during the drive into work between 8:00 am and 9:00 am, the user would enter the time and the day "playlist #1" would be available for listening. In this manner, the playlist may be communicated to the electronic device thereby allowing a user to listen to selective audio information at a desirable time.

FIG. **5A** illustrates a portable radio system having a mount for an electronic device according to one embodiment of the present invention. Portable radio **500** includes a mount **501** operable to receive electronic device **502**. Mount **501** may include a connector operable to provide communications and power to electronic device **502**. During use, electronic device **502** when mounted within portable radio **500** communicates with portable radio to provide remotely received selective audio information. In one embodiment, electronic device **502** may include a user interface allowing a user to access the Internet. Therefore, selective audio information located on the Internet may be accessed by the user and remotely communicated to electronic device **502** coupled to portable radio **500**.

In another embodiment, portable radio **500** may include memory operably located within for storing downloaded

12

information. For example, portable radio **500** may include 32 MB of RAM allowing electronic device **502** to receive selective information and download the selective information to memory located within portable radio **500**. In this manner, the downloaded music may be operable to be played within portable radio **500** while allowing electronic device to be removed from portable radio **500**. Therefore, portable radio **500** including electronic device **502** allows a user to communicate selected audio information to portable radio **500**.

FIG. **5B** illustrates automobile console having a mount for coupling an electronic device according to one aspect of the present invention. Console **510** includes mount **511** operable to receive electronic device **512**. Mount **511** may be located in many different locations within an automobile such as coupled to a sun visor, center console, dashboard, floorboard, etc. Mount **511** allows the user to couple electronic device **512** to the automobile and provide an interface for communication between electronic device **512** and the automobile audio system. Mount **511** may also include a power connection that allows electronic device **512** to use the automobiles power during use. The power connection may also be used in association with a recharging circuit operable to recharge a power supply within the electronic device. During operation, electronic device **512** coupled to mount **511** may receive selected audio information via wireless communication and communicate the selective information to the automobile audio system.

In one embodiment, the automobile may include memory operable associated with the automobile for storing-information. The memory may be used in association with mount **511** and electronic device **512** to store the selected audio information. In this manner, voluminous audio information can be stored within the memory allowing electronic device **512** to receive additional information. In one embodiment, a mount may be provided for a home audio system (not shown) for downloading selected audio information for use with a home audio system. For example, a mount device may be coupled to a home stereo system such that the upon placing an electronic device such as electronic device **500** within the mount, selected audio information may be communicated to the home audio system thereby allowing a home audio system to be used in association with an electronic device.

FIG. **6** illustrates a block diagram of a system for communicating voice mail messages using email according to one embodiment of the present invention. The system, indicated generally at **600**, includes email server **601** coupled to a voice mail storage device **602**. System **600** further includes a computer system or network terminal **603** such as a computer coupled to network **604**. System **600** further includes mount **605** for mounting electronic device **606** for hardwire communication of information. Device **606** may also communicate with network **604** using a wirelessly communication network operably associated with network **604** and coupled, for example, via tower **607**.

During operation, system **600** communicates voice mail messages to a user utilizing email server **601**. For example, if a user receives a voice mail message, email server **601** would be notified and a voice mail message would be sent to the user's email account in the form of an email message. For example, a voice mail message would be sent to a user's email account within intranet **604** in the form of an audio file as an attachment to the email. Upon receiving the email, a user may click on the audio file representing the voice mail message to hear the message left by a caller.

In one embodiment, a user may be accessing the Internet via a phone line and, as such, be unable to receive notification that a voice mail message has been received. System **600**

A51                    Samsung-LG-HTC Ex. 1001 p. 27

13

would receive the voice mail message and send an email comprising the voice mail message to the user email account. In this manner, a user can remain connected to the network and receive voice mail without having to log off or disconnect from the Internet. In one embodiment, a user may receive the voice mail message via a portable electronic device. For example, a user may be using remote device **605** operable to receive wirelessly communicated information. System **600** would receive the voice mail message and forward the voice mail message to a user's portable electronic device **606**. In this manner, a user may be capable of receiving voice emails at remote locations.

In another embodiment, a user may subscribe to use an Internet email account that may be operably associated with system **600**. Utilizing an Internet email account may allow a user the flexibility to check voice email messages from any location in the world. For example, a user may access a "Hotmail" email account while traveling on business in a foreign country. The user, upon gaining access to the "Hotmail" account, would be able to listen to voice mail messages sent to the user via the "Hotmail" email account. Through utilizing an email account to receive voice mail messages, a user may be afforded great flexibility in communicating voice mail messages. For example, a user may be able to forward a voice mail message received in the form of an email to one or a plurality of other email accounts. In this manner, a voice email message may be sent efficiently to other email users.

For example, a user may maintain a distribution list of individuals working on a particular project that may have a need to hear certain voice email messages. In this manner, a user may efficiently disseminate information to other individuals while adding additional textual information to the body of the email allowing a user to comment on the original voice email message. In another embodiment, a user may forward a received voice email message to another account operable to receive forwarded voice email messages. For example, system **600** may be operable to receive an email message having a voice mail message as an attachment. The system would then be operable to forward the voice mail message to specified phone number, separate email account, and/or voice mail account, etc. thereby providing a user flexibility in receiving voice email.

In one embodiment, a user may utilize an email account to establish an answering service for voice mails. For example, a user's telephone number may be operable with an email account to provide an answering service. A user may record a message for a specified phone number or extension and, upon receiving an incoming call; the recorded message may be played back to incoming the call's initiator. System **600** would then forward the received voicemail message via an email account to the user. For example, a user may have an account set up at a residence for receiving voicemail messages via a user-defined email account. The user could then forward all received voice mails from the home account to an email account at a place of work. Therefore, the user may have complete access to received voicemail messages. In the same manner, a user could set up their work phone number to forward a voicemail message to the user's home email account thereby allowing a user to receive a voicemail at a home email account. Therefore, system **600** may be operable in a plurality of ways to provide email messages comprised of voicemail messages received via a voice mail or email account.

FIG. **7** illustrates a flow chart for providing voice email messages according to one embodiment of the present invention. The method begins at step **701** where a voice mail message is left for a user. The message could be at a residence,

14

place of business, etc. The method then proceeds to step **702** where the message may be stored as an audio file within a database operable to store a file comprised of the voice mail message. Upon storing the file, the method proceeds to step **703** where an electronic mail message may be generated. The electronic mail message may be addressed to the recipient of the voice mail message. The method then proceeds to step **704** where the audio file representing the voice mail message is attached to the electronic message.

Upon attaching the audio file, the method then proceeds to step **705** where the email message may be sent to the email address. Upon sending the email message the method proceeds to step **706** where the method determines if the email message should be sent to a wireless electronic device. If the message is not to be sent to a wireless device, the method proceeds to step **720** where the method ends. If the message is to be sent to a wireless electronic device, the method proceeds to step **707** where a signal may be sent to the wireless electronic device and at step **708** an indication is provided to the electronic device indicating that a voicemail message has been received via a user's email account. The method may then proceed to step **709** where the user decides whether or not to listen to the voice email message. If the user decides not to listen to the voice email message, the method may proceed to step **710** where the method ends. If the user decides to listen to the voice email message, the method proceeds to step **711** where a request may be sent by the electronic device requesting the voice email message be forwarded to the user's electronic device.

At step **712**, the voicemail message may be sent to the user's electronic device. Upon forwarding the voicemail message to the user the method may proceed to step **720** where the method ends. As such, FIG. **7** depicts one method of providing an email message comprised of a voice mail message. Certainly, other methods may be deployed as advancements in technology and are made without departing for the spirit and scope of the present invention.

FIG. **8** illustrates a flow diagram of a method for providing selected audio information to an electronic device according to one embodiment of the present invention. The method begins at step **800** where a user accesses a webpage via the Internet. The webpage may be a home page illustrated in FIG. **4** or other web pages operable to display selectable references to audio information. The method proceeds to step **801** where a user selects desirable audio information. For example, a user may select a single song, a plurality different songs, an entire album, a broadcast station, streaming audio, etc. or other selectable audio information. Upon the user selecting a reference to audio information, the method may proceed to step **802** where a playlist may be created that represents the user's selected audio information.

The playlist may be variable in size and comprised of a plurality of different types of available audio information. Upon creating a playlist, the method may proceed to step **803** where information associated with the playlist is obtained. For example, a list of network or URL locations comprised of the desirable audio information may be obtained. In this manner, desirable audio information may be obtained from many different sources such as URLs, network addresses, hard drives, databases comprised of audio information, etc. The sources may be accessed to obtain the selected audio information.

Upon obtaining data associated with the customized playlist, the method may proceed to step **804** where the user is prompted for a destination for the playlist. For example, a user may want to communicate the selected audio information to a remote electronic device, an automobile audio sys-

15                                                                                                                16

tem, a home stereo system, a home computer, an electronic device coupled to a home network or computer system, etc. or other locations or devices operable to receive the selected audio information. In one embodiment, a user may select a device owned by a friend to accept the selected audio information. For example, a husband may want to send a romantic playlist to his wife on their anniversary. In this situation, the husband would select his wife's electronic device as the receiving device for the selected audio information.

Upon selecting a device, the method proceeds to step **805** where the method determines the destination of the selected audio information. If the information is to be sent to a device via a wire line connection, the method proceeds to step **813** where playlist data is sent to a user via a wire line connection. The method may then proceed to step **814** where the playlist is executed at the device. If the information is to be sent to a device requiring wireless communication, the method proceeds to step **806** where the information is formatted for communicating the information to a wireless electronic device. For example, a wireless PDA device may be selected as a destination device for the selected audio information. The PDA device may include an audio player, such as an MP3 player operable to play or execute MP3 audio files. In such an embodiment, the method could format the information such that the information may be wirelessly communicated and subsequently played by the MP3 player.

Upon formatting the information, the method may then proceed to step **807** where the audio information is wirelessly communicated to the selected device. In some embodiments, the device may be operable to receive a limited amount of information based upon storage capacity of the device (i.e., 16 MB). In such a case, the method may divide the information into component parts and periodically communicate the component parts, such as packets, to the electronic device. Upon communicating the audio information, the method may then proceed to step **808** where the signal may be received by the destination or electronic device.

The method may then proceed to step **809** where the method determines if all of the audio information has been received. For example, if 16 MB or 32 MB of selected audio information was initially transmitted due to capacity limitations of the selected device, the method may query the selected device to determine if capacity is available. If available memory exists, the method may proceed to step **807** where the method may communicate additional audio information based upon the amount of available memory. The method repeats until all of the selected audio information has been transmitted.

Upon communicating the selected information, the method may proceed to step **810** where the playlist may be executed. For example, a user may select a continuous communication of selected audio information (e.g., several hours of music. Internet broadcast, etc.). As such, the method may continuously play or execute the received audio information. In another embodiment, the method may proceed to step **811** where the method may store or buffer the received information until it is desirable to execute the received selected audio information. As such, upon executing the selected audio information, the method may proceed to step **809** where the method may repeat. In one embodiment, a user may elect to download a broadcast of an on-line radio station. For example, a user may want to listen to a radio station located in a remote location wherein conventional radio receivers could not receive the desired broadcast. For example, a person living in Houston, Tex. may not be able to receive a radio broadcast signal from a radio station in Seattle, Wash. utilizing a conventional radio receiver.

In accordance with the teachings of the present invention, a user may select an on-line broadcast or radio station as all or a part of the selected audio information. The user may then receive radio broadcasts without having to use a home computer system or conventional radio receiver.

At step **804**, a user may select a device that does not require remote communication of information. For example, a user may elect to communicate the selected audio information to device, such as a personal computer, PDA device, MP3 player, etc. coupled via a network connection to the Internet or an Intranet. The user may receive the selected playlist at the determined device for eventual playing. In one embodiment, a user may select a plurality of devices as destination devices for receiving downloads of the selected audio information. For example, the user may want to download the information to a home stereo system, a PDA device, and an automobile stereo. As such, the selected information may be communicated to more than one destination device. In addition, the format of the download may match or conform to the selected destination device(s).

The present invention may be configured in a plurality of ways to communicate desirable audio information to users by allowing users to select desirable audio information and transmitting the desirable audio information to a specified destination thereby allowing a user to receive on-demand customized audio information. Moreover, the download may occur in an off-line environment, allowing a user to enjoy the selected audio information accessed on-line without having to be on-line or utilizing a browsing environment. In one embodiment of the present invention, the method of FIG. **8** may be modified to allow a user to select a "user group" for receiving customized audio information. For example, a "user group" may include users that prefer contemporary jazz wherein a user may request a certain song. Therefore, a virtual request line may be designed for a specific genre of music allowing "members" to transmit audio information to the "group".

In another embodiment of the present invention, the method may be modified to allow a user to select a specific genre to be transmitted to the users device. For example, a user may elect to have random country and western music transmitted to a destination device. The user could efficiently create a radio station format and have the format received at a destination device.

In a further embodiment, a user may select a group of genres to be downloaded to a desirable device. As such, the method may be modified to allow a user to select several different genres to download random music within the specified genres. In another embodiment, a user may elect to download the same music as another individual. For example, a user may want to download the same music as their best friend. Therefore the user could elect to download the same music as their friend or group of friends. In another example, a user may want to listen to the same music that an artist listens to on a specific weekday of evening. For example, a user may want to listen to the same music that Barry White listens to on a Saturday night.

Therefore, the user may select "Barry White's" Saturday night playlist and receive the same playlist Barry White receives on Saturday night. In another embodiment, the method of FIG. **8** may be modified to allow a user to manipulate song post download. For example, a user may want to store, delete, replay, copy, forward, etc. received audio information. Therefore, the method of FIG. **4** may be modified such that a user can manipulate or process the received audio information in a plurality of ways. In one embodiment of the present invention, an on-line radio station may be provided.

**A53**                                            Samsung-LG-HTC Ex. 1001 p. 29

17 18

For example, the radio station may be created for transmitting audio or on-line broadcasts. The on-line broadcasters or hosts may create their own format for broadcast. For example, an on-line radio station may be provided that transmits only children's songs.

Prior to conception of the present invention, conventional radio stations were monetarily limited to be capable of transmitting music such as children's songs to conventional radio receivers. The present invention, by providing a medium for transmitting selectable audio information, enables the existence of on-line broadcasting with little or no overhead cost for a host. A user may select an on-line broadcast for on-line or off-line delivery. In another embodiment, on-line broadcast of audio information representing books or novels may be provided to individuals such as the visually impaired. For example, an on-line broadcast station may provide several hours of audio information broadcast representing books or novels to be broadcast with very little overhead.

FIG. 9 illustrates an automobile console having a mount for an electronic device according to one embodiment of the present invention. Console 900 includes a conventional audio system 901 comprised of a receiver 902 and CD player 903. Interface 904 may be coupled to audio system 901 via plug 905 and cable 908, which may be coupled to an auxiliary line into audio system 901. Interface 904 may also include contact 906 for contacting electronic device 907. Cable 908 may be a multiple conductive cable for providing power from the automobiles power system via a protection circuit or fuse 909 for powering electronic device 907. In one embodiment, interface 904 may be operable to recharge electronic device 907 utilizing a power source associated with an automobile.

During operation, electronic device 907 may be mounted within interface 904. Electronic device 907 may also be powered or recharged via power line 910 and communicate with the systems audio system via interface cable or bus line 911. Audio information communicated to electronic device 907 may be transferred to audio system 901 such that a user may listen to selected audio information. For example, a user may have previously selected a plurality of audio files to be transmitted to electronic device 907. Electronic device 907 may communicate the selected audio information to the automobiles audio system that utilizes interface 901 thereby allowing the user to listen to selected audio information. In one embodiment, cable 908 may be custom-installed to audio system 901. For example, the cable may be coupled to an auxiliary line for the system's radio or may be coupled to CD player line 912.

In another embodiment, a radio manufacturer may provide interface 904 as a standard interface integrated into the audio system, thereby allowing communication between electronic device 907, audio system 901 and/or console 900. Electronic device 907 may include a plurality of different types of devices. For example, electronic device 907 may include a PDA device operable to store selected audio information. The information may be either remotely downloaded using an Internet web browser and wireless communication to the PDA device. In another embodiment, selected audio information may communicated to a PDA device via a hard wire coupled to a computer system interfacing with the Internet. In another embodiment, electronic device 907 may include an audio file player operable to play audio files such as MP3s, etc.

The audio files may be remotely or locally communicated to electronic device 907 and upon coupling to audio system 901, the audio files may be transmitted to audio system 901 in a form receivable by audio system 901. Although the disclosed embodiments have been described in detail, it should

be understood that various changes, substitutions and alterations can be made to the embodiments without departing from their spirit and scope.

The benefits, advantages, solutions to problems, and any element(s) that may cause any benefit, advantage, or solution to occur or become more pronounced are not to be construed as a critical, required, or essential feature or element of the present invention. Accordingly, the present invention is not intended to be limited to the specific form set forth herein, but on the contrary, it is intended to cover such alternatives, modifications, and equivalents, as can be reasonably included within the spirit and scope of the invention as provided by the claims below.

While the present invention has been described with respect to a limited number of embodiments, those skilled in the art will appreciate numerous modifications and variations therefrom. It is intended that the appended claims cover all such modifications and variations as fall within the true spirit and scope of this present invention.

What is claimed is:

**1**. A system comprising:
a cellular telephone comprising a display, a non-volatile memory, and a processing device operable to execute instructions stored in the non-volatile memory;
a browser saved locally at the cellular telephone and configured to facilitate accessing of a web page; and
a collection of instructions stored in the non-volatile memory and operable to direct the cellular telephone to request a list of network addresses for a plurality of portions of an available media, to request delivery of a first portion of the available media such that the first portion is delivered at a first communication rate, and to request delivery of a second portion of the available media such that the second portion is delivered at a second communication rate that is different than the first communication rate.

**2**. The system of claim **1**, wherein the browser utilizes hyper text transfer protocol (http) to facilitate accessing the available media.

**3**. The system of claim **1**, further comprising a first wireless receiver and a second wireless receiver, wherein the first wireless receiver is configured to receive information at the first communication rate.

**4**. The system of claim **3**, wherein the first wireless receiver is a wide area wireless transceiver and the second wireless receiver is not a wide area wireless transceiver.

**5**. The system of claim **1**, further comprising an email client saved locally to the cellular telephone, wherein the email client is operable to receive an email with a media file attachment.

**6**. The system of claim **1**, further comprising a non-circular physical interface configured such that the non-circular physical interface acts as a single docking point that includes a portion configured to transmit power and a different portion configured to transmit data.

**7**. A system comprising:
a computing device having a wireless receiver, a top surface, a display that makes up a majority of the top surface, a non-volatile memory, and a processing device operable to execute instructions stored in the non-volatile memory;
a browser saved locally at the computing device and configured to facilitate accessing of a web page; and
a collection of instructions stored in the non-volatile memory and operable to direct the computing device to request a list of network addresses for a plurality of portions of an available media, to request delivery of a

Samsung-LG-HTC Ex. 1001 p. 30

US 8,359,007 B2

19                                                    20

first portion of the available media such that the first portion is delivered at a first communication rate, and to request delivery of a second portion of the available media such that the second portion is delivered at a second communication rate that is different than the first communication rate.

**8**. The system of claim **7**, wherein the computing device is configured such that a user is able to access the browser and choose the available media without a physical keyboard or an external mouse.

**9**. The system of claim **7**, further comprising a first wireless receiver and a second wireless receiver, wherein the first wireless receiver is configured to receive information at the first communication rate.

**10**. The system of claim **7**, further comprising:

an email client saved locally to the cellular telephone, wherein the email client is operable to receive an email with a media file attachment;

an audio file player; and

a non-circular physical interface configured such that the non-circular physical interface acts as a single docking point that includes a portion configured to transmit power and a different portion configured to transmit data.

**11**. A system comprising:

a cellular network component operable to receive a communication comprising a request for network locations where a plurality of segments of an available media are stored, further wherein the request is from a cellular device having a non-volatile memory and a collection of instructions stored in the non-volatile memory that are operable to direct the cellular device to switch between at least two transmission rates for receiving the available media;

a list including

a first network location for a file representing at least a first segment of the available media and

a second network location for a different file representing a second segment of the available media; and

wireless data delivery resources operable to communicate a first stream representing the first segment of the available media at a first communication rate and a second stream representing the second segment of the available media at a second communication rate.

**12**. The system of claim **11**, wherein the list is a playlist and the available media is a collection of audio files.

**13**. The system of claim **11**, wherein the list is a playlist and the available media is a collection of video files.

**14**. The system of claim **11**, further comprising a collection of instructions configured for execution on the cellular device, wherein the instructions are operable to direct the cellular device to request the first and second segments of the available media such that the first segment is delivered at the first communication rate and the second segment is delivered at the second communication rate that is slower than the first communication rate.

**15**. The system of claim **14**, wherein at least a portion of the collection of instructions are configured to be used with a browser executing at the cellular device and operable to make use of a hyper text transfer protocol.

**16**. The system of claim **11**, further comprising instructions operable to direct the cellular device to request the list, and to switch between the at least two communication rates based in part on an amount of information buffered at the cellular device.

**17**. The system of claim **16**, wherein at least a portion of the instructions are configured to be used with a browser executing at the cellular device and operable to make use of a hyper text transfer protocol.

**18**. A method comprising:

receiving a communication at a component of a cellular network, wherein the communication comprises a request for a listing of network locations where a plurality of segments of an available media are stored, further wherein the request is from a cellular device having a non-volatile memory and a collection of instructions stored in the non-volatile memory that are operable to direct the cellular device to switch between at least two transmission rates for receiving a media stream based at least in part on an amount of information buffered at the wireless device; and

sending a message comprising a plurality of network locations for different segments of the available media, wherein the message comprises network locations that allow a requesting device to utilize a first transmission rate for a first segment of the available media and a different transmission rate for a second segment of the available media.

**19**. The method of claim **18**, wherein the listing of network locations comprises at least one Uniform Resource Locator (URL).

**20**. The method of claim **18**, further comprising receiving information representing the first segment of the available media from a server and utilizing a wireless data network to deliver the information to the wireless device.

* * * * *

**Samsung-LG-HTC Ex. 1001 p. 31**

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 13,768, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

The undersigned also hereby certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Garamond type style.

As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C)(i), the undersigned has relied upon the word count of this word processing system in preparing this certificate.


Dated: January 15, 2015          By: */s/ Emily E. Niles*
                                      Emily E. Niles
                                      *Counsel for Patent Owner-Appellant*

## PROOF OF SERVICE

I hereby certify that on January 15, 2016, the foregoing OPENING BRIEF FOR APPELLANT AFFINITY LABS OF TEXAS, LLC was filed with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the appellate CM/ECF system which pursuant to Federal Rule of Appellate Procedure 25(c)(2) and Federal Circuit ECF-6(A) constitutes service on all parties represented by attorneys who have registered for the CM/ECF system, and that a copy was served on counsel of record for Petitioners' Appellees via e-mail:

Steven.Baughman@ropesgray.com
Brian.Biddinger@ropesgray.com
Douglas.Hallward-Driemeier@ropesgray.com
Gabrielle.Higgins@ropesgray.com
tpatterson@pattersonsheridan.com
jselinger@pattersonsheridan.com

Dated: January 15, 2016          By: _/s/ Emily E. Niles_ 
                                     Emily E. Niles
                                     *Counsel for Patent Owner-Appellant*